UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

JEREMY STANFIELD, on behalf of )
himself and all others )
similarly situated, )
)
          Plaintiff, )
)
       vs. ) Case No. 3:20-cv-
) 07000-WHA
TAWKIFY, INC., et al.; and )
DOES 1-25, )
)
         Defendants. )
_____ )

REMOTE VIDEOTAPED DEPOSITION OF JEREMY STANFIELD

WEDNESDAY, MAY 26, 2021, 10:01 A.M.

MURRIETA, CALIFORNIA

REPORTED BY:
Tami L. Le
CSR No. 8716, RPR

Job No. 60670

1      A     Yes.

2      Q     Did you -- between the time when you first

3   clicked on the Tawkify ad and when you ultimately

4   made the purchase, did you have any reservations

5   with going forward with the matchmaking service?

6      A     I mean, yeah.  Like I said, I wanted to

7   think about it over the weekend.  And they -- they

8   also mentioned -- I mean, even when I -- even when I

9   paid it, to me, it wasn't a full, like, commitment

10   because they said I had to go through some type of

11   screening or approval process after I paid.  So, you

12   know, even paying didn't seem like it was, like,

13   concrete at that point.

14      Q     In your mind, it was concrete once you were

15   accepted as a client by Tawkify?

16      A     Right.

17      Q     Okay.  Did you -- strike that.

18            Did anyone at Tawkify tell you that, you

19   know, before the official client acceptance process,

20   that you could get a full refund?

21      A     That I could get a full refund?

22      Q     Yeah, of what you just said, the 3700.

23      A     I mean, if I wasn't -- like, if I'm going

24   through another process whether I could go, like,

25   full, like, get accepted or not, then, to me, if I'm

JEREMY STANFIELD

May 26, 2021

1   not accepted, then I would get a full refund.  So, I

2   mean, to me that -- like, nothing's concrete until I

3   get approved.

4        Q    Right.  I understand that.

5             But specifically, my question was did

6   Tawkify tell you that?  Did they tell you that

7   before --

8             (Simultaneous speaking.)

9        A    Yeah, they said --

10       Q    I'm sorry, Mr. Stanfield.  I apologize.  I

11   want to get it all out just for the record so it's

12   clear.

13       A    Go ahead.

14       Q    Did anyone at Tawkify tell you that before

15   you were ultimately accepted as a client, approved

16   as a client, that if you were not accepted as a

17   client, you would get a full refund of everything

18   you paid?

19       A    Sure, yeah.  I mean, why would they keep my

20   money if I wasn't accepted?

21       Q    They told you that; right?

22       A    I believe so, yes.

23       Q    Okay.  And do you recall about how long it

24   took for you to be formally approved as a Tawkify

25   client after you received that email on the 29th of

```
 1                    "And I'm not so sure about 70%.
 2              We never used to do Zoom dates
 3              except for distance or traffic."
 4              You respond:
 5                    "Yes I'm good with that, but if
 6              the video date doesn't turn into a
 7              physical date, then it should count
 8              as one of my 6."
 9              It should not count as one of my 6; is that
10       correct?
11          A   Right.
12          Q   Okay.
13                    "Well that's not what ███ told
14              me.  She said" -- this is you
15              talking.  "She said that most of my
16              dates will be zoom because 70% don't
17              want to do an in person date at
18              first.  I clarified and she said it
19              counts if you do a zoom date (sic)
20              and she then doesn't want to do an
21              in person."
22              Now, did I read that correctly so far?
23          A   Yeah.
24          Q   Okay.  Now, ███ responds to you and she
25       said:
```

```
 1              "I see your point but the same
 2         amount of work - screening and
 3         vetting - is done by ████  whether
 4         it's a Zoom or in-person date.
 5              "Did she say that people aren't
 6         wanting IP dates because of Covid?"
 7         And you say:
 8              "Well that's not what was
 9         presented to me.  You never
10         mentioned zoom dates and said we
11         would meet somewhere.  I'm not good
12         with it."
13         Did I read that correctly, sir?
14    A    Yes.
15    Q    Okay.  She says:
16              "You can" -- and she emphasizes
17         by using all caps CAN -- "meet
18         somewhere as long as your match is
19         okay with it.  I did mention Zoom
20         dates.  It's what we were doing for
21         months during Covid but now we (sic)
22         are officially giving people the
23         option to do either.  I'm sorry that
24         wasn't made clear but it's kind of
25         moot because we are offering in
```

```
 1          person dates now.
 2              (As Read) "And ███████ by the way,
 3          is one of the most experienced
 4          matchmakers on the team.  You've got
 5          a goodie!"
 6          Did I read that correctly, sir?
 7     A    Yes.
 8     Q    Okay.  "We specifically talked
 9          about your company picking the
10          place and you setting it up" --
11          This is you speaking now?
12     A    Yeah.
13     Q    -- "and setting it up and we meet
14          there.  There was no mention that
15          it might be a zoom date and then
16          that counts.  You can't represent
17          yourself fully on the zoom call and
18          shouldn't count towards the 6.  So
19          again if there is no budging on
20          that, then I want to cancel.  This
21          isn't negotiable for me."
22          Did I read that correctly, sir?
23     A    Yes.
24     Q    Okay.  She responds:
25              "You don't have to do Zoom
```

1    dates." She emphasized the "HAVE."

2    You don't have to do Zoom dates.

3    That's all I'm saying. Just do an

4    in-person date that ███ will set up

5    for you.

6     "And by the way, I'm not

7    yelling - just wanted to emphasize

8    the," quote, "have," close quote.

9    Smiley face.

10    Did I read that correctly, sir?

11  A  **Yes.**

12  Q  We'll pause there because I think that's

13 where that exchange ends.

14    So ultimately, you ended up not going on

15 these Zoom dates; correct?

16  **A  Correct. But my concern of not being a**

17 **part of the 70 percent of the dating pool was still**

18 **there. She wouldn't address it, kept going in**

19 **circles. And I got tired of it. Like, she just**

20 **kept going in the same circle, not addressing the**

21 **70 percent part. And it's just -- you know, I**

22 **didn't like it and I still didn't like it, and she**

23 **never addressed it.**

24    **So I didn't -- like, the very next day,**

25 ███ **called and said she had an in-person date. But**

1    still, in my mind, I'm thinking I'm only getting

2    access to 30 percent of the dating pool.  And, you

3    know, that's not fair.  That's not good service.

4    It's misrepresentation, and it's not what was

5    presented to me.

6         Q    But I want to walk you back for a second,

7    though, Mr. Stanfield, because you said that if not

8    going on an in-person date was off the

9    table -- strike that.  Let me rephrase.

10            You ultimately told █████ that if you had to

11   do Zoom dates, essentially, then you were going to

12   cancel because it was nonnegotiable; is that fair?

13        A    That was part of my issue.  That was half

14   of it.  The other half was not being a part of the

15   70 percent of the dating pool because █████ was clear

16   that every -- that out of everyone, 70 percent of

17   women wanted Zoom first.

18        Q    I understand that.

19            But you then said, after having heard that

20   explanation, that it was not negotiable for you to

21   do Zoom, it had to be in person; correct?

22        A    Yeah, that was me answering what she said.

23   But, again, my concern is still the same for the

24   70 percent.  She never -- she never addressed it.

25   It was never addressed.  So I never -- we never came

1    to a conclusion on that -- on that -- on that point.

2        Q    Okay.  But even though you didn't come to a

3    conclusion on that point, you still decided to go on

4    a date after that; correct?

5        A    I mean, I tried to cancel and they didn't

6    cancel.  So, I mean, they -- they -- they kept going

7    in circles and circles on text.  And then, you know,

8    they're telling me they have an in-person date.  And

9    I did end up going on the date.  I mean, that's

10   obvious.  I can't dispute that.

11            But I still wasn't happy with it and I

12   wasn't comfortable because, you know, clearly by the

13   quality and the level of compatibility of the two

14   dates that I went on, it was clear it was from a

15   very small dating pool, and it was

16   misrepresentation.

17       Q    Okay.  Sir, I understand that, but I want

18   to direct you back to my question, which is here you

19   expressed your dissatisfaction with the fact that

20   some of the dates could be Zoom dates.

21            Is that accurate so far?

22       A    I did express that and I expressed about

23   the 70 percent.

24       Q    Correct.

25       A    Those are two things that were equally

1    **important to me.  One of them was addressed and one**

2    **of them wasn't.**

3        Q    Okay.  I understand that.  But I want to

4    take it in steps to make sure the record is clear.

5            So two things were important to you.  One

6    was no Zoom dates; that's correct?

7        A    **If it was going to count, yes.  If it**

8    **wasn't going to count, I would be open to it.  That**

9    **was clear.**

10       Q    Okay.  So open to Zoom dates as long as it

11   doesn't count against the six dates that you paid

12   for --

13       A    **Yep.**

14       Q    -- the package that you paid for?

15       A    **Yep.**

16       Q    Okay.  But then the second concern was

17   because, according to ██████ approximately 70 percent

18   of the women were not comfortable doing in-person

19   because of COVID, you felt that the dating pool for

20   you was going to be restricted as a result?

21       A    **Correct.**

22       Q    Is that a fair representation?

23       A    **Correct.**

24       Q    Okay.  So ultimately, you decided to move

25   forward with the dating service even though you knew

JEREMY STANFIELD

May 26, 2021

```
 1   that potentially 70 percent of the people in the
 2   dating pool didn't want to do in-person because of
 3   COVID?
 4              MR. CONN:  Hold on.
 5              THE DEPONENT:  What?
 6              MR. CONN:  Hold on.  I want to think if
 7   I --
 8              MR. GRAHAM:  Do you have an objection?
 9              MR. CONN:  I'm trying to decide if I have
10   an objection.  No.
11              Jeremy, I apologize.
12              MR. GRAHAM:  Let me pause for a second.
13              Court Reporter Tami, can you refresh
14   realtime?  It's stalled on me for some reason.
15              Okay.  So let me go back.
16      Q    So, Mr. Stanfield, I just want to be clear.
17              So we resolved, at least in our discussion
18   here, the issue of Zoom versus in person, right,
19   meaning that you were not okay doing a Zoom date, it
20   had to be in person.  If it's going to be Zoom, it
21   just can't count toward your six-date package.
22              Is that a fair representation?
23      A    Right, yes.
24      Q    Now, the 70 percent concern you had, I'm
25   going to paraphrase, and feel free to correct me, is
```

1    that because, according to ███ up to 70 percent

2    approximately of the dating pool women did not want

3    to go on in-person dates because of COVID, you felt

4    like you would have a reduced caliber or quality of

5    dates potentially because 30 percent -- you were

6    essentially subject to a 30 percent pool as opposed

7    to the full hundred percent pool?

8        A    **Correct.**

9        Q    Okay.

10       A    **Yes.**

11       Q    Okay.  Thank you.

12            Now, having known that, in this back and

13   forth with ███ and ███, you still decided to go on

14   a date after that; correct?

15       A    **Yes.**

16       Q    Okay.  And the date that you went on after

17   that, it was in person, it was not Zoom?

18       A    **Yes.**

19       Q    Meaning that it was in person; right?

20       A    **Yes, it was in person.**

21       Q    I just had to clarify that because I -- it

22   was my fault for mixing two questions in one.

23       A    **Sure.**

24       Q    Okay.  So you mentioned a second ago that

25   you tried to cancel in this discussion, but I want

JEREMY STANFIELD

May 26, 2021

```
 1   to look at the text message so that we're -- we're
 2   really clear.
 3          So give me one second to pull up the
 4   precise page where you mention cancelation here.
 5          Here it goes.  Can you see what's on my
 6   screen right now, Mr. Stanfield?
 7      A   Yes.
 8      Q   Okay.  So at the top of this page, and
 9   we're still on the July 7th exchange, you say:
10              "We specifically talked about
11          your company picking the place and
12          setting it up and we meet there.
13          There was no mention that it might
14          be a zoom date and then that counts.
15          You can't represent yourself fully
16          on a zoom call and it shouldn't
17          count towards the 6.  So again if
18          there is no budging on that, then I
19          want to cancel.  This isn't
20          negotiable for me."
21          Did I read that accurately, sir?
22      A   Yes.
23      Q   Okay.  You said if there was no budging on
24   that, you want to cancel; isn't that fair?
25      A   That's exactly what I said, yes.
```

JEREMY STANFIELD

May 26, 2021

```
 1      Q    Right.  So you didn't say --
 2      A    Right there.
 3      Q    You didn't say "cancel my package now," did
 4  you?
 5      A    I didn't say those exact words, that's
 6  correct.
 7      Q    In fact, you didn't tell them "cancel my
 8  package" in any way in that exchange, did you?
 9      A    I did tell them that I wanted to cancel
10  because I didn't like their policy and they
11  misrepresented to me.
12      Q    I just want to direct you back to your
13  words, Mr. Stanfield.  You said, "if there is no
14  budging on that, then I want to cancel."
15      A    And there was other things I said too.  You
16  can't just point to one thing and say that it's
17  binary.  It's not.  There's other concerns and I
18  wasn't happy with the 70 percent and they
19  misrepresented and I tried to cancel.  So I mean --
20          MR. GRAHAM:  Objection; nonresponsive.
21  Objection; nonresponsive.
22      Q    Sir, I just want to direct you back to this
23  particular exchange.  You'll have an opportunity to
24  talk about your other communications because there
25  are many others, and we'll talk about them all or at
```

JEREMY STANFIELD

May 26, 2021

```
 1   least a chunk of them.
 2        A    Sure.
 3        Q    But on this particular communication,
 4   you're talking about canceling here.  I want to
 5   focus on this.
 6             Okay.  Here your cancelation request was
 7   conditional, wasn't it?
 8        A    It was conditional and it involved other
 9   paragraphs in that exchange.  It was an entirety of
10   my concern with the 70 percent and the Zoom dates
11   counting.
12             So it's a package deal.  It's not binary.
13   It's not one or the other.  I did -- if you want to
14   point to this one paragraph, then, yes, it says
15   specifically "if you can't budge on the in-person
16   Zoom dates, then I want to cancel."  But I still had
17   a concern that was never addressed about the
18   70 percent.  It clearly shows that she didn't
19   address it.  So to me, in my mind, so I can express
20   myself clearly to you, it's a whole-package deal.  I
21   wasn't comfortable with it and my concern was never
22   addressed.
23        Q    Okay.  Are you done?  I don't want to
24   interrupt your answer.  Are you done answering, sir?
25        A    I'm done.
```

```
 1      Q    Okay.  So understand all that.
 2           But they did budge here, didn't they?  They
 3  did in person as opposed to Zoom?
 4      A    But they also only picked from 30 percent
 5  of the dating pool.
 6      Q    Sir, it's a "yes" or "no."  Did they budge
 7  here, "yes" or "no"?
 8      A    Did they budge?
 9      Q    Yeah.
10      A    Budge?  What do you mean, did they budge?
11  I don't understand your question.
12      Q    Sir, I'm just referring back to your
13  language.  You said, "So again if there's no budging
14  on that," meaning Zoom dates are going to count
15  as --
16           (Simultaneous speaking.)
17      A    On that specific --
18      Q    Sir, I'm not done.  Sorry, sir.
19      A    Go ahead.
20      Q    Can't talk over each other.
21      A    No problem.
22      Q    "So again if there's no budging on
23           that, then I want to cancel."
24           My question is they did budge on that; you
25  were not given a Zoom date to count as one of your
```

1   six dates, were you?

2      **A      They -- it was an in-person date, but it**

3   **was still part of the smaller dating pool.  So it**

4   **still -- they still didn't address my concern and**

5   **they still took that in-person date from 30 percent,**

6   **according to ████, 30 percent of the dating pool,**

7   **which is a misrepresentation to me.**

8          MR. GRAHAM:  Objection; nonresponsive.

9      Q    Sir, I just want to be clear here because

10  this is an important point.  All right?  So --

11  because ultimately, you would agree with me that

12  Tawkify can't force a woman to go on an in-person

13  date if she's uncomfortable because of COVID?  You

14  agree with that; right?

15     **A      Yes, I agree with that.**

16     Q    Because Tawkify can't force you to go on an

17  in-person date if you're uncomfortable with that;

18  right?

19     **A      I agree.**

20     Q    Just like Tawkify couldn't force you to go

21  on a Zoom date if you were uncomfortable doing it;

22  right?

23     **A      Yes.**

24     Q    Okay.  So ultimately, it's up to the people

25  in the dating market to decide what they're

JEREMY STANFIELD

May 26, 2021

```
 1   comfortable with; isn't that a fair statement?
 2       A    Right.  And that should have been presented
 3   before I spent my money.  It wasn't.
 4       Q    Sir, but my question simply is they can't
 5   force you to do it, can they?
 6       A    No, they cannot.
 7       Q    Okay.  So at this point in the conversation
 8   where you're telling them "if you don't budge on
 9   charging me a date for a Zoom date as opposed to an
10   in-person date, then I want to cancel," they then
11   budged on it?  They said, "Okay, well, here's an
12   in-person date."  They didn't give you a Zoom date
13   after that, did they?
14       A    I don't consider that budging when they
15   told me that I could have an in-person date, but it
16   would be from a small percentage of the dating pool.
17   It wasn't -- like, again, it's not binary.  I'm not
18   sure why we have to keep going in circles about
19   this.  But they told me there's an opportunity for
20   an in-person date.  It's not like they said there
21   was -- no one's doing Zoom dates -- or no one's
22   doing in-person, it's a hundred percent Zoom dates
23   and they had to budge on an in-person.  There was an
24   option for in-person, but it's only 30 percent of
25   the dating pool.  So it's not a -- the true budging
```

1    **is not -- still not taking care of all my concerns**

2    **with their service and their misrepresentation.  My**

3    **concern was never addressed.**

4         **So, like, I'm not sure what you're trying**

5    **to get to, but I'm going to keep responding this**

6    **way.**

7    Q    Sir, you can respond however you want.  We

8    have a court reporter here to record your answer.

9    That's the whole point, is to do a question and

10   answer.  So my question --

11   **A    Sounds good.**

12   Q    -- coming back to the issue that we're

13   discussing here is --

14   **A    Sure.**

15   Q    -- ultimately, you decided, knowing that,

16   according to ███, that 30 percent of people here

17   were okay doing in-person and 70 percent were not,

18   you still decided to go on an in-person date, didn't

19   you?

20   **A    I did.**

21   Q    You could have told her, "You know what,

22   given what you told me about the approximate

23   70 percent, no more dates, no more budging,

24   nothing's negotiable, I want to stop right now and I

25   don't want to go on an in-person date because it's

1   only 30 percent pool now."

2          You could have said that, couldn't you?

3      A   I could have.

4      Q   But you did not say that, did you?

5      A   Because no one addressed my concern, so --

6      Q   That's a "yes" or "no" question, sir.

7      A   I could have said that.  I did not say it.

8      Q   Okay.  All right.  We can move.

9          Okay.  So I want to now turn to what

10  happened after that.  So let's talk about that first

11  date.

12         So what was the name of your first date?

13     A   I don't remember.

14     Q   Do you remember the day that you went on

15  it, the date -- like, what day of the month you went

16  on that date?

17     A   I don't.

18     Q   Would it refresh your recollection if you

19  saw, like, communications that you had about the

20  date as to when it happened?

21     A   If it shows the date, then, yeah, I

22  probably would be able to recall it.

23     Q   Okay.  Give me one moment, sir.

24         Okay.  So we're going to stay in Exhibit 5,

25  and then -- actually, one second.  Strike that.

```
 1              (As Read) "He makes between 200k
 2              and 400k a year and lives in a nice
 3              house."
 4              Did I read that accurately so far?
 5      A    Yes.
 6      Q    Okay.  And is that what you told ███████ that
 7   you made between 200 and 400K a year and live in a
 8   nice house?
 9      A    Yes.
10      Q    Okay.  Was that true?
11      A    Yeah, it was pretty close.  I was right
12   around -- you know, I was at Power at the time, so
13   it was pretty close to 200.
14      Q    Earlier today, sir, you testified that you
15   made about $150,000 a year at Power.  So was it
16   150,000 or was it closer to 2-?
17      A    I mean, it's a range.  Some -- I think last
18   year, I made more than what I'm making so far this
19   year.  So it was -- last year was higher than this
20   year, so maybe that's why there's a discrepancy.
21      Q    Were you making 400K a year?
22      A    No, but I was right around 200.
23      Q    Okay.
24      A    I don't know -- I don't know why she gave a
25   range of 2- and 4-.  But, I mean, I'm pretty sure I
```

1    **told her around 2-.   These are her notes, not mine.**

2        Q    Right.   That's why I asked if you had

3    mentioned this to her.   A second ago, you mentioned

4    that you did, so I just wanted to clarify.

5        **A    Sure.**

6        Q    Okay.

7        **A    Okay.**

8        Q    So then you say -- then she says -- strike

9    that.   She says, this is ███ speaking:

10                (As Read) "Her income doesn't

11                really matter so much as what she

12                does with her time.   Shouldn't be

13                living off her parents or someone

14                else.   No one with Trust Fund money

15                who wastes time all day.   No one

16                into reality TV, soap operas or

17                drama.   Someone doing something.   He

18                feels he is always getting better

19                and learning and growing and open to

20                new perspectives and opinions.

21                Politics -- he considers himself an

22                independent -- no one far left or

23                far right.   Not into someone with

24                extremes."

25                Let me stop there for a second.   What I

```
 1    just talked about since the last question, are these
 2    sorts of descriptors accurate in terms of what you
 3    told ███ you were interested in?
 4         A    Yes.
 5         Q    Okay.  "Doesn't want someone who
 6              feels they have to think like she
 7              does.  Not seeing another child but
 8              open to it.  Also would be happy to
 9              get vasectomy.  Has the money and
10              time.  Bulk of time is spent
11              working and with daughter.  He is
12              used to driving to do his solar
13              work.  He likes to dance and dances
14              a lot of different styles."
15              Let me stop there for a second.  Of the
16    things I just described since the last question, are
17    these fairly accurate in terms of what you told
18    ███?
19         A    I wasn't open to another child.
20         Q    Okay.  So you --
21         A    That part's not really accurate.
22         Q    Okay.  Thank you for that.
23              So you never told anyone at Tawkify that
24    you were open to having kids, any more kids?
25         A    I don't recall saying that.  I mean, I
```

May 26, 2021

1          So I was just trying to get some kind of

2     response to -- to get them to do something because I

3     wasn't getting anywhere, just the constant emails

4     and text messaging, I wasn't getting any resolution.

5     So I just -- I -- I stated that to -- to put some

6     teeth into what I was saying, but I didn't have an

7     attorney at that point.

8          Q    So you lied to Tawkify?

9          A    On that particular sentence, yes.

10         Q    So you misrepresented the facts to Tawkify?

11         A    I -- I did not have an attorney, if that's

12    your question.

13         Q    Did you misrepresent the fact that you

14    spoke to your attorney this morning and he suggested

15    that you offer what you said there to Tawkify?

16         MR. CONN:  Objection; asked and answered.

17         Q    BY MR. GRAHAM:  You can still answer, sir.

18    Did you misrepresent the facts there, "yes" or "no"?

19         A    Yes.

20         MR. GRAHAM:  Okay.  All right.  We'll pull

21    this document down.

22         All right.  What number are we at?

23         THE REPORTER:  14.

24         MR. GRAHAM:  Marking as Exhibit 14 a

25    document that's Bates-labeled STANFIELD000038.  One

JEREMY STANFIELD

May 26, 2021

```
 1        A    They ignored 99 percent of my preferences.
 2        Q    I'm going to ask -- "yes" or "no," sir --
 3   is it --
 4        A    It's not a "yes" or "no" question -- it's
 5   not a "yes" or "no" answer.
 6        Q    It actually is.
 7        A    It's not binary.
 8        Q    It actually is.  When you say --
 9             (Simultaneous speaking.)
10        Q    This is the question, sir:  When you say
11   they completely ignored your preferences, is that an
12   accurate statement or is that an inaccurate
13   statement?
14        A    Completely ignored my preferences, I guess
15   in that one aspect, then it's not accurate.
16             MR. CONN:  Hey, Priscilla, I'm having
17   trouble downloading about half of these.  At the end
18   when you send everything to the court reporter,
19   would you mind sending them to me as well?
20             MS. SZETO:  I'll copy you.
21             MR. CONN:  Cool.  Thanks.
22             MS. SZETO:  Uh-huh.
23        Q    BY MR. GRAHAM:  I want to go back to
24   Exhibit 2, which has already been entered.  Let me
25   pull it back up for you, Mr. Stanfield.
```

1       **A      Yeah.  Actually, the -- the first time it**
2   **was offered to me, that language wasn't used, but it**
3   **was used here on July 22nd, that is correct.**
4       Q     Okay.  Now, you're in sales; right,
5   Mr. Stanfield?
6       **A      Yes, I'm in sales.**
7       Q     And you've been doing that for about nine
8   years for several employers?
9       **A      Sure, yes.**
10      Q     The concept of something being
11  nonrefundable is very understandable to you;
12  correct?
13      **A      It -- yes, it is.**
14      Q     Okay.  If Tawkify tells you that they're
15  willing to give you another match but it's
16  nonrefundable, did you interpret that as meaning
17  that you would get a full cash refund for that
18  match?
19      **A      So, again, the -- when they first offered**
20  **me a credit for a match, those words weren't used.**
21  **That was only after I was convinced to go on a**
22  **second date that was also bad that they -- on that**
23  **interaction there that you're showing me, they use**
24  **that language.  But when it was first said to me,**
25  **the words "nonrefundable" were not used.  I wouldn't**

```
 1   have asked for a full refund if that was, you know,
 2   the case.  They clearly admitted that it was not
 3   good service and a bad -- bad match and shouldn't be
 4   counted, and that goes for both of them.
 5           But as far as this particular thing, it's
 6   crystal clear that they're using the words
 7   "nonrefundable."  It's in writing.  I mean...
 8      Q    Did anyone at Tawkify ever tell you when
 9   they credit a match back to your account that that
10   means that you get a full refund for that match if
11   you decide not to go forward with Tawkify services?
12      A    Did anyone -- the conversation with ████ --
13   I believe her name was ████ -- she said that I
14   shouldn't have got that match and that I will get a
15   full credit for that match.  She didn't mention
16   anything about refunds.  We didn't even talk about
17   refunds at that point, but she did say that I would
18   get credit, but she didn't say it was nonrefundable
19   or doesn't -- you know, as far as I'm concerned, if
20   she's going to give me a credit, I should have
21   canceled right then and gotten a full refund because
22   she had already admitted that she was giving me a
23   credit.  She didn't say it was a nonrefundable
24   credit, but -- those words were never used at that
25   time.
```

JEREMY STANFIELD

May 26, 2021

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA            )
                                    )   ss.
 4   COUNTY OF ORANGE               )

 5

 6

 7          I, TAMI L. LE, hereby certify:

 8          I am a duly qualified Certified Shorthand

 9   Reporter in the State of California, holder of

10   Certificate Number CSR 8716 issued by the Court

11   Reporters Board of California and which is in full

12   force and effect.  (Fed. R. Civ. P. 28(a)).

13          I am authorized to administer oaths or

14   affirmations pursuant to California Code of Civil

15   Procedure, Section 2093(b), and prior to being

16   examined, the deponent was first duly sworn by me.

17   (Fed. R. Civ. P. 28(a), 30(f)(1).

18          I am not a relative or employee or attorney

19   counsel of any of the parties, nor am I a relative

20   or employee of such attorney or counsel, nor am I

21   financially interested in this action.  (Fed. R.

22   Civ. 28).

23          I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition and the foregoing transcript is
```

JEREMY STANFIELD

May 26, 2021

1  a true record of the testimony given by the witness.

2  (Fed. R. Civ. P. 30(f)(1)).

3          Before completion of the deposition, a review

4  of the transcript  [x] was  [ ] was not requested.

5  If requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed,

7  are appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated:  May 28, 2021.

10

11

12                                    TAMI L. LE

13          Certified Shorthand Reporter No. 8716, RPR

14

15

16

17

18

19

20

21

22

23

24

25