1   **NELSON MULLINS RILEY & SCARBOROUGH LLP**
Jahmy S. Graham (SBN 300880)
2   jahmy.graham@nelsonmullins.com
Priscilla Szeto (SBN 305961)
3   priscilla.szeto@nelsonmullins.com
Crispin L. Collins (SBN 311755)
4   crispin.collins@nelsonmullins.com
19191 South Vermont Avenue, Suite 900
5   Torrance, CA 90502
Telephone:     424.221.7400
6   Facsimile:     424.221.7499

7   Attorneys for Defendant
TAWKIFY, INC.

8

9                    UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

11

12   JEREMY STANFIELD, on behalf of himself        Case No. 3:20-cv-07000-WHA
and all others similarly situated,
13                                                 **REDACTED VERSION FILED UNDER SEAL**
                          Plaintiff,
14                                                 Assigned to Hon. William H. Alsup
15         v.
                                                   **DEFENDANT TAWKIFY, INC.'S**
16   TAWKIFY, INC., et al.; and DOES 1 -25,        **CORRECTED SUPPLEMENTAL BRIEFING**
                                                   **RE: CONVERTED MOTION FOR**
17                        Defendants.              **SUMMARY JUDGMENT**

18                                                 [Filed Concurrently with the Declarations of
19                                                 Jahmy S. Graham and Thane Schultz, Request for
                                                   Judicial Notice, and [Proposed] Order]
20
                                                   Date:   August 12, 2021
21                                                 Time:  8:00am
                                                   Ctrm:  12
22

23

24

25

26

27

28

**TO THE COURT, PLAINTIFF, AND HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on August 12, 2021 at 8:00 a.m. in Courtroom 12 of the United States District Court Northern Division, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant Tawkify, Inc. ("Tawkify") will move, pursuant to the Court's Minute Entry Order (Dkt. 62), for an Order granting Summary Judgment in favor of Tawkify against Plaintiff Jeremy Stanfield ("Plaintiff" or "Stanfield"), and for other such relief as may be just.

Tawkify moves for summary judgment on the grounds that there is no genuine dispute as to any material fact as to the following issues:

1.       Plaintiff lacks standing under Article III of the United States Constitution to bring his claims because his alleged injuries are purely speculative and stem from purported procedural violations of California's Dating Services Contract Act, Cal. Civ. Code § 1694, *et seq.* ("DSCA") that did not impact him personally in a concrete and particularized way;

2.       Plaintiff also lacks statutory standing under the DSCA, Unfair Competition Law ("UCL") (Bus. & Prof. Code § 17200, *et seq.*), and California Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1650), all of which—similar to Article III—require the existence of a cognizable injury.

3.       Plaintiff's claim under the UCL, based on alleged fraud, additionally fails as a matter of law for lack of specificity.

4.       Plaintiff's claim under the CLRA—tethered to the alleged DSCA violations—similarly fails as a matter of law for lack of statutory standing and lack of specificity.

///

///

///

///

///

///

///

///

///

DEFENDANT TAWKIFY, INC.'S CORRECTED  SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1        This motion is based on this Notice, the attached Memorandum of Points and Authorities,

2   the Declarations of Jahmy S. Graham and Thane Schultz, the Request for Judicial Notice,

3   concurrently filed herewith, and all other records and pleadings on file with this Court, as well as

4   such other evidence as may be presented at the hearing of this motion.

5

6   Dated:  July 9, 2021                    Respectfully submitted,

                                            NELSON MULLINS RILEY & SCARBOROUGH LLP
7

8                                           By:    _/s/ Jahmy S. Graham_____
                                                   Jahmy S. Graham
9                                                  Priscilla Szeto
                                                   Crispin L. Collins
10
                                                   Attorneys for Defendant
11                                                 TAWKIFY, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF RELEVANT MATERIAL FACTS ...................................... 2

     A.      The Parties. ........................................................................................... 2

     B.      Plaintiff Initiates Contact with Tawkify. ............................................. 3

     C.      Plaintiff Negotiates Pricing, Purchases a Client Package, and Reviewed the Terms of Use and Refund Policy. .......................................................... 4

     D.      Plaintiff Misrepresents His Characteristics, Interests, Values, and Preferences in Women to Tawkify. ....................................................................... 5

     E.      Plaintiff Was Informed and Understood that Matchmaking is to Sample People Outside His Usual Thinking and Meet People He Would Not Normally Select. ................................................................................................... 7

     F.      Plaintiff Demanded Non-Negotiable In-Person Dates During a Pandemic, and Tawkify Accommodated His Request. ................................................. 7

     G.      Plaintiff Meets with Two Matches His Matchmaker Arranged. ................... 8

     H.      Plaintiff Seeks a Refund. ..................................................................... 11

     I.      Plaintiff Turns Down Tawkify's Offer of Non-Refundable Bonus Matches, Unequivocally Cancels, and Receives a Prorated Refund Instead. ........... 13

     J.      Plaintiff Threatens Litigation. .............................................................. 13

     K.      Plaintiff Admits to Violating Tawkify's Terms of Use by Sharing His Account Login Information Without Permission .................................................. 14

     L.      Plaintiff Cannot Articulate Having Suffered Any Actual Damages .......... 14

III.    LEGAL STANDARD ....................................................................................... 15

IV.     ARGUMENT ................................................................................................... 16

     A.      Plaintiff Lacks Standing to Pursue His Claims. ................................... 16

        1.      Plaintiff lacks constitutional standing under Article III. ............... 16

        2.      Plaintiff lacks Statutory Standing. ................................................. 23

        3.      Plaintiff's Claims for Injunctive Relief Fails ................................ 24

V.      CONCLUSION ................................................................................................ 25

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelman v. Spark Networks Ltd.*,
   Nos. B195332, B197097, 2008 WL 2108667 (2008)..................................................20, 21, 23

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................................15

*Apple Inc. v. Psystar Corp.*,
   F.Supp.2d--, 2009 WL 3809798 (N.D. Cal. Nov. 13, 2009) ...................................................15

*Beley v. Mun. Ct.*,
   100 Cal. App. 3d 5 (1979) .......................................................................................................22

*Boorstein v. Men's Journal, LLC*,
   No. 12-771, 2012 WL 2152815 (C.D. Cal. June 14, 2012)......................................................22

Casillas v. Madison Avenue Associates, Inc.,
   926 F.3d 329, 734 (7th Cir. 2019) ...........................................................................................17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................................................15

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013)..............................................................................................................16

Davis v. Federal Election Com'n,
   554 U.S. 724 (2008) .................................................................................................................23

*Doe v. SUCCESSFULMATCH.COM*,
   70 F.Supp. 3d 1066 (N.D. Cal. 2014) ......................................................................................24

*Emp'rs Ins. Of Wausau v. Granite St. Ins. Co.*,
   330 F.3d 1214 (9th Cir. 2003) ..................................................................................................20

*Friends of the Earth Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
   528 U.S. 167 (2000)..................................................................................................................23

*Gertz v. Toyota Motor Corp.*,
   2011 WL 13142144 (C.D. Cal. Apr. 28, 2011) .......................................................................18

*Hall v. Time Inc.*,
   158 Cal. App. 4th 847 (2007) ...................................................................................................24

*Howell* v. *Grindr*,
   No. 15-cv-1337, 2015 WL 9008801 (S.D. Cal. Dec. 15, 2015) ........................................22, 23

*Howell v. Grindr*,
   No. 15-cv-1337, 2016 WL 1668243 (S.D. Cal. Apr. 27, 2016) (*Howell II*)......................21, 22

*Kaing v. Pulte Homes, Inc.*,
   No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010) ..............................................24

*Legion v. American Humanist Assn.*,
   139 S. Ct. 2067 (2019)..................................................................................................17

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)......................................................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)......................................................................................................16

*Mayfield v. United States*,
   599 F.3d 964 (9th Cir. 2010) ......................................................................................24, 25

*McClinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ..........................................................................................16

*Miller v. Hearst Communications, Inc.*,
   No. 12-0733, 2012 WL 320524 (C.D. Cal. Aug. 3, 2012) ...................................................22

*Philips v. Ford Motor Co.*,
   2017 WL 635469 ..........................................................................................................16

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015) ..........................................................................................24

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)...............................................................................16, 17, 18, 22

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)......................................................................................................17

*Surrell v. California Water Serv. Co.*,
   518 F.3d 1097 (9th Cir. 2008) ........................................................................................15

*Swearingen v. Late July Snacks LLC*,
   2017 WL 1806483 (N.D. Cal. May 5, 2017) ......................................................................24

*TransUnion LLC v. Ramirez*,
   Case No. 20-297, 2021 WL 2599472 (U.S. Jun. 25, 2021)........................................17, 18, 23

*Weatherall Aluminum Prod. Co. v. Scott*,
   71 Cal. App. 3d 245 (1977) ........................................................................................21, 22

Case No. 3:20-cv-07000-WHA

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

**Statutes**

Bus. & Prof. Code § 17200 ................................................................................................24

Bus. & Prof. Code § 17204 ................................................................................................24

Cal. Civ. Code § 1650 ..........................................................................................................1

Cal. Civ. Code, § 1689.5 .....................................................................................................21

Cal. Civ. Code, § 1689.11(c) ...............................................................................................21

Cal. Civ. Code § 1694 ...........................................................................................................1

Cal. Civ. Code § 1694.1(e) .................................................................................................19

Cal. Civ. Code § 1694.2(e) .................................................................................................19

Cal. Civ. Code § 1694.4(d) .................................................................................................20

Cal. Civ. Code § 1694.1(e) .................................................................................................19

**Other Authorities**

Fed. R. Civ. P. 56(a)...........................................................................................................15

Fed. R. Civ. P. 9 .................................................................................................................24

FRCP 56 ..............................................................................................................................15

United States Constitution Article III ........................................................................... *passim*

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Despite Plaintiff Jeremy Stanfield's ("Plaintiff") attempts to move the goalposts and change the true nature of this dispute, this case is about an overly demanding, untruthful, and unreasonable client who expected perfection from his dates despite his own personal flaws and misrepresentations. Plaintiff now admits that his motivations for filing suit against Tawkify, Inc. ("Tawkify") were not to vindicate his rights under California's Dating Services Contract Act ("DSCA") (Cal. Civ. Code § 1694, *et seq.*). Rather, under the guise of an ill-fitting putative class action, Plaintiff has revealed the actual grievance he had with Tawkify was his personal feelings of incompatibility with his romantic matches—due, in large part, to Plaintiff's *own* misrepresentations about himself to Tawkify. Despite ultimately canceling his contract and receiving a prompt refund, Plaintiff wants more. And yet, when asked to articulate his damages, Plaintiff admits that other than the "stress" of the matchmaking experience and what he paid on dates, including for food and beverages that he personally consumed, he "can't quantify it." This Court correctly found a question of standing during the hearing on Tawkify's Motion to Dismiss. Plaintiff's admissions since made through discovery have only confirmed his lack of standing to pursue the relief he seeks.

The First Amended Complaint ("FAC") alleges that Tawkify's agreements with Plaintiff did not include the following DSCA-required disclosures: (1) that a consumer is relieved from further payment in the event of a disability or death; (2) that a consumer is entitled to a full refund within ten (10) days if s/he cancels during the three-day cooling period; and (3) the identification of a designated operator to contact for cancellation. (*See* FAC, ¶¶ 27-37.) The FAC also alleges that Tawkify engaged in high-pressure sales tactics. Although the FAC alleges the absence of DSCA disclosures injured him, Plaintiff has no evidence to support a claim for damages, or any relief—including injunctive relief—against Tawkify. This is the exact sort of case for which summary judgment was designed: an allegation-heavy complaint lacking in evidentiary support, particularly as to an essential element of every cause of action—standing to sue.

Moreover, Plaintiff cannot establish a causal connection between the purportedly missing DSCA-disclosures and his alleged injuries. This is fatal to Plaintiff's case. Plaintiff admitted in

written discovery that he did not cancel because of a disability or death. He admitted in his deposition that he did not cancel within three days (and instead used Tawkify's services for several weeks, including to meet with two matches). Plaintiff also admitted to having no issue locating and contacting a Tawkify Customer Success ("CS") representative each time he wanted to complain, cancel, or request a refund, and to receiving a refund before he filed this action. Plaintiff was thus already made more than whole **before** filing suit. Upon cancellation, Tawkify promptly issued a prorated refund for services not yet rendered, which was all that the DSCA requires, contrary to Plaintiff's insistence that he was entitled to a full refund within ten days. Notwithstanding this, Plaintiff received a refund of all moneys pre-paid by him for the six-match package. No material facts, therefore, are in dispute to support Plaintiff's claims that he has suffered any damages or a cognizable concrete and particularized redressable injury that is fairly traceable to Tawkify's alleged violation of the DSCA.  In fact, during the hearing on Tawkify's Motion to Dismiss, Plaintiff's counsel confirmed that Plaintiff's grievance with Tawkify was unrelated to the DSCA, but that Tawkify had "completely ignored his preferences." The DSCA **does not** provide any remedy for a consumer's dissatisfaction with the services rendered. As each claim is tethered to these alleged DSCA violations, and Plaintiff cannot put forth any evidence that these alleged violations actually harmed, or even applied to, him, no triable issues of material fact exist on the essential elements of Plaintiff's claims.

Finally, Plaintiff has not, and cannot allege or prove reliance on any purported misrepresentations and/or fraudulent statements Tawkify made.  Plaintiff's conclusory allegations in the FAC and his discovery responses to the contrary do not controvert this fact. Because Plaintiff lacks standing to bring his individual claims, Tawkify respectfully requests that the Court grant summary judgment and dismiss the FAC with prejudice.

## II.    STATEMENT OF RELEVANT MATERIAL FACTS

### A.    The Parties.

Plaintiff is a single father of three, but currently lives only with his daughter in Riverside County. (Declaration of Jahmy S. Graham ("Graham Decl."), Ex. Z, Deposition of Plaintiff Stanfield ("Stanfield Depo."). at 13:1-2, 11-20.) He previously lived in San Bernardino County

during the relevant time period. (*Id.* 14:1-5.) Plaintiff is not in a committed relationship. (*Id.* at 193:9-15.) Of the three women that he had each child with, he was previously married to the mother of one of them. (*Id.* 15:8-16:13.) Plaintiff works in solar panel sales and ████████████████ ████████████████████████████████████████████████████████ He was working in this same position when he initiated contact with Tawkify in June 2020. (*Id.*) ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

Tawkify is a San Francisco-based company that operates an online matchmaking service. (Declaration of Thane Schultz in Support of MSJ ("Schultz Decl."), ¶ 4.) Tawkify users can either purchase packages, which would both place them into Tawkify's confidential database of potential matches and guarantee a certain number of curated matches, or pay a smaller fee to be included in the database as a member. (Schultz Decl., Ex. I.) Some users are also recruited into the database. (*Id.*) Each paying client has a designated matchmaker who regularly meets with, and checks in, and searches through the profiles of available matches in Tawkify's confidential database to identify suitable candidates based on the client's characteristics, stated interests, values, and preferences. (*Id.*) After finding suitable candidates, the matchmaker then personally screens each candidate for additional indicators before selecting a match and coordinating the details of the date. (*Id.*) After each date, the matchmaker reviews feedback from both the client and the match to assess the next match cycle, if any. (*Id.*) To protect the privacy of its users, Tawkify does not share its users' contact information, profile details, photos, or any other identifying information; it would only share this information after both parties agree. (*Id.*)

**B.      Plaintiff Initiates Contact with Tawkify.**

Plaintiff initially contacted Tawkify on June 15, 2020 after viewing an advertisement on Facebook. (Graham Decl., Ex. C.) He was drawn to Tawkify's offer of a "concierge service" that can do the work of finding a match for him, especially during the Covid-19 pandemic, where he admitted it was "very difficult to go out and meet people." (Graham Decl., Ex. Z at 27:21-28:15.) Plaintiff testified that he was seeking to be in a serious relationship. (*Id.* at 28:16-24.) Plaintiff recalls

being directed to Tawkify's webpage with a contact form to input his information "for someone to get in contact" with him after clicking on the Facebook advertisement. (*Id.* at 29:13-30:4.) Plaintiff confirms the contact form contained a checkbox stating that "By continuing, I certify that I am over 18 and have read and agreed to the Terms of Use, Privacy Policy, and Refund Policy," with the words "Terms of Use," "Privacy Policy," and "Refund Policy" all hyperlinked in blue font. (*Id.* at 33:15-36:2; Graham Decl., Ex. D, STANFIELD000087.) Plaintiff admits to having clicked on the checkbox to signify his agreement. (Graham Decl., Ex. Z at 35:11-14; 219:11-22.) Plaintiff also testifies to understanding the function of a hyperlink, that "[w]hen you open it, it opens up a document." (*Id.* at 48:3-6.)

### C.    Plaintiff Negotiates Pricing, Purchases a Client Package, and Reviewed the Terms of Use and Refund Policy.

During his initial call with a Tawkify Member Services ("MS") representative, Plaintiff was informed that Tawkify was only allowing Zoom (virtual) dates due to Covid-19, but in-person meetings have since resumed. (Graham Decl., Ex. Z at 37:15-23.) He was introduced to Tawkify's different options and packages, along with their pricing. (*Id.* at 38:5-9.) Tawkify offered him a discount and advised that the client package includes a matchmaker who would tailor the search based on his stated needs, desires, personality type, and the like. (*Id.* at 37:24-38:24) He chose to move forward with purchasing a package after that call. (Graham Decl., Ex. E) Although Plaintiff has raised the MS representative's comment, "I'll offer you a million dollars if you pay today," and recalled her mentioning that "it was unprofessional," he admits that once he said he would not pay that day, "she backed off." (Graham Decl., Ex. Z at 40:1-15.) Plaintiff also admits that he knew her offer to pay him a million dollars "was a joke." (*Id.* at 40:16-41:20.)

Plaintiff purchased an all-inclusive "6 Match Standard Client Package" (the "Client Package") for $3,700.00 on June 29, 2020. (Graham Decl., Ex. J.) He negotiated the original price of the package ($5,400) to a lower price before he agreed to purchase and enter into a client agreement. (Graham Decl., Ex. Z at 42:2-17.) Plaintiff asked to have the weekend before paying for the package because he wanted to "really think about it and make sure it's something I want to do" and because he needed to transfer funds into his bank account to pay for the package. (*Id.* at 42:18-

1   25.) ███████████████████████████████████████████████████████

2   ███████████████████████████████████████ (*Id.* at 43:4-16.) Tawkify emailed him a receipt.

3   (*Id.*) Plaintiff was aware that until he was approved as a client, he had only been speaking with

4   Tawkify's "salespeople" and that he would receive a full refund of all moneys paid if he was not

5   approved as a client. (*Id.* at 51:14-22 and 61:2-13.)

6          Under the Client Package, Plaintiff was entitled to "[f]ull service matchmaking," which

7   included "matchmaker meetings & check-ins, match searches throughout client's local area,

8   candidate pre-screenings, date plaining for each in-person and/or video introduction and post-date

9   feedback." (*Id.*). Tawkify's services, thus, are not limited to the date itself but also include the work

10  done throughout a given "match cycle." (*See id.*) Tawkify's Refund Policy also makes it clear that

11  "Client packages run in all-inclusive 'match cycles,' with all work performed to find and select each

12  match, plan and coordinate a date to introduce the client to that match, and obtain/provide post-

13  introduction feedback included." (Declaration of Thane Schultz ISO Motion to Dismiss, Dkt. 50-

14  1.) The receipt Plaintiff received contains a statement that it "confirms your purchase and agreement

15  with our Terms of Use, Privacy Policy, and Refund Policy." (Graham Decl., Ex. F.) Plaintiff

16  confirms that when he received this emailed receipt, he clicked on the links and reviewed each

17  document." (Graham Decl., Ex. Z at 48:7-21.) Plaintiff further testified that it is his general practice

18  to click on hyperlinks and review documents before moving forward on the internet; he does it to

19  understand the details of what he is getting. (*Id.* 49:4-17.)[1] Plaintiff admits that he affirmatively

20  agreed to Tawkify's Refund Policy. (*Id.* at 209:14-25.) Tawkify does not consider someone a client

21  until after approval by the selection committee. (Graham Decl., Ex. AA, Deposition of Thane

22  Schultz ("Schultz Dep."), at 192:4-14.) Plaintiff was approved as a client the next day on June 30,

23  2021. (Graham Decl., Ex. G.)

24          **D.    Plaintiff Misrepresents His Characteristics, Interests, Values, and Preferences
                    in Women to Tawkify.**

25

26          The MS representative Plaintiff spoke with uploaded onto his profile her notes from their

27  initial call for his matchmaker's reference. (Schultz Decl., Ex. A.) The notes state Plaintiff was

28  ───────────────────────────────
    [1] Of note, Plaintiff's Declaration in Support of his Opposition to Tawkify's Motion to Compel states the opposite.
    Plaintiff denies having clicked on or viewing any Terms of Use or policies. (Dkt. 30-1.)

"open to more children, potentially, for the right person" and that his match "should be family-oriented, have a passionate purpose in her work life," and have "well [sic] rounded interests." (*Id.*) Plaintiff also informed Tawkify that his match should be "fit" and have a "active and healthy lifestyle." (*Id.*) Plaintiff described himself to his matchmaker as "fit," but when asked at the deposition, he admits that he is not as "fit" as he once was. (Graham Decl., Ex. Z at 157:5-14.)

On or about July 6, 2020, **after** Tawkify accepted/approved him as a client, Plaintiff met with his designated matchmaker for a "very thorough and detailed" discussion about his interests, values, and preferences in women to "fill in the gaps" from his initial call with the MS representative. (Graham Decl., Ex. Z at 77:12-78:2.) Plaintiff testified that he recalled telling his matchmaker about wanting an outgoing woman who "preferably had children already" and does "not really want any more children because I already have three." (*Id.* at 78:3-79:11.) Plaintiff further testifies to having informed his matchmaker that he did not "really" like traveling and that he wanted "a bigger person" with "meat on their bones . . . and is healthy looking." (*Id.*) When asked if there was anything further that "was really important,"[2] Plaintiff did not recall anything further. (*Id.* at 79:13-22.)

Plaintiff's matchmaker's notes from her initial call with him were uploaded onto his profile on July 7, 2020. (Schultz, Ex. B.) Notably, Plaintiff's matchmaker's notes state that Plaintiff represented that he ██████████████████████████████████ and lives in a nice house," "[l]ikes to date single moms or someone who really understands the dynamic of him being a father," that he was "[n]ot seeking another child but open to it," that he likes dancing and was "[n]ot a huge traveler—prefers to find local stuff—Hawaii, Catalina," and that he prefers a woman that is "CURVY in the HIPS AND BUTT from body type" but that her "[f]ace is most

---

[2] During the Hearing on Tawkify's Motion to Dismiss, Plaintiff's counsel informed the Court that Plaintiff's "grievance was that they completely ignored his preferences" because Plaintiff liked dancing and did not like traveling. Plaintiff's counsel further emphasized that dancing and traveling "were two of the big things." (Graham Decl., Ex. H 26:4-25.)

important. . . ." (*Id.* [emphasis in original].) He also mentioned that he would prefer someone between the ages 35 and 45, but he would date a "very mature" 30-year-old or someone in their 50s if they "look great" and "really take care of themselves." (*Id.*)   The notes further included that Plaintiff represented that his match's "income doesn't really matter so much as what she does wit [sic] her time" and that "[h]e feels he is . . . opening [sic] to new perspectives and opinions." (*Id.*)

### E.   Plaintiff Was Informed and Understood that Matchmaking is to Sample People Outside His Usual Thinking and Meet People He Would Not Normally Select.

That same day, Plaintiff received a follow-up message and reminder from his matchmaker on what to expect in his matchmaking experience. (Graham Decl., Ex. Z at 87:2-5; Schultz Decl., Ex. C.) Plaintiff's matchmaker reminded him that "[t]he parameters we talked about on the welcome call are rough frameworks for me to work around; they are not promises," and that ***"[t]he idea is to sample people outside your usual thinking and to discover what actually feels important*** and where connection[s] can happen." (*Id.* [emphasis added].) Importantly, Plaintiff's matchmaker emphasized that "[h]aving someone else pick some dates for you is, in part, to receive dates that you would NOT normally select for yourself." (*Id.* [emphasis in original]) Plaintiff's matchmaker continued that she "can not emphasize enough that the experience of Tawkify is getting to meet and chat with new single people that you never would have otherwise met. . . . Tawkify introduction yields learning, and sometimes Tawkify introductions simply yield an hour or two interacting with another good person of the opposite sex." (*Id.*)

Plaintiff testified that he understood that his matchmaker could **not** guarantee a particular experience on a date, but they would "work through this process collectively to get to the right place ultimately." (Graham Decl., Ex. Z at 88:20-89:9.)

### F.   Plaintiff Demanded Non-Negotiable In-Person Dates During a Pandemic, and Tawkify Accommodated His Request.

Although he recalled that both Tawkify's MS representative and his matchmaker had explained that Tawkify was doing dates on Zoom "because of Covid," and that his matchmaker does "the same amount of work—screening and vetting . . . whether it's a Zoom or in-person date," [Graham Decl., Ex. Z at 88:4-13, 89:10-24 and 104:1-15], he refused them because he did not believe it would be a "full experience." (*Id.* at 90:1-3.) Plaintiff testified that his matchmaker

informed him "that some people are still uncomfortable with meeting in person" and up to "70% of people want to do Zoom," but he was not "okay with that." (*Id.* at 91:1-13, 98:1-8.) Plaintiff even texted the MS representative to complain about having to meet potential matches remotely during the pandemic, that he "didn't like the policy and . . . didn't think it was fair." (*Id.* at 98:16-21) He falsely accused that the MS representative "never mentioned" Zoom dates but was reminded that she did because "[i]t's what we were doing for months during Covid but now we are officially giving people the option to do either." (Graham Decl., Ex. I.) Among the documents Plaintiff produced was the introduction sheet for the Client Package he purchased, which stated: "ALL INCLUSIVE PACKAGE, Full service matchmaking, all work performed throughout each match cycle: matchmaker meetings & check ins, match searches throughout client's local area, candidate pre-screenings, date planning for each in-person ***and/or video introduction*** and post-date feedback." (Graham Decl., Ex. J (emphasis added).) Plaintiff insisted that "whether I read it or not, it wasn't something I was okay with." (Stanfield Depo. at 172:16-22.) Plaintiff was advised that he was not required to go on a Zoom date and ultimately did **not** go on any Zoom dates; he met both matches in-person.[3] (*Id.* at 95:2-9, 118:15-20; Graham Decl., Ex. J.)

Plaintiff ultimately conceded in his deposition that he understood that Tawkify could not force a woman to go on an in-person date if she was uncomfortable because of Covid-19, and that it was up to the people in the dating market to decide what they were comfortable with. (Graham Decl., Ex. Z at 116:9-117:1.) Plaintiff confirmed that despite knowing that he might effectively foreclose on a percentage of the dating pool by refusing matches that preferred to meet only through Zoom, he nevertheless <u>decided</u> to continue using Tawkify's service. (*Id.* at 118:15-20.)

## G.    Plaintiff Meets with Two Matches His Matchmaker Arranged.

On July 11, 2020, Plaintiff went on a date with his first match. (Graham Decl., Ex. K.)

---

[3] Notably, during the month that Plaintiff purchased his Client Package, Covid-19 was surging throughout California and resulted in the re-closure of certain venues. (*See* RJN, Ex. B, Mark Saunders, "California orders watch list counties to stop indoor operations, close bars amid surge in COVID-19 cases," ABC 10 News San Diego (July 1, 2020).) For additional context, on June 29, 2020, the day Plaintiff purchased the Client Package, Los Angeles County reported the largest single-day number of new infections the county had reported since the pandemic hit the United States. (RJN, Ex. C Colleen Shalby, Maura Dolan, *L.A. County coronavirus cases surge past 100,000 with record one-day tally*, L.A. TIMES, (Jun. 29, 2020).) On June 16, 2020, San Bernardino County—where Plaintiff resides—reached a new milestone in Covid-19 hospitalizations. (RJN, Ex, D, Sandra Emerson, *San Bernardino County reports highest one-day jump in coronavirus cases*, THE SUN (Jun. 16, 2020).)

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1   Plaintiff was late to the date. (Graham Decl., Ex. Z at 122:21-123:3.) They met at a restaurant and

2   had drinks; Plaintiff also ate an appetizer. (*Id.* at 122:7-11.) As Plaintiff requested, his date was also

3   a single parent and within two years of his age. (Graham Dec., Ex. L.) Plaintiff described her as a

4   "nice person."  (*Id.*)   Nevertheless, Plaintiff testified that he found her physically unattractive,

5   describing her as looking "sickly" and "way older than me." (Graham Decl., Ex. Z. at 121:20-25.)

6   Plaintiff also testified that "[w]e had nothing in common." (*Id.* at 122:1.). In an email to a Tawkify

7   Customer Success ("CS") representative dated July 14, 2020, Plaintiff complained that "when I first

8   saw her, I thought she was 55 and that she looked sickly or anorexic. . . . she was all skin and bones.

9   There was "a glaring difference in our age [sic] looks, even though we are only two year apart."

10  (Graham Decl., Ex. M.) Contrary to his representations to Tawkify that he wanted a fit, healthy, and

11  active woman, Plaintiff recently testified that "I'm a thicker dude. So I like women that are also

12  thicker and big like me." (Graham Decl., Ex. Z at 123:10-14.) Plaintiff was also upset that his first

13  match was "not big on dancing," she was "really into traveling and just went to Costa Rica and

14  Iceland in the past year," and she came off as "very reserved" and "didn't like to laugh or joke

15  around." (Graham Decl., Ex. M; Stanfield Depo. at 122:1-5.) Plaintiff had previously represented

16  to Tawkify that although he was not a "huge traveler," he enjoyed travelling "locally" to areas such

17  as Hawaii and Catalina Island (Schultz Decl., Ex. B.)[4] Plaintiff testified differently at his deposition,

18  however, declaring: "I don't ever want to travel." (Graham Decl., Ex. Z at 124:15-23.)

19       On a feedback form Plaintiff's first match submitted about him, she declined to meet with

20  Plaintiff again, stating that while Plaintiff "seemed like a nice guy," he was "over 15 minutes late."

21  (Schultz Decl., Ex. E.) When she asked about traffic, "he said it wasn't bad." (*Id.*) Plaintiff's first

22  match also noticed that "[h]is credit card got declined," which "did not give [her] confidence that

23  he could support a wife and [sic] new family." (*Id.*) She further commented that Plaintiff did not

24  want the date to end, stating:"[he] made me feel like he wanted to go to a 2nd place . . . [w]hen he

25  dropped me off [sic] he said 'so is the date done?' like he wanted us to do something else . . . I'm

26  not sure what he wanted, but I don't like that question. What was he thinking?" (*Id.*)

27

28  [4] For reference, Hawaii is approximately 2,500 miles from San Bernardino, California—where Plaintiff resided—and Costa Rica is approximately 3,300 miles from San Bernardino.  (*See* RJN, Exh. E (Google Map).)

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1    Although Plaintiff's email to Tawkify's CS representative suggested "maybe we should just

2    call it," Plaintiff admits that ultimately he had not yet given up on Tawkify's services and was

3    interested in meeting his second match. (Stanfield Depo. at 137:21-24.) Particularly, he was also

4    offered a credit for a non-refundable bonus match. (Schultz Decl., Ex. E.) On July 14, 2020, Plaintiff

5    went on a date with his second match, who he describes as having a "**_beautiful_**" and **"pretty face"**[5]

6    and is a "**good looking"** woman who runs an ████████████████ (Stanfield Depo. at 168:18-

7    20; Graham Dec., Ex. N (emphasis added).) Plaintiff was also late to this date.[6] Plaintiff admits he

8    viewed the second match's work with the ████ community as "a real connection for" them, as he

9    █████████████████████████ (Graham Dec., Ex. N.) Plaintiff further described

10   her as wanting children and very engaged in her work. (Stanfield Depo. at 159:8-10.) Nevertheless,

11   Plaintiff claims that his second match still did not meet his standards on physical attraction, as "she

12   was also extremely thin and wasn't curvy at all," "[h]er demeanor was very reserved and wasn't big

13   on joking around much," and "[s]he wasn't into dancing and wasn't into socializing or doing much

14   besides work." (Graham Decl., Ex. N.) Despite the latter complaint about his second match's focus

15   on her work, Plaintiff also noted that she had "a desire to sell her company and start a family and be

16   a stay at home mom." (_Id._) In the post-date feedback form, Plaintiff selected "Kinda" in the drop-

17   box option response to Tawkify's question on whether it was "on track with the match." (Schultz

18   Decl., Ex. D.)  Plaintiff's second match chose the drop-box option response of "Definitely not" to

19   Tawkify's question of whether it was "on track with the match" as to Plaintiff's characteristics,

20   explaining that she was "looking for someone more professional/sophisticated." (_Id._) Nevertheless,

21   Plaintiff's second match noted that he "[s]eemed fun," was a "nice guy," and that they "**_[h]ad a fun_**

22   **_conversation and quite a few things in common_**." (_Id._ (emphasis added).) Plaintiff admitted in

23   deposition that it was not an accurate statement for him to claim, as he does in the FAC and his

24   counsel reasserted to this Court, that Tawkify had "completely ignored" his preferences. (Stanfield

25   Depo. at 202:10-15.)

26   _____

27   [5] Plaintiff admits in his deposition that he told is matchmaker "it was important . . . that a woman have a pretty face." (Stanfield Depo. at 168:21-23.)

28   [6] Per the text message exchanges between Plaintiff's matchmaker and himself, the date was scheduled for 7:30 pm, but Plaintiff sent a text message to the matchmaker at 7:33 pm that he was looking for parking. (Graham Decl., Ex. O.)

1   Concurrently with these first two matches, Tawkify had begun working on setting up

2   Plaintiff's third match.  (Schultz Decl., Ex. F.) The morning after Plaintiff's second date, on July

3   15, 2020, a CS representative sent a text message to Plaintiff asking how his date with his second

4   match went. (Graham Dec., Ex. O.) Plaintiff did not directly respond and instead emailed the CS

5   team, stating that he "definitely need[s] a new matchmaker." (*Id.*; Graham Decl., Ex.  B.) Later that

6   afternoon, he also sent an email to Tawkify asking for "a credit for those two matches and a different

7   matchmaker or a full refund." (Graham Dec., Ex.  W.) Plaintiff admits that he was able to get into

8   contact with Tawkify each time he wanted to express frustration or request cancellation and that

9   Tawkify's contact information was provided to him in emails and the Client Agreement and Refund

10  Policy. (Stanfield Depo. at 184:24-185:9 ["they typically always responded"]; Schultz Decl., Ex. I;

11  Schultz Decl. iso MTD, Ex. A.)

12      **H.      Plaintiff Seeks a Refund.**

13      Plaintiff testified that he believed he was entitled to a full refund of all moneys paid "because

14  [Tawkify] didn't provide the service that they would" and admitted that the matches were not good

15  and that he would "get credits." (*Id.* at 204:8-23.) When asked whether there were any other reasons

16  entitling him to a full refund, he responded that there were no other reasons. (*Id.* at 205:7-17.)  Not

17  only is the FAC silent on whether Plaintiff would have sought cancellation and a refund sooner had

18  he known about his right under the DSCA to cancel within three days of purchase, Plaintiff did not

19  cite the lack of DSCA disclosures as a reason he believes he was entitled to a refund in any of his

20  discovery responses or during the entirety of his deposition.[7]

21      On July 17, 2020, Plaintiff was scheduled to speak with a CS representative. He told her,

22  "I'd like a full refund processed today. I don't wish to discuss this or book time again for someone

23  to be late and/or not communicate with me in a timely fashion. You're dealing with people on a

24  high level, yet you are not at a high standard when it comes to communication or performance."

25  (Graham Dec., Ex.  X.)  This is particularly interesting, given Plaintiff was late to both of his dates.

26

27  [7] As of the date of this motion, Plaintiff has belatedly sought leave of Court to amend the FAC to add purported
    claims wholly unrelated to his DSCA claims. Tawkify opposes Plaintiff's request. Notably, however, even the
28  proposed Second Amended Complaint does not allege that had Plaintiff known of the DSCA requirements for a 3-day
    cooling period he would have behaved any differently or chosen to seek cancellation or a full refund within that 3-day
    period after purchase. (*See* Dkt. 71.)

On July 19, 2020, a different CS representative contacted Plaintiff seeking to discuss Plaintiff's complaints further and requesting "the opportunity to bonus your account back for the 2 matches you went on and start fresh with a different match maker that will take better care with your matches." (Graham Dec., Ex. D.) The CS representative followed up further but did not receive a response. (*Id.*)

On July 21, 2020, Plaintiff finally responded, noting that while they seemed "sincere," he had complaints about Tawkify's service, including, his being "set up with two people that have the same body type as my ████████ daughter," feeling that "MULTIPLE personality things and hobbies and interest things were COMPLETELY ignored"; that a Tawkify representative was "10 minutes late when [he] booked an appointment on HER schedule system and then had the audacity to tell [him] 'she forgot the appointment was at 2 and thought it was at 3'"; and that only 30% of Tawkify's dating pool was open to in-person dates due to COVID-19. (Graham Dec., Ex. Y, [emphasis in original]) Plaintiff continued, "I can do MUCH BETTER on my own and have no problem finding beautiful curvy women that have a kid and likes [sic] to dance and joke around and are outgoing, successful and stable. I was hoping this would save me time and effort, but all it's done is waste my time, money and emotional effort!" (*Id.*) Plaintiff concluded, "I'd like a full refund processed today and if you want me to sign a non disclosure [sic] agreement or gag order to get all my money back, I'll be happy to do so. I spoke to my attorney this morning and he suggested I offer to do so." (*Id.*) In his deposition, however, Plaintiff admitted that he "lied" to Tawkify when he claimed to have an attorney and that his attorney suggested that he offer Tawkify a non-disclosure agreement in exchange for a full refund for services that had been rendered to him. (Stanfield Depo. at 195:1-19.) When asked to confirm that Tawkify informed him on multiple occasions in multiple ways that he would not get a refund for services actually rendered, Plaintiff responded that he "wouldn't call those services" but "would call that a scam." (*Id.* at 205:18-24.) He believed that despite meeting with two matches on two dates, services could not be considered rendered, including the time his matchmaker spent searching and screening potential candidates for matches, because he "didn't completely like each date." (*Id.* at 205:25-2016:18.)

I.   **Plaintiff Turns Down Tawkify's Offer of Non-Refundable Bonus Matches, Unequivocally Cancels, and Receives a Prorated Refund Instead.**

On July 22, 2020, a CS representative sent a response to Plaintiff acknowledging that "[i]t sounds… like your mind is made up and you would like to cancel and request a refund." (Graham Dec., Ex. Q.) The CS representative reiterated, "You do have the option to change to a different match maker and I'd be happy to personally oversee that as well as give you **a non-refundable bonus match** to make up for your bad date… Please let me know what you decide." (*Id.*) (emphasis added).) In response, Plaintiff emailed, "Yes I want a full refund and it was much more than a disconnect with my matchmaker. Anyways, please refund all $3700 of my money today." (*Id.*)

Later that day, a CS representative notified Plaintiff that his refund request had been submitted to Accounting and could take 45 to 60 days to process as Tawkify was "processing a higher than usual amount of refunds due to covid." (*Id.*) Plaintiff retorted, "This needs to be prioritized over some lame Covid cancellation! Cancelling over Covid isn't even a legit reason to cancel if you signed up during Covid. Unbelievable!" (*Id.*) On August 1, 2020, Plaintiff received a prorated refund of $1,850.01. (Graham Dec., Ex. R.) The refund represents a prorated refund of services not yet rendered, as Plaintiff had already completed two match cycles and was transitioning into a third match cycle. (Schultz Decl., Ex. F; *See e.g.*, Thane Depo., at 96:20-97:4)

J.   **Plaintiff Threatens Litigation.**

On August 4, 2020, Plaintiff emailed the CS team demanding that he be refunded the full $3,700 he had paid. (Graham Dec., Ex. S.) After several back and forth exchanges on August 7, 2020, Tawkify directed Plaintiff to Tawkify's Refund Policy, stating, "[w]e don't refund for services rendered for any reason. You were given a non-refundable bonus match to make up for one of the two dates, but this was forfeited given you chose to [*sic*] refund." (Graham Dec., Ex. T.) Plaintiff was even provided screenshots of when, and how, he had previously agreed to Tawkify's refund policy. (*Id.*)

Plaintiff responded to the email by stating, "that's cool, prepared [*sic*] to get sued and I'll make sure it's a class action because you clearly miss representing [*sic*] and taking advantage of people! Enjoy the loss of business and money that's coming to you!!" (*Id*.) On August 26, 2020,

1   Tawkify refunded Plaintiff the remaining $1,849.98 that he had paid for Tawkify's services—**before**

2   Tawkify was served with the summons and complaint in this action. (Graham Dec., Ex.  U.) At his

3   deposition, Plaintiff made clear that he has no desire to ever purchase or use Tawkify's services

4   again in the future. (Stanfield Depo. at 260:16-20.)

5      **K.    Plaintiff Admits to Violating Tawkify's Terms of Use by Sharing His Account
                 Login Information Without Permission**

6

7          Plaintiff admits he agreed to Tawkify's Terms of Use and that it was his general practice to

8   read documents he agrees to. (Stanfield Depo. at 35:11-36:1; 49:4-17; and 209:15-25.) The Terms

9   of Use included a provision stating that the account he creates "is for your personal use only. You

10  may not authorize others to use your account, and you may not assign or otherwise transfer your

11  account to any other person or entity." (Schultz Decl., Ex. H.) The Terms of Use further states that

12  Plaintiff is "responsible for keeping your password for the Website confidential **. . .** [and] fully

13  responsible for all actions and activities that occur under [his] username and password**"** and he

14  was prohibited from sharing his login credentials with "anyone." (*Id.*) Plaintiff's activity log for

15  his Tawkify profile, however, confirms that after he sought cancellation, different IP (Internet

16  Protocol) addresses began logging into his Tawkify account. (Schultz Decl., Ex. G.) When asked

17  to confirm that he "did not give your password or username to any person *other than your*

18  attorneys**,"** Plaintiff responded, "no."  (*Id.* at 218:13-23.) Tawkify also requested clarification

19  from Plaintiff through written discovery, which appears to confirm that Plaintiff did in fact share

20  his login and password with his attorneys—although he does not specify specifically which

21  attorney.[8]

22      **L.         Plaintiff Cannot Articulate Having Suffered Any Actual Damages**

23          Plaintiff admits that Tawkify has since refunded him all moneys he paid Tawkify, which

24  includes the prorated refund previously issued on August 1, 2020. (Stanfield Depo., at 247:14-23.)

25  The full $3,700 he paid for the Client Package has been returned to him. (*Id.* at 247:14-23.) When

26  asked to detail what basis Plaintiff believes entitles him to additional money from Tawkify, other

27

28  _____
[8] As of the date of this filing, Tawkify has e-filed a Discovery Dispute letter with the Court, detailing Plaintiff's ongoing resistance to producing the information and/or documents requested in response to its discovery requests on this issue. (Dkt. 70-70-5.) A hearing is set for July 7, 2021 to resolve this pending discovery dispute.

1    than what his counsel would say, Plaintiff identifies "the stress" of the matchmaking experience,

2    "losing" money for months (for services that were rendered in which the total amount paid was

3    ultimately refunded to him in full), and the money he spent on the dates. Plaintiff further admits that

4    he "can't quantify it." (*Id.* at 249:3-11.)

5        In total, Plaintiff states he spent approximately $40 on gas to travel from his home to the

6    restaurants, approximately $50 from his first date and approximately $80-$100 for his second date.

7    (*Id.* at 250:7-251:22.)  In the first date, Plaintiff bought drinks for himself and his date, though only

8    he ate an appetizer. (*Id.*)  Both he and his second match ate during dinner. (*Id.* at 250:7-251:22.)

9    Plaintiff could not identify any further "out-of-pocket" costs he claims to have spent in relation to

10   his interactions with Tawkify or use of its services. (*Id.* at 253:8-11.)

11   **III.   LEGAL STANDARD**

12       Summary judgment "must be granted under FRCP 56 when 'the pleadings, the discovery and

13   disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

14   fact and that the movant is entitled to judgment as a matter of law.'" *Apple Inc. v. Psystar Corp.*, --

15   -F.Supp.2d--, 2009 WL 3809798, at *2 (N.D. Cal. Nov. 13, 2009) (Alsup, W.); Fed. R. Civ. P. 56(a).

16   Where a defendant moves for summary judgment on a claim for which the plaintiff bears the burden

17   of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to

18   establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*,

19   477 U.S. 317, 322 (1986).

20       The burden then shifts to plaintiff, who must "go beyond the pleadings and by [his] own

21   affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

22   'specific facts showing that there is a genuine issue for trial." *Id.* at 323-24 (explaining that "[o]ne

23   of the principal purposes of the summary judgment rule is to isolate and dispose of factually

24   unsupported claims").  Unsupported conjecture or conclusory statements do not create a genuine

25   dispute of material fact and will not defeat summary judgment. *Surrell v. California Water Serv.*

26   *Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). A dispute is "material" only if it could affect the outcome

27   of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

28   A party cannot defeat summary judgment by arguing "some metaphysical doubt as to the material

1   facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome

2   a summary judgment motion, the nonmoving party must offer some "concrete evidence from which

3   a reasonable juror could return a verdict in his favor."  *Id.* at 256.

4   **IV.   ARGUMENT**

5       **A.   Plaintiff Lacks Standing to Pursue His Claims.[9]**

6           **1.   Plaintiff lacks constitutional standing under Article III**

7           Article III standing requires that a plaintiff allege an injury in fact that is fairly traceable to

8   the challenged conduct.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In order to

9   allege an injury in fact, Plaintiff must have suffered "an invasion of a legally protected interest

10  which is (a) concrete and particularized, [ ] and (b) 'actual and imminent, not 'conjectural' or

11  'hypothetical.'"  *Id.* (internal citations omitted).  Alleging current exposure to a risk of injury does

12  not show future injury is "imminent."  *Id.*  563-64.  Rather, "imminent" means "certainly

13  impending," not just "possible" or even "likely."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138,

14  1145, 1147 (2013).

15          The U.S. Supreme Court's *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) decision is

16  particularly instructive on whether allegations of purely procedural violations, such as those alleged

17  here, constitute an Article III injury-in-fact.  "Particularized" injuries must "affect the plaintiff in a

18  personal and individual way."  *Id.* at 1543 (internal citations omitted).  Even if Plaintiff's conclusory

19  grievances of being "subjected to policies and practices" (that had no impact on his own individual

20  circumstances) or that his request for a full refund—which Tawkify was not required to provide

21  under the DSCA as a matter of law—took longer than he'd like could be considered "particularized"

22  injuries, this determination alone is insufficient to satisfy Article III standing.  *See id.* at 1548 ("we

23  have made it clear time and time again that an injury in fact must be **both** concrete and

24  particularized") (emphasis in original).  "A concrete injury must be '*de facto*'; that is, it must

25  actually exist[,]" and a plaintiff cannot "automatically satisf[y] the injury-in-fact requirement"

26  _____

27  [9] Plaintiff asserts three claims against Tawkify: (1) a purported violation of the DSCA; (2) UCL; and (3) CLRA. (*See* FAC.) Each of these claims fail as a matter of law. Plaintiff has the burden of proof at trial on the issue of damages or cognizable harm, which is an essential element. *See McClinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988).

28  A failure to present a triable question of fact on the issue of damages (or cognizable harm) is sufficient to justify granting a motion for summary judgement in full. *Philips v. Ford Motor Co.*, 2017 WL 635469.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

simply because a "statute grants a person a statutory right and purports to authorize that person to sue to vindicate the right." *Id.* at 1548-49 (internal citations omitted). The *Spokeo* Court defined "concrete" injuries as those that are "real, and not abstract," finding that a plaintiff cannot merely "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." 136 S. Ct. at 1549; *accord Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing").

The U.S. Supreme Court has recently affirmed (just last week on June 25, 2021) that under Article III, "a federal court may resolve only 'a real controversy with real impact on real persons.'" *TransUnion LLC v. Ramirez*, Case No. 20-297, 2021 WL 2599472 (U.S. Jun. 25, 2021) (citing to American *Legion v. American Humanist Assn.*, 139 S. Ct. 2067 (2019) [Gorsuch, J., concurring in judgment]). The Court reiterated that "federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive branches, or of private entities. And federal courts do not issue advisory opinions." *Id.* at *6. That is what Plaintiff seeks here.

The Supreme Court cautioned in *TransUnion* that "**an injury in law is not an injury in fact.**" *Id.* at *7-*8 (emphasis added). Citing to *Spokeo*, the Court explained that it "has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at *8 (citing to *Spokeo*, 578 U.S., at 341.) Constitutional standing requires proof of a concrete injury "***even in the context of a statutory violation.***" *Id.* "Article III is not a "freewheeling power to hold defendants accountable for legal infractions." *Casillas*, 926 F.3d, at 332 (full cite). In order to vindicate a statutory violation, the alleged violation must "personally harm the plaintiff . . . ." *TransUnion*, at *8. Without evidence that the plaintiff "suffered any physical, monetary or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts," an "uninjured plaintiff" such as Plaintiff Jeremy Stanfield— "in those circumstances is, by definition, ***not seeking to remedy any harm to [him/]herself*** but instead is merely seeking to ensure

1  a defendant's compliance with regulatory law (and of course, to obtain some money via the statutory

2  damages)." *Id.* (citing to *Spokeo*, 578 U.S. at 345 [Thomas, J., concurring]) (internal quotation

3  marks omitted). The Supreme Court is clear that these are **not** grounds for Article III standing, and

4  that "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the

5  public interest in enforcing a defendant's general compliance with regulatory law." *Id.* at *9 (citing

6  to *Lujan* (full cite), 504 U.S. at 577); *c.f.*, Plaintiff Stanfield's FAC, ¶ 65 ("Plaintiff . . . ha[s] lost

7  money or property, including . . . costs associated with efforts to respond to or challenge Tawkify's

8  policies").

9        The FAC, Plaintiff's deposition testimony, and his responses to written discovery all confirm

10  what this Court suspected during the hearing on Tawkify's Motion to Dismiss—that there not only

11  is a question on standing, but an entire lack thereof to maintain this action. Plaintiff has suffered no

12  monetary damages. He confirms that he received a prorated refund and then ultimately the full

13  $3,700 he paid for the Client Package. (*Id.* at 247:14-23.) *At most*, Plaintiff can only quantify that

14  he voluntarily spent approximately $190 out-of-pocket on gas to drive to his dates, drinks for his

15  dates, an appetizer for himself during the first date, and dinner for his match and himself in the

16  second date. (Stanfield Depo. at 250:7-251:22.) These costs, however, are entirely unrelated to any

17  alleged DSCA violations and amount to items for which Plaintiff himself received a benefit, *e.g.*,

18  food and beverages that he consumed. (*Id.*) Plaintiff cannot plausibly seek to recover such costs

19  from Tawkify simply because he subjectively disliked his two matches. *See Gertz v. Toyota Motor

20  Corp.*, 2011 WL 13142144, *12 (C.D. Cal. Apr. 28, 2011) ("Gertz I") (general allegations of

21  disappointed expectations insufficient to establish a cognizable harm.) Plaintiff also has not suffered

22  any physical or cognizable intangible harm traditionally recognized as providing a basis for a

23  lawsuit in American courts (such as reputational harm i.e. defamation). *See TransUnion* LLC, 2021

24  WL 2599472, at *7 (citing to *Spokeo*, 578 U.S. at 345 [Thomas, J., concurring]). At most, Plaintiff

25  admits to feeling "stress" over the matchmaking experience, which he admits he "can't put a dollar

26

27

28

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1    amount on it." (Stanfield Depo., at 251:23-252:10.).[10] The law does not provide remedies to any of

2    these idiosyncratic and hypothetical "injuries."

3                    a.    **Plaintiff was only entitled to a prompt, prorated refund under**
                           **the DSCA,[11] which he received before filing suit.**
4

5              It is undisputed that, under the DSCA, if a buyer cancels a dating service contract within a

6    three-day cooling period, he is entitled to a full refund within ten days of cancellation of all moneys

7    paid, regardless of whether services have already been rendered.  Cal. Civ. Code § 1694.1(e).

8    Plaintiff, however, misconstrues the law by combining two unrelated sections of the DSCA,

9    California Civil Code sections 1694.1(e) and 1694.2(e)[12] to assert that, if read together, a client who

10   cancels a dating service contract without required disclosures at any time is thus entitled to a refund

11   of "all moneys paid" within ten days, regardless of whether services have already been rendered.[13]

12   By this flawed logic, Plaintiff could hypothetically meet all six matches (or eight, when including

13   the two bonus non-refundable matches he was offered but ultimately declined), "cancel" for lack of

14   disclosures that do not apply to him, and somehow still be entitled to a refund of all six (or eight)

15   matches used. As the DSCA's legislative history, the statute's construction, and analogous case law

16   all make clear, the DSCA does not provide for such relief. (*See* Dkt. 59 at pp. 4-6.) Indeed, even

17   this Court questioned—and Plaintiff's counsel conceded—such a peculiar reading of the DSCA, as

18

19   _____

     [10] This "stress" however is, as evidenced by Plaintiff's own deposition testimony, is entirely self-inflicted and
20   conjectural. Plaintiff alleges to being frustrated from (1) purportedly having to either meet his matches remotely in the
     midst of a global pandemic or be foreclosed from meeting a percentage of women who prefer Zoom dates due to his
21   non-negotiable requirement for in-person dates; (2) being matched with women who appeared too "skinny" for his
     personal liking despite other commonalities and his representation that he wanted a fit, active, and healthy woman
22   (among a host of other misrepresentations about what he values and seeks in a partner—which guided how his
     matchmaker searched and screened for candidates); and (3) being refused a full refund he was not entitled to after
23   having already met with two matches on dates his matchmaker arranged, and even wanting to continue the date after
     dinner, which undermines his claim that he received no value or viable matches from Tawkify.
24   [11] For the Court's reference, a more extensive discussion and analysis of the California Legislature's history as it
     relates to the DSCA is in Tawkify's Motion to Dismiss (Dkt. 59 at pp. 4-6.) This Motion contains an abridged version
     of the arguments made therein.
25   [12] Section 1694.1(e) follows subsections discussing cancelations made within the three-day cooling period and states
     that "All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the
26   notice of cancellation." Cal. Civ. Code § 1694.1(e). Section 1694.2(e) states that "If a dating service contract is not in
     compliance with this chapter, the buyer may, at any time, cancel the contract." Cal. Civ. Code § 1694.2(e).
27   [13] Of note, Plaintiff's position is inconsistent on this point, as he both argues that "all moneys paid" must be refunded
     within 10 days of cancelation (seemingly regardless of services already rendered) and yet maintains that he deserves
28   more than the prorated amount anyhow because of the bonus matches Tawkify offered. (*See* Opp. at 7:19-25, 6:15-25.)
     Plaintiff cannot have it both ways.

1   it would inevitably result in a windfall of money and services unjustly earned by the uninjured

2   plaintiff. (Graham Decl., Ex. H, at 28:13-29:4.)

3       As set forth more fully in Tawkify's reply brief in support of its motion to dismiss (Dkt. 59

4   at pp. 4-6.), providing a consumer with a full refund within days, even for services already rendered,

5   was an extraordinary remedy meant only to close a unique and specific loophole that allowed dating

6   service providers to undermine the three-day cooling period by withholding a portion of what a

7   buyer had pre-paid. Such is plainly not the case here with Plaintiff Stanfield.

8       This interpretation of the DSCA is further supported by *Adelman v. Spark Networks Ltd.*,

9   Nos. B195332, B197097, 2008 WL 2108667 (2008).[14] There, the plaintiff, similar to Plaintiff

10  Stanfield here, filed a putative class action complaint alleging that his dating membership contract

11  was void because it did not include the disclosure provisions required by the DSCA, therefore

12  entitling him "to either a full refund or a refund of the price minus the reasonable value of the

13  services received." *Id.* at *1-2. The appellate court affirmed the trial court's dismissal of the

14  complaint with prejudice, concluding that the record supported a finding that no actual injury

15  existed, that plaintiff decided to keep paying for the service, that the price paid was "worth the

16  services" he received, and that plaintiff was an inadequate class representative. *Id.* It further noted

17  that "[plaintiff] does not explain why the services he received were any less valuable because of the

18  omission from the contract of certain allegedly required provisions that he never sought to invoke

19  and were no value to him." *Id.* at *7. These exact deficiencies are also present here.

20      Under the DSCA, Plaintiff's circumstances for canceling merely "entitled [him] to receive

21  a refund or refund credit of that portion of the cash price as is allocable to the services not actually

22  received by" him.  Cal. Civ. Code § 1694.4(d).  That amount is what he received within ten days

23  after he unequivocally turned down Tawkify's offer to credit his Tawkify account with non-

24  refundable bonus matches. (Graham Dec., Ex. R.)

25

26  [14] The Ninth Circuit has held that courts may consider unpublished California state court opinions as persuasive authority when no published California opinion controls. *See Emp'rs Ins. Of Wausau v. Granite St. Ins. Co.*, 330 F.3d

27  1214, 1220 n.8 (9th Cir. 2003) (stating that the court "may consider unpublished state decisions" and that unpublished opinions, "while certainly not dispositive of how the California Supreme Court would rule," may still "lend[] support" to a certain position regarding California law). Regarding this issue, there are no controlling published California

28  opinions. Therefore, the Court can and should treat *Adelman* as persuasive authority.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1

### b. Plaintiff's right to a full three-day cooling period also does not toll based on a lack of notice.

2

3    During the hearing on Tawkify's Motion to Dismiss, Plaintiff raised a case it did not cite to

4    in his papers—*Weatherall Aluminum Prod. Co. v. Scott*, 71 Cal. App. 3d 245, 249 (1977)—and

5    claimed that it stood for the proposition that the three-day cooling period for Plaintiff "doesn't start

6    to run until you give notice"—an implication that Plaintiff's right to a full refund of all moneys

7    prepaid for the Client Package within 10 days of canceling would somehow continue in perpetuity.

8    As a preliminary matter, *Weatherall* is wholly distinguishable and does not stand for such a broad

9    proposition. Moreover, such an interpretation of the DSCA would contradict the California appellate

10   court's holding in *Adelman*.  *Adelman, supra.*, 2008 WL 2108667 at *2 ("They stipulated, among

11   other things, that Spark's membership contracts do not expressly provide a three-day right of

12   rescission…").  Likewise, in *Howell v. Grindr*, No. 15-cv-1337, 2016 WL 1668243, *3 (S.D. Cal.

13   Apr. 27, 2016) (*Howell II*), the Southern District of California ruled that "[w]hen a dating service

14   violates the DSCA and a buyer cancels the contract, the dating service shall **refund a pro rata**

15   **portion of the services not received**." *Id.* at *3 (emphasis added).

16   In *Weatherall*, the contract at issue was **not** a DSCA contract, but a "home solicitation

17   contract" as defined by  Cal. Civ. Code, § 1689.5.  *Weatherall*, 71 Cal. App. 3d at 246.  These sorts

18   of contracts require certain disclosures, including a party's cancellation rights. *Id.* at 247. As the

19   court in *Weatherall* held, however, if the right to cancel is not disclosed, a party "retain[s] a right to

20   cancel." *Id.* This is not an issue in dispute in this matter. Tawkify does not dispute that Plaintiff

21   retains a right to cancel; in fact, Plaintiff admits that Tawkify allowed him to cancel without issue

22   or penalty and he received a prorated refund. Plaintiff's retained right to cancel is not the same as a

23   retained right to a refund of all moneys paid (or for the post-3-day-cooling-period refund to be issued

24   within ten days). In *Weatherall*, the cancelling party was not required to pay for any services

25   rendered under a statute that is unique *only* to the home buying context with "home solicitation

26   contracts"—Cal. Civ. Code, § 1689.11(c).  *Weatherall*, 71 Cal. App. 3d at 248. Under Cal. Civ.

27   Code, § 1689.11(c), "If the seller has performed any services pursuant to a home solicitation contract

28   or offer prior to its cancellation, the seller is entitled to no compensation." (Emphasis added.) That

1  is not what the DSCA provides.

2  Even if this Court determines that home solicitation contracts are somehow similar to the

3  DSCA—which they are not, the California appellate court's decision in *Beley v. Mun. Ct.*, 100 Cal.

4  App. 3d 5 (1979) is far more analogous to the facts in the instant action. *Beley* affirmed the holding

5  in *Weatherall* that a buyer's right to cancel is "technically extended indefinitely (until the Seller

6  complied with the notice requirement)," it disagreed with the buyer's claim that the statute thus

7  gives him a unfettered right to retain the substantial benefits conferred by the seller's performance

8  without payment. *Id.* at 9. The court held that even if the seller cannot recover payment under the

9  contract, nothing in *Weatherall* or in the relevant statute precluded seller from recovering, on a

10  quantum meruit basis, the reasonable value of the improvements buyer received. *Id.* The court

11  further commented that the facts of that case—a buyer's invocation of his technical right under the

12  statute to cancel **after** substantial completion of a project by the seller—is different than what was

13  contemplated by the legislature, and that "[i]t would be grossly inequitable to interpret the statute

14  to mean that Seller gets no compensation even though Buyer has the benefit of several thousand

15  dollars' worth of home improvements. *Id.*

16  As evidenced above, Tawkify's alleged procedural violations of the DSCA's requirements

17  "result[ed] in no harm" to Plaintiff Stanfield.[15] District courts have routinely rejected efforts to

18  establish standing through mere statutory violations, including in the context of the DSCA.  *Howell*

19  v. *Grindr,* No. 15-cv-1337, 2015 WL 9008801, at *4 (S.D. Cal. Dec. 15, 2015) ("*Howell I*") ; *and*

20  *see Boorstein*, 2012 WL 2152815; *see also Miller v. Hearst Communications, Inc.*, No. 12-0733,

21  2012 WL 320524, at *7 (C.D. Cal. Aug. 3, 2012) ("[b]ecause Plaintiff fails to allege a cognizable

22  injury, she lacks statutory standing . . . regardless of whether her allegations are sufficient to state a

23  violation of the STL [Shine the Light] law").  *Howell* is instructive, as it involves a dating service

24  provider and the exact same procedural violations under the DSCA. In *Howell I*, the court dismissed

25  plaintiff's amended complaint because the DSCA "requires a showing that the economic injury

26  suffered by him was *due to* a violation of the statute."  *Howell I*, 2015 WL 9008801, at *4 (emphasis

27
28  ---
[15] *See e.g., Spokeo*, 136 S. Ct. at 1550 ("not all inaccuracies [under the applicable statute] cause harm or present any material risk of harm").  Merely being "deprived of a procedural right . . . alone, is not enough to create standing." *See Boorstein v. Men's Journal, LLC*, No. 12-771, 2012 WL 2152815 (C.D. Cal. June 14, 2012).

1   added). Similar to Plaintiff Stanfield's complaint, the plaintiff in *Howell I* alleged that "Defendant's

2   dating service contract does not include a three-day cancellation provision and does not include the

3   name and address to which the notice of cancellation is to be mailed." *Id.* The court concluded that

4   those allegations were **not enough** to constitute an injury, commenting that the operative complaint

5   "alleges a violation of the statute and monetary injury, but does not allege that the injury resulted

6   from a violation of the statute. The FAC does not allege the facts surrounding the cancellation of

7   the contract . . . ." *Id.* Such is the case here. Further, just like in *Adelman*, the mere fact that Plaintiff

8   entered into a contract that allegedly violated the DSCA does not mean the services he received

9   were less valuable than what he initially paid (and was ultimately refunded). *See Adelman*, 2008

10  WL 2108667, at *7.

11      Plaintiff does not allege, nor has he provided any evidence to support, a theory that *had*

12  Tawkify disclosed that he may cancel within three days of signing the agreement, he *would have*

13  done so. Moreover, Plaintiff did not cancel due to any alleged disability, death, or relocation (*i.e.*,

14  the other DSCA disclosures he alleged are missing from Tawkify's contracts but which do not apply

15  to his personal circumstances), or had any issues getting in contact with Tawkify. (Graham Decl.,

16  Ex.  V.) Rather, as alleged in the FAC and borne out through discovery, Plaintiff's sole reasoning

17  for canceling had nothing to do with the alleged DSCA violations at issue. It also revealed that

18  whenever given an opportunity to cancel, he indicated a willingness to continue using Tawkify's

19  services—until he ultimately did not anymore.

20              **2.       Plaintiff lacks Statutory Standing.**

21      As the U.S. Supreme Court held in *TransUnion*, "standing is not dispensed in gross; rather,

22  plaintiff must demonstrate standing for each claim that they press and for each form of relief that

23  they seek (for example, injunctive relief and damages). *TransUnion* (cite) (citing to Davis, 554 U.S.

24  at 734 and *Friends of the Earth Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167,

25  185 (2000).

26       Beyond Article III and the DSCA, Plaintiff likewise lacks standing under California's UCL

27  and CLRA—both of which are tethered to the alleged DSCA violations and thus also fail.  As to the

28  UCL, standing "requires more than mere allegations that a defendant engaged in fraudulent or

1  deceitful business practices. Standing also requires a plausible claim of causation, which in turn

2  requires a showing of reliance." *Kaing v. Pulte Homes, Inc.*, No. 09-5057 SC, 2010 WL 625365

3  (N.D. Cal. Feb. 18, 2010); Bus. & Prof. Code § 17204 ("Action for relief pursuant to this chapter

4  shall be prosecuted exclusively . . . by a person who has suffered injury in fact and has lost money

5  or property as a result of the unfair competition"); *see Hall v. Time Inc.*, 158 Cal. App. 4th 847, 856-

6  57 (2007) (collecting cases that have addressed reliance as a prerequisite to standing under Section

7  17200).  Similarly, the CLRA requires that Plaintiff tie Tawkify's alleged DSCA violations to an

8  economic loss that he suffered.  *See Doe v. SUCCESSFULMATCH.COM*, 70 F.Supp. 3d 1066, 1075

9  (N.D. Cal. 2014) ("to adequately plead a CLRA claim, a plaintiff must allege that she relied on the

10  defendant's alleged misrepresentation and that she suffered economic injury as a result."); *see also*

11  *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) ("plaintiffs meet this requirement

12  [pleading a sufficient CLRA claim] if they show that, by relying on a misrepresentation . . . they

13  'paid more for a product than they otherwise would have paid, or bought it when they otherwise

14  would not have done so.'").[16]

15      As discussed *supra*, Plaintiff lacks standing because he received the appropriate relief he

16  was entitled to under the DSCA (a prompt, prorated refund) before filing suit, and even more (a full

17  refund prior to serving Tawkify with the summons and complaint). Plaintiff's UCL and CLRA

18  claims further fail because Plaintiff does not (and cannot) allege or prove reliance. No evidence

19  supports that Plaintiff relied on any alleged misrepresentations by Tawkify relating to the DSCA,

20  or otherwise, to his detriment, and would have acted differently if he had notice of what the DSCA

21  requires. These undisputed facts are fatal to Plaintiff's UCL and CLRA claims, too.

22          **3.    Plaintiff's Claims for Injunctive Relief Fails**

23      "Absent any intent to purchase [t]he products in the future, Plaintiffs cannot" justify

24  injunctive relief." *See, e.g., Swearingen v. Late July Snacks LLC,* 2017 WL 1806483, at *10 (N.D.

25  Cal. May 5, 2017) (quotation and citation omitted)). "[A] plaintiff must demonstrate standing

26  separately for each form of relief sought." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir.

27

28  [16] As discussed at length in Tawkify's Motion to Dismiss and Reply Briefs, These claims further fail for lack of
specificity required under Federal Rules of Civil Procedure 9. (Dkt. 59, at pp. 10-11.)

2010) (internal quotations and citations omitted). "Thus, a plaintiff who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief" such as an injunction.  *See id*. "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'"  *Id*. at 970 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Here, Plaintiff has testified in no uncertain terms that he has no intention of ever using Tawkify's services again.  Plaintiff testified that he will never use Tawkify's services in the future. (Stanfield Depo at 260:16-20.) His prayer and claims for injunctive relief, therefore, should be dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Tawkify's motion for summary judgment on all of Plaintiffs' claims for lack of standing, damages, or any cognizable injury.

Dated:   July 9, 2021                              Respectfully submitted,

                                                  NELSON MULLINS RILEY & SCARBOROUGH LLP


                                                  By:    Jahmy S. Graham
                                                         Jahmy S. Graham
                                                         Priscilla Szeto
                                                         Crispin L. Collins

                                                         Attorneys for Defendant
                                                         TAWKIFY, INC.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2021, I electronically filed the forgoing with the Clerk of court using the CM/ECF system and I served a copy of the forgoing pleading on all counsel for all parties via the CM/ECF system and/or mailing same by United States Mail, properly addressed, and first class postage prepaid, to all counsel of record in this matter.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed  July 9, 2021 at Torrance, California.


By:   /s/ Jahmy S. Graham
      Jahmy S. Graham