# EXHIBIT 1

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Jahmy S. Graham (SBN 300880)
jahmy.graham@nelsonmullins.com
Priscilla Szeto (SBN 305961)
priscilla.szeto@nelsonmullins.com
Crispin L. Collins (SBN 311755)
crispin.collins@nelsonmullins.com
19191 South Vermont Avenue, Suite 900
Torrance, CA 90502
Telephone:    424.221.7400
Facsimile:     424.221.7499

Attorneys for Defendant
TAWKIFY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

| | |
|---|---|
| JEREMY STANFIELD, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAWKIFY, INC., et al.; and DOES 1 -25,<br><br>Defendants. | Case No. 3:20-cv-07000-WHA<br><br>**REDACTED VERSION FILED UNDER SEAL**<br><br>Assigned to Hon. William H. Alsup<br><br>**DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE: CONVERTED MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed Concurrently with the Declarations of Jahmy S. Graham and Thane Schultz, Request for Judicial Notice, and [Proposed] Order]<br><br>Date:   August 12, 2021<br>Time:  8:00am<br>Ctrm:  12 |

**TO THE COURT, PLAINTIFF, AND HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on August 12, 2021 at 8:00 a.m. in Courtroom 12 of the United States District Court Northern Division, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant Tawkify, Inc. ("Tawkify") will move, pursuant to the Court's Minute Entry Order (Dkt. 62), for an Order granting Summary Judgment in favor of Tawkify against Plaintiff Jeremy Stanfield ("Plaintiff" or "Stanfield"), and for other such relief as may be just.

Tawkify moves for summary judgment on the grounds that there is no genuine dispute as to any material fact as to the following issues:

1.      Plaintiff lacks standing under Article III of the United States Constitution to bring his claims because his alleged injuries are purely speculative and stem from purported procedural violations of California's Dating Services Contract Act, Cal. Civ. Code § 1694, *et seq.* ("DSCA") that did not impact him personally in a concrete and particularized way;

2.      Plaintiff also lacks statutory standing under the DSCA, Unfair Competition Law ("UCL") (Bus. & Prof. Code § 17200, *et seq.*), and California Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1650), all of which—similar to Article III—require the existence of a cognizable injury.

3.      Plaintiff's claim under the UCL, based on alleged fraud, additionally fails as a matter of law for lack of specificity.

4.      Plaintiff's claim under the CLRA—tethered to the alleged DSCA violations—similarly fails as a matter of law for lack of statutory standing and lack of specificity.

///

///

///

///

///

///

///

///

///

DEFENDANT TAWKIFY, INC.'S CORRECTED  SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1      This motion is based on this Notice, the attached Memorandum of Points and Authorities,

2  the Declarations of Jahmy S. Graham and Thane Schultz, the Request for Judicial Notice,

3  concurrently filed herewith, and all other records and pleadings on file with this Court, as well as

4  such other evidence as may be presented at the hearing of this motion.

5

6  Dated: July 9, 2021          Respectfully submitted,

7                       NELSON MULLINS RILEY & SCARBOROUGH LLP

8                By:   /s/ Jahmy S. Graham_____

9                       Jahmy S. Graham
                          Priscilla Szeto

10                     Crispin L. Collins

11                     Attorneys for Defendant
                     TAWKIFY, INC.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF RELEVANT MATERIAL FACTS ....................................... 2

        A.      The Parties. ........................................................................................... 2

        B.      Plaintiff Initiates Contact with Tawkify. .............................................. 3

        C.      Plaintiff Negotiates Pricing, Purchases a Client Package, and Reviewed the
                Terms of Use and Refund Policy. ......................................................... 4

        D.      Plaintiff Misrepresents His Characteristics, Interests, Values, and Preferences
                in Women to Tawkify. ........................................................................... 5

        E.      Plaintiff Was Informed and Understood that Matchmaking is to Sample
                People Outside His Usual Thinking and Meet People He Would Not Normally
                Select. ................................................................................................... 7

        F.      Plaintiff Demanded Non-Negotiable In-Person Dates During a Pandemic, and
                Tawkify Accommodated His Request. ................................................... 7

        G.      Plaintiff Meets with Two Matches His Matchmaker Arranged. ............. 8

        H.      Plaintiff Seeks a Refund. ..................................................................... 11

        I.      Plaintiff Turns Down Tawkify's Offer of Non-Refundable Bonus Matches,
                Unequivocally Cancels, and Receives a Prorated Refund Instead. ......... 13

        J.      Plaintiff Threatens Litigation. ............................................................. 13

        K.      Plaintiff Admits to Violating Tawkify's Terms of Use by Sharing His Account
                Login Information Without Permission .................................................. 14

        L.      Plaintiff Cannot Articulate Having Suffered Any Actual Damages .......... 14

III.    LEGAL STANDARD ...................................................................................... 15

IV.     ARGUMENT .................................................................................................. 16

        A.      Plaintiff Lacks Standing to Pursue His Claims. ................................... 16

                1.      Plaintiff lacks constitutional standing under Article III. ............... 16

                2.      Plaintiff lacks Statutory Standing. ............................................ 23

                3.      Plaintiff's Claims for Injunctive Relief Fails ............................. 24

V.      CONCLUSION ............................................................................................... 25

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelman v. Spark Networks Ltd.*,
  Nos. B195332, B197097, 2008 WL 2108667 (2008)..................................................20, 21, 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................................15

*Apple Inc. v. Psystar Corp.*,
  F.Supp.2d--, 2009 WL 3809798 (N.D. Cal. Nov. 13, 2009) ...............................................15

*Beley v. Mun. Ct.*,
  100 Cal. App. 3d 5 (1979) ...................................................................................................22

*Boorstein v. Men's Journal, LLC*,
  No. 12-771, 2012 WL 2152815 (C.D. Cal. June 14, 2012)..................................................22

Casillas v. Madison Avenue Associates, Inc.,
  926 F.3d 329, 734 (7th Cir. 2019) .......................................................................................17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................................15

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013)..........................................................................................................16

Davis v. Federal Election Com'n,
  554 U.S. 724 (2008) .............................................................................................................23

*Doe v. SUCCESSFULMATCH.COM*,
  70 F.Supp. 3d 1066 (N.D. Cal. 2014) ..................................................................................24

*Emp'rs Ins. Of Wausau v. Granite St. Ins. Co.*,
  330 F.3d 1214 (9th Cir. 2003) .............................................................................................20

*Friends of the Earth Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000)..............................................................................................................23

*Gertz v. Toyota Motor Corp.*,
  2011 WL 13142144 (C.D. Cal. Apr. 28, 2011) ....................................................................18

*Hall v. Time Inc.*,
  158 Cal. App. 4th 847 (2007) ..............................................................................................24

*Howell v. Grindr*,
  No. 15-cv-1337, 2015 WL 9008801 (S.D. Cal. Dec. 15, 2015) ........................................22, 23

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

*Howell v. Grindr*,
No. 15-cv-1337, 2016 WL 1668243 (S.D. Cal. Apr. 27, 2016) (*Howell II*)......................21, 22

*Kaing v. Pulte Homes, Inc.*,
No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010) ...............................................24

*Legion v. American Humanist Assn.*,
139 S. Ct. 2067 (2019)........................................................................................................17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................................16

*Mayfield v. United States*,
599 F.3d 964 (9th Cir. 2010) ...........................................................................................24, 25

*McClinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) ...............................................................................................16

*Miller v. Hearst Communications, Inc.*,
No. 12-0733, 2012 WL 320524 (C.D. Cal. Aug. 3, 2012) ......................................................22

*Philips v. Ford Motor Co.*,
2017 WL 635469 ................................................................................................................16

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) ...............................................................................................24

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)........................................................................................16, 17, 18, 22

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)............................................................................................................17

*Surrell v. California Water Serv. Co.*,
518 F.3d 1097 (9th Cir. 2008) .............................................................................................15

*Swearingen v. Late July Snacks LLC*,
2017 WL 1806483 (N.D. Cal. May 5, 2017) .........................................................................24

*TransUnion LLC v. Ramirez*,
Case No. 20-297, 2021 WL 2599472 (U.S. Jun. 25, 2021).........................................17, 18, 23

*Weatherall Aluminum Prod. Co. v. Scott*,
71 Cal. App. 3d 245 (1977) ...........................................................................................21, 22

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

**Statutes**

Bus. & Prof. Code § 17200 ........................................................................................................24

Bus. & Prof. Code § 17204 ........................................................................................................24

Cal. Civ. Code § 1650 ..................................................................................................................1

Cal. Civ. Code, § 1689.5 ...........................................................................................................21

Cal. Civ. Code, § 1689.11(c) .....................................................................................................21

Cal. Civ. Code § 1694 ..................................................................................................................1

Cal. Civ. Code § 1694.1(e) ........................................................................................................19

Cal. Civ. Code § 1694.2(e) ........................................................................................................19

Cal. Civ. Code § 1694.4(d) ........................................................................................................20

Cal. Civ. Code § 1694.1(e) ........................................................................................................19

**Other Authorities**

Fed. R. Civ. P. 56(a)..................................................................................................................15

Fed. R. Civ. P. 9 ........................................................................................................................24

FRCP 56 .....................................................................................................................................15

United States Constitution Article III ................................................................................. *passim*

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Despite Plaintiff Jeremy Stanfield's ("Plaintiff") attempts to move the goalposts and change the true nature of this dispute, this case is about an overly demanding, untruthful, and unreasonable client who expected perfection from his dates despite his own personal flaws and misrepresentations. Plaintiff now admits that his motivations for filing suit against Tawkify, Inc. ("Tawkify") were not to vindicate his rights under California's Dating Services Contract Act ("DSCA") (Cal. Civ. Code § 1694, *et seq.*). Rather, under the guise of an ill-fitting putative class action, Plaintiff has revealed the actual grievance he had with Tawkify was his personal feelings of incompatibility with his romantic matches—due, in large part, to Plaintiff's *own* misrepresentations about himself to Tawkify. Despite ultimately canceling his contract and receiving a prompt refund, Plaintiff wants more. And yet, when asked to articulate his damages, Plaintiff admits that other than the "stress" of the matchmaking experience and what he paid on dates, including for food and beverages that he personally consumed, he "can't quantify it." This Court correctly found a question of standing during the hearing on Tawkify's Motion to Dismiss. Plaintiff's admissions since made through discovery have only confirmed his lack of standing to pursue the relief he seeks.

The First Amended Complaint ("FAC") alleges that Tawkify's agreements with Plaintiff did not include the following DSCA-required disclosures: (1) that a consumer is relieved from further payment in the event of a disability or death; (2) that a consumer is entitled to a full refund within ten (10) days if s/he cancels during the three-day cooling period; and (3) the identification of a designated operator to contact for cancellation. (*See* FAC, ¶¶ 27-37.) The FAC also alleges that Tawkify engaged in high-pressure sales tactics. Although the FAC alleges the absence of DSCA disclosures injured him, Plaintiff has no evidence to support a claim for damages, or any relief— including injunctive relief—against Tawkify. This is the exact sort of case for which summary judgment was designed: an allegation-heavy complaint lacking in evidentiary support, particularly as to an essential element of every cause of action—standing to sue.

Moreover, Plaintiff cannot establish a causal connection between the purportedly missing DSCA-disclosures and his alleged injuries. This is fatal to Plaintiff's case. Plaintiff admitted in

written discovery that he did not cancel because of a disability or death. He admitted in his deposition that he did not cancel within three days (and instead used Tawkify's services for several weeks, including to meet with two matches). Plaintiff also admitted to having no issue locating and contacting a Tawkify Customer Success ("CS") representative each time he wanted to complain, cancel, or request a refund, and to receiving a refund before he filed this action. Plaintiff was thus already made more than whole **before** filing suit. Upon cancellation, Tawkify promptly issued a prorated refund for services not yet rendered, which was all that the DSCA requires, contrary to Plaintiff's insistence that he was entitled to a full refund within ten days. Notwithstanding this, Plaintiff received a refund of all moneys pre-paid by him for the six-match package. No material facts, therefore, are in dispute to support Plaintiff's claims that he has suffered any damages or a cognizable concrete and particularized redressable injury that is fairly traceable to Tawkify's alleged violation of the DSCA.  In fact, during the hearing on Tawkify's Motion to Dismiss, Plaintiff's counsel confirmed that Plaintiff's grievance with Tawkify was unrelated to the DSCA, but that Tawkify had "completely ignored his preferences." The DSCA **does not** provide any remedy for a consumer's dissatisfaction with the services rendered. As each claim is tethered to these alleged DSCA violations, and Plaintiff cannot put forth any evidence that these alleged violations actually harmed, or even applied to, him, no triable issues of material fact exist on the essential elements of Plaintiff's claims.

Finally, Plaintiff has not, and cannot allege or prove reliance on any purported misrepresentations and/or fraudulent statements Tawkify made.  Plaintiff's conclusory allegations in the FAC and his discovery responses to the contrary do not controvert this fact. Because Plaintiff lacks standing to bring his individual claims, Tawkify respectfully requests that the Court grant summary judgment and dismiss the FAC with prejudice.

## II.     STATEMENT OF RELEVANT MATERIAL FACTS

### A.     The Parties.

Plaintiff is a single father of three, but currently lives only with his daughter in Riverside County. (Declaration of Jahmy S. Graham ("Graham Decl."), Ex. Z, Deposition of Plaintiff Stanfield ("Stanfield Depo."). at 13:1-2, 11-20.) He previously lived in San Bernardino County

during the relevant time period. (*Id.* 14:1-5.) Plaintiff is not in a committed relationship. (*Id.* at 193:9-15.) Of the three women that he had each child with, he was previously married to the mother of one of them. (*Id.* 15:8-16:13.) Plaintiff works in solar panel sales and ███████████ ████████████████████████████████████████████████████ He was working in this same position when he initiated contact with Tawkify in June 2020.  (*Id.*) ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

Tawkify is a San Francisco-based company that operates an online matchmaking service. (Declaration of Thane Schultz in Support of MSJ ("Schultz Decl."), ¶ 4.) Tawkify users can either purchase packages, which would both place them into Tawkify's confidential database of potential matches and guarantee a certain number of curated matches, or pay a smaller fee to be included in the database as a member. (Schultz Decl., Ex. I.) Some users are also recruited into the database. (*Id.*)  Each paying client has a designated matchmaker who regularly meets with, and checks in, and searches through the profiles of available matches in Tawkify's confidential database to identify suitable candidates based on the client's characteristics, stated interests, values, and preferences. (*Id.*) After finding suitable candidates, the matchmaker then personally screens each candidate for additional indicators before selecting a match and coordinating the details of the date. (*Id.*) After each date, the matchmaker reviews feedback from both the client and the match to assess the next match cycle, if any. (*Id.*) To protect the privacy of its users, Tawkify does not share its users' contact information, profile details, photos, or any other identifying information; it would only share this information after both parties agree. (*Id.*)

**B.      Plaintiff Initiates Contact with Tawkify.**

Plaintiff initially contacted Tawkify on June 15, 2020 after viewing an advertisement on Facebook. (Graham Decl., Ex. C.) He was drawn to Tawkify's offer of a "concierge service" that can do the work of finding a match for him, especially during the Covid-19 pandemic, where he admitted it was "very difficult to go out and meet people." (Graham Decl., Ex. Z at 27:21-28:15.) Plaintiff testified that he was seeking to be in a serious relationship. (*Id.* at 28:16-24.) Plaintiff recalls

being directed to Tawkify's webpage with a contact form to input his information "for someone to get in contact" with him after clicking on the Facebook advertisement. (*Id.* at 29:13-30:4.) Plaintiff confirms the contact form contained a checkbox stating that "By continuing, I certify that I am over 18 and have read and agreed to the Terms of Use, Privacy Policy, and Refund Policy," with the words "Terms of Use," "Privacy Policy," and "Refund Policy" all hyperlinked in blue font. (*Id.* at 33:15-36:2; Graham Decl., Ex. D, STANFIELD000087.) Plaintiff admits to having clicked on the checkbox to signify his agreement. (Graham Decl., Ex. Z at 35:11-14; 219:11-22.) Plaintiff also testifies to understanding the function of a hyperlink, that "[w]hen you open it, it opens up a document." (*Id.* at 48:3-6.)

### C.     Plaintiff Negotiates Pricing, Purchases a Client Package, and Reviewed the Terms of Use and Refund Policy.

During his initial call with a Tawkify Member Services ("MS") representative, Plaintiff was informed that Tawkify was only allowing Zoom (virtual) dates due to Covid-19, but in-person meetings have since resumed. (Graham Decl., Ex. Z at 37:15-23.) He was introduced to Tawkify's different options and packages, along with their pricing. (*Id.* at 38:5-9.) Tawkify offered him a discount and advised that the client package includes a matchmaker who would tailor the search based on his stated needs, desires, personality type, and the like. (*Id.* at 37:24-38:24) He chose to move forward with purchasing a package after that call. (Graham Decl., Ex. E) Although Plaintiff has raised the MS representative's comment, "I'll offer you a million dollars if you pay today," and recalled her mentioning that "it was unprofessional," he admits that once he said he would not pay that day, "she backed off." (Graham Decl., Ex. Z at 40:1-15.) Plaintiff also admits that he knew her offer to pay him a million dollars "was a joke." (*Id.* at 40:16-41:20.)

Plaintiff purchased an all-inclusive "6 Match Standard Client Package" (the "Client Package") for $3,700.00 on June 29, 2020. (Graham Decl., Ex. J.) He negotiated the original price of the package ($5,400) to a lower price before he agreed to purchase and enter into a client agreement. (Graham Decl., Ex. Z at 42:2-17.) Plaintiff asked to have the weekend before paying for the package because he wanted to "really think about it and make sure it's something I want to do" and because he needed to transfer funds into his bank account to pay for the package. (*Id.* at 42:18-

1  25.) █████████████████████████████████████████████

2  █████████████████████████ (*Id.* at 43:4-16.) Tawkify emailed him a receipt.

3  (*Id.*) Plaintiff was aware that until he was approved as a client, he had only been speaking with

4  Tawkify's "salespeople" and that he would receive a full refund of all moneys paid if he was not

5  approved as a client. (*Id.* at 51:14-22 and 61:2-13.)

6         Under the Client Package, Plaintiff was entitled to "[f]ull service matchmaking," which

7  included "matchmaker meetings & check-ins, match searches throughout client's local area,

8  candidate pre-screenings, date plaining for each in-person and/or video introduction and post-date

9  feedback." (*Id.*). Tawkify's services, thus, are not limited to the date itself but also include the work

10 done throughout a given "match cycle." (*See id.*) Tawkify's Refund Policy also makes it clear that

11 "Client packages run in all-inclusive 'match cycles,' with all work performed to find and select each

12 match, plan and coordinate a date to introduce the client to that match, and obtain/provide post-

13 introduction feedback included." (Declaration of Thane Schultz ISO Motion to Dismiss, Dkt. 50-

14 1.) The receipt Plaintiff received contains a statement that it "confirms your purchase and agreement

15 with our Terms of Use, Privacy Policy, and Refund Policy." (Graham Decl., Ex. F.) Plaintiff

16 confirms that when he received this emailed receipt, he clicked on the links and reviewed each

17 document." (Graham Decl., Ex. Z at 48:7-21.) Plaintiff further testified that it is his general practice

18 to click on hyperlinks and review documents before moving forward on the internet; he does it to

19 understand the details of what he is getting. (*Id.* 49:4-17.)[1] Plaintiff admits that he affirmatively

20 agreed to Tawkify's Refund Policy. (*Id.* at 209:14-25.) Tawkify does not consider someone a client

21 until after approval by the selection committee. (Graham Decl., Ex. AA, Deposition of Thane

22 Schultz ("Schultz Dep."), at 192:4-14.) Plaintiff was approved as a client the next day on June 30,

23 2021. (Graham Decl., Ex. G.)

24     **D.    Plaintiff Misrepresents His Characteristics, Interests, Values, and Preferences
             in Women to Tawkify.**

25

26      The MS representative Plaintiff spoke with uploaded onto his profile her notes from their

27 initial call for his matchmaker's reference. (Schultz Decl., Ex. A.) The notes state Plaintiff was

28 ───────────────────────────

[1] Of note, Plaintiff's Declaration in Support of his Opposition to Tawkify's Motion to Compel states the opposite. Plaintiff denies having clicked on or viewing any Terms of Use or policies. (Dkt. 30-1.)

"open to more children, potentially, for the right person" and that his match "should be family-oriented, have a passionate purpose in her work life," and have "well [sic] rounded interests." (*Id.*) Plaintiff also informed Tawkify that his match should be "fit" and have a "active and healthy lifestyle." (*Id.*) Plaintiff described himself to his matchmaker as "fit," but when asked at the deposition, he admits that he is not as "fit" as he once was. (Graham Decl., Ex. Z at 157:5-14.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

On or about July 6, 2020, **after** Tawkify accepted/approved him as a client, Plaintiff met with his designated matchmaker for a "very thorough and detailed" discussion about his interests, values, and preferences in women to "fill in the gaps" from his initial call with the MS representative. (Graham Decl., Ex. Z at 77:12-78:2.) Plaintiff testified that he recalled telling his matchmaker about wanting an outgoing woman who "preferably had children already" and does "not really want any more children because I already have three." (*Id.* at 78:3-79:11.) Plaintiff further testifies to having informed his matchmaker that he did not "really" like traveling and that he wanted "a bigger person" with "meat on their bones . . . and is healthy looking." (*Id.*) When asked if there was anything further that "was really important,"[2] Plaintiff did not recall anything further. (*Id.* at 79:13-22.)

Plaintiff's matchmaker's notes from her initial call with him were uploaded onto his profile on July 7, 2020. (Schultz, Ex. B.) Notably, Plaintiff's matchmaker's notes state that Plaintiff represented that he ████████████████████████████████████████ and lives in a nice house," "[l]ikes to date single moms or someone who really understands the dynamic of him being a father," that he was "[n]ot seeking another child but open to it," that he likes dancing and was "[n]ot a huge traveler—prefers to find local stuff—Hawaii, Catalina," and that he prefers a woman that is "CURVY in the HIPS AND BUTT from body type" but that her "[f]ace is most

---

[2] During the Hearing on Tawkify's Motion to Dismiss, Plaintiff's counsel informed the Court that Plaintiff's "grievance was that they completely ignored his preferences" because Plaintiff liked dancing and did not like traveling. Plaintiff's counsel further emphasized that dancing and traveling "were two of the big things." (Graham Decl., Ex. H 26:4-25.)

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

important. . . ." (*Id.* [emphasis in original].) He also mentioned that he would prefer someone between the ages 35 and 45, but he would date a "very mature" 30-year-old or someone in their 50s if they "look great" and "really take care of themselves." (*Id.*)  The notes further included that Plaintiff represented that his match's "income doesn't really matter so much as what she does wit [sic] her time" and that "[h]e feels he is . . . opening [sic] to new perspectives and opinions." (*Id.*)

### E.   Plaintiff Was Informed and Understood that Matchmaking is to Sample People Outside His Usual Thinking and Meet People He Would Not Normally Select.

That same day, Plaintiff received a follow-up message and reminder from his matchmaker on what to expect in his matchmaking experience. (Graham Decl., Ex. Z at 87:2-5; Schultz Decl., Ex. C.) Plaintiff's matchmaker reminded him that "[t]he parameters we talked about on the welcome call are rough frameworks for me to work around; they are not promises," and that *"[t]he idea is to sample people outside your usual thinking and to discover what actually feels important* and where connection[s] can happen." (*Id.* [emphasis added].) Importantly, Plaintiff's matchmaker emphasized that "[h]aving someone else pick some dates for you is, in part, to receive dates that you would NOT normally select for yourself." (*Id.* [emphasis in original]) Plaintiff's matchmaker continued that she "can not emphasize enough that the experience of Tawkify is getting to meet and chat with new single people that you never would have otherwise met. . . . Tawkify introduction yields learning, and sometimes Tawkify introductions simply yield an hour or two interacting with another good person of the opposite sex." (*Id.*)

Plaintiff testified that he understood that his matchmaker could **not** guarantee a particular experience on a date, but they would "work through this process collectively to get to the right place ultimately." (Graham Decl., Ex. Z at 88:20-89:9.)

### F.   Plaintiff Demanded Non-Negotiable In-Person Dates During a Pandemic, and Tawkify Accommodated His Request.

Although he recalled that both Tawkify's MS representative and his matchmaker had explained that Tawkify was doing dates on Zoom "because of Covid," and that his matchmaker does "the same amount of work—screening and vetting . . . whether it's a Zoom or in-person date," [Graham Decl., Ex. Z at 88:4-13, 89:10-24 and 104:1-15], he refused them because he did not believe it would be a "full experience." (*Id.* at 90:1-3.) Plaintiff testified that his matchmaker

informed him "that some people are still uncomfortable with meeting in person" and up to "70% of people want to do Zoom," but he was not "okay with that." (*Id.* at 91:1-13, 98:1-8.) Plaintiff even texted the MS representative to complain about having to meet potential matches remotely during the pandemic, that he "didn't like the policy and . . . didn't think it was fair." (*Id.* at 98:16-21) He falsely accused that the MS representative "never mentioned" Zoom dates but was reminded that she did because "[i]t's what we were doing for months during Covid but now we are officially giving people the option to do either." (Graham Decl., Ex. I.) Among the documents Plaintiff produced was the introduction sheet for the Client Package he purchased, which stated: "ALL INCLUSIVE PACKAGE, Full service matchmaking, all work performed throughout each match cycle: matchmaker meetings & check ins, match searches throughout client's local area, candidate pre-screenings, date planning for each in-person ***and/or video introduction*** and post-date feedback." (Graham Decl., Ex. J (emphasis added).) Plaintiff insisted that "whether I read it or not, it wasn't something I was okay with." (Stanfield Depo. at 172:16-22.) Plaintiff was advised that he was not required to go on a Zoom date and ultimately did **not** go on any Zoom dates; he met both matches in-person.[3] (*Id.* at 95:2-9, 118:15-20; Graham Decl., Ex. J.)

Plaintiff ultimately conceded in his deposition that he understood that Tawkify could not force a woman to go on an in-person date if she was uncomfortable because of Covid-19, and that it was up to the people in the dating market to decide what they were comfortable with. (Graham Decl., Ex. Z at 116:9-117:1.) Plaintiff confirmed that despite knowing that he might effectively foreclose on a percentage of the dating pool by refusing matches that preferred to meet only through Zoom, he nevertheless <u>decided</u> to continue using Tawkify's service. (*Id.* at 118:15-20.)

## G.     Plaintiff Meets with Two Matches His Matchmaker Arranged.

On July 11, 2020, Plaintiff went on a date with his first match. (Graham Decl., Ex. K.)

---

[3] Notably, during the month that Plaintiff purchased his Client Package, Covid-19 was surging throughout California and resulted in the re-closure of certain venues. (*See* RJN, Ex. B, Mark Saunders, "California orders watch list counties to stop indoor operations, close bars amid surge in COVID-19 cases," ABC 10 News San Diego (July 1, 2020).) For additional context, on June 29, 2020, the day Plaintiff purchased the Client Package, Los Angeles County reported the largest single-day number of new infections the county had reported since the pandemic hit the United States. (RJN, Ex. C Colleen Shalby, Maura Dolan, *L.A. County coronavirus cases surge past 100,000 with record one-day tally*, L.A. TIMES, (Jun. 29, 2020).) On June 16, 2020, San Bernardino County—where Plaintiff resides—reached a new milestone in Covid-19 hospitalizations. (RJN, Ex, D, Sandra Emerson, *San Bernardino County reports highest one-day jump in coronavirus cases*, THE SUN (Jun. 16, 2020).)

Plaintiff was late to the date. (Graham Decl., Ex. Z at 122:21-123:3.) They met at a restaurant and had drinks; Plaintiff also ate an appetizer. (*Id.* at 122:7-11.) As Plaintiff requested, his date was also a single parent and within two years of his age. (Graham Dec., Ex. L.) Plaintiff described her as a "nice person." (*Id.*)   Nevertheless, Plaintiff testified that he found her physically unattractive, describing her as looking "sickly" and "way older than me." (Graham Decl., Ex. Z. at 121:20-25.) Plaintiff also testified that "[w]e had nothing in common." (*Id.* at 122:1.). In an email to a Tawkify Customer Success ("CS") representative dated July 14, 2020, Plaintiff complained that "when I first saw her, I thought she was 55 and that she looked sickly or anorexic. . . . she was all skin and bones. There was "a glaring difference in our age [sic] looks, even though we are only two year apart." (Graham Decl., Ex. M.) Contrary to his representations to Tawkify that he wanted a fit, healthy, and active woman, Plaintiff recently testified that "I'm a thicker dude. So I like women that are also thicker and big like me." (Graham Decl., Ex. Z at 123:10-14.) Plaintiff was also upset that his first match was "not big on dancing," she was "really into traveling and just went to Costa Rica and Iceland in the past year," and she came off as "very reserved" and "didn't like to laugh or joke around." (Graham Decl., Ex. M; Stanfield Depo. at 122:1-5.) Plaintiff had previously represented to Tawkify that although he was not a "huge traveler," he enjoyed travelling "locally" to areas such as Hawaii and Catalina Island (Schultz Decl., Ex. B.)[4] Plaintiff testified differently at his deposition, however, declaring: "I don't ever want to travel." (Graham Decl., Ex. Z at 124:15-23.)

On a feedback form Plaintiff's first match submitted about him, she declined to meet with Plaintiff again, stating that while Plaintiff "seemed like a nice guy," he was "over 15 minutes late." (Schultz Decl., Ex. E.) When she asked about traffic, "he said it wasn't bad." (*Id.*) Plaintiff's first match also noticed that "[h]is credit card got declined," which "did not give [her] confidence that he could support a wife and [sic] new family." (*Id.*) She further commented that Plaintiff did not want the date to end, stating:"[he] made me feel like he wanted to go to a 2nd place . . . [w]hen he dropped me off [sic] he said 'so is the date done?' like he wanted us to do something else . . . I'm not sure what he wanted, but I don't like that question. What was he thinking?" (*Id.*)

---

[4] For reference, Hawaii is approximately 2,500 miles from San Bernardino, California—where Plaintiff resided—and Costa Rica is approximately 3,300 miles from San Bernardino.  (*See* RJN, Exh. E (Google Map).)

Although Plaintiff's email to Tawkify's CS representative suggested "maybe we should just call it," Plaintiff admits that ultimately he had not yet given up on Tawkify's services and was interested in meeting his second match. (Stanfield Depo. at 137:21-24.) Particularly, he was also offered a credit for a non-refundable bonus match. (Schultz Decl., Ex. E.) On July 14, 2020, Plaintiff went on a date with his second match, who he describes as having a "**_beautiful_**" and "**pretty face**"[5] and is a "**good looking**" woman who runs an ████████████████████ (Stanfield Depo. at 168:18-20; Graham Dec., Ex. N (emphasis added).) Plaintiff was also late to this date.[6] Plaintiff admits he viewed the second match's work with the ████ community as "a real connection for" them, as he ██████████████████████████████ (Graham Dec., Ex. N.) Plaintiff further described her as wanting children and very engaged in her work. (Stanfield Depo. at 159:8-10.) Nevertheless, Plaintiff claims that his second match still did not meet his standards on physical attraction, as "she was also extremely thin and wasn't curvy at all," "[h]er demeanor was very reserved and wasn't big on joking around much," and "[s]he wasn't into dancing and wasn't into socializing or doing much besides work." (Graham Decl., Ex. N.) Despite the latter complaint about his second match's focus on her work, Plaintiff also noted that she had "a desire to sell her company and start a family and be a stay at home mom." (*Id.*) In the post-date feedback form, Plaintiff selected "Kinda" in the drop-box option response to Tawkify's question on whether it was "on track with the match." (Schultz Decl., Ex. D.)  Plaintiff's second match chose the drop-box option response of "Definitely not" to Tawkify's question of whether it was "on track with the match" as to Plaintiff's characteristics, explaining that she was "looking for someone more professional/sophisticated." (*Id.*) Nevertheless, Plaintiff's second match noted that he "[s]eemed fun," was a "nice guy," and that they "**[h]ad a fun conversation and quite a few things in common**." (*Id.* (emphasis added).) Plaintiff admitted in deposition that it was not an accurate statement for him to claim, as he does in the FAC and his counsel reasserted to this Court, that Tawkify had "completely ignored" his preferences. (Stanfield Depo. at 202:10-15.)

---

[5] Plaintiff admits in his deposition that he told is matchmaker "it was important . . . that a woman have a pretty face." (Stanfield Depo. at 168:21-23.)

[6] Per the text message exchanges between Plaintiff's matchmaker and himself, the date was scheduled for 7:30 pm, but Plaintiff sent a text message to the matchmaker at 7:33 pm that he was looking for parking. (Graham Decl., Ex. O.)

Concurrently with these first two matches, Tawkify had begun working on setting up Plaintiff's third match.  (Schultz Decl., Ex. F.) The morning after Plaintiff's second date, on July 15, 2020, a CS representative sent a text message to Plaintiff asking how his date with his second match went. (Graham Dec., Ex. O.) Plaintiff did not directly respond and instead emailed the CS team, stating that he "definitely need[s] a new matchmaker." (*Id.*; Graham Decl., Ex.  B.) Later that afternoon, he also sent an email to Tawkify asking for "a credit for those two matches and a different matchmaker or a full refund." (Graham Dec., Ex.  W.) Plaintiff admits that he was able to get into contact with Tawkify each time he wanted to express frustration or request cancellation and that Tawkify's contact information was provided to him in emails and the Client Agreement and Refund Policy. (Stanfield Depo. at 184:24-185:9 ["they typically always responded"]; Schultz Decl., Ex. I; Schultz Decl. iso MTD, Ex. A.)

### H.    Plaintiff Seeks a Refund.

Plaintiff testified that he believed he was entitled to a full refund of all moneys paid "because [Tawkify] didn't provide the service that they would" and admitted that the matches were not good and that he would "get credits." (*Id.* at 204:8-23.) When asked whether there were any other reasons entitling him to a full refund, he responded that there were no other reasons. (*Id.* at 205:7-17.)  Not only is the FAC silent on whether Plaintiff would have sought cancellation and a refund sooner had he known about his right under the DSCA to cancel within three days of purchase, Plaintiff did not cite the lack of DSCA disclosures as a reason he believes he was entitled to a refund in any of his discovery responses or during the entirety of his deposition.[7]

On July 17, 2020, Plaintiff was scheduled to speak with a CS representative. He told her, "I'd like a full refund processed today. I don't wish to discuss this or book time again for someone to be late and/or not communicate with me in a timely fashion. You're dealing with people on a high level, yet you are not at a high standard when it comes to communication or performance." (Graham Dec., Ex.  X.)  This is particularly interesting, given Plaintiff was late to both of his dates.

---

[7] As of the date of this motion, Plaintiff has belatedly sought leave of Court to amend the FAC to add purported claims wholly unrelated to his DSCA claims. Tawkify opposes Plaintiff's request. Notably, however, even the proposed Second Amended Complaint does not allege that had Plaintiff known of the DSCA requirements for a 3-day cooling period he would have behaved any differently or chosen to seek cancellation or a full refund within that 3-day period after purchase. (*See* Dkt. 71.)

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

On July 19, 2020, a different CS representative contacted Plaintiff seeking to discuss Plaintiff's complaints further and requesting "the opportunity to bonus your account back for the 2 matches you went on and start fresh with a different match maker that will take better care with your matches." (Graham Dec., Ex. D.) The CS representative followed up further but did not receive a response. (*Id.*)

On July 21, 2020, Plaintiff finally responded, noting that while they seemed "sincere," he had complaints about Tawkify's service, including, his being "set up with two people that have the same body type as my ███████ daughter," feeling that "MULTIPLE personality things and hobbies and interest things were COMPLETELY ignored"; that a Tawkify representative was "10 minutes late when [he] booked an appointment on HER schedule system and then had the audacity to tell [him] 'she forgot the appointment was at 2 and thought it was at 3'"; and that only 30% of Tawkify's dating pool was open to in-person dates due to COVID-19. (Graham Dec., Ex. Y, [emphasis in original]) Plaintiff continued, "I can do MUCH BETTER on my own and have no problem finding beautiful curvy women that have a kid and likes [sic] to dance and joke around and are outgoing, successful and stable. I was hoping this would save me time and effort, but all it's done is waste my time, money and emotional effort!" (*Id.*) Plaintiff concluded, "I'd like a full refund processed today and if you want me to sign a non disclosure [sic] agreement or gag order to get all my money back, I'll be happy to do so. I spoke to my attorney this morning and he suggested I offer to do so." (*Id.*) In his deposition, however, Plaintiff admitted that he "lied" to Tawkify when he claimed to have an attorney and that his attorney suggested that he offer Tawkify a non-disclosure agreement in exchange for a full refund for services that had been rendered to him. (Stanfield Depo. at 195:1-19.) When asked to confirm that Tawkify informed him on multiple occasions in multiple ways that he would not get a refund for services actually rendered, Plaintiff responded that he "wouldn't call those services" but "would call that a scam." (*Id.* at 205:18-24.) He believed that despite meeting with two matches on two dates, services could not be considered rendered, including the time his matchmaker spent searching and screening potential candidates for matches, because he "didn't completely like each date." (*Id.* at 205:25-2016:18.)

**I.     Plaintiff Turns Down Tawkify's Offer of Non-Refundable Bonus Matches, Unequivocally Cancels, and Receives a Prorated Refund Instead.**

On July 22, 2020, a CS representative sent a response to Plaintiff acknowledging that "[i]t sounds… like your mind is made up and you would like to cancel and request a refund." (Graham Dec., Ex.  Q.) The CS representative reiterated, "You do have the option to change to a different match maker and I'd be happy to personally oversee that as well as give you **a non-refundable bonus match** to make up for your bad date… Please let me know what you decide." (*Id.*) (emphasis added).) In response, Plaintiff emailed, "Yes I want a full refund and it was much more than a disconnect with my matchmaker. Anyways, please refund all $3700 of my money today." (*Id.*)

Later that day, a CS representative notified Plaintiff that his refund request had been submitted to Accounting and could take 45 to 60 days to process as Tawkify was "processing a higher than usual amount of refunds due to covid." (*Id.*) Plaintiff retorted, "This needs to be prioritized over some lame Covid cancellation! Cancelling over Covid isn't even a legit reason to cancel if you signed up during Covid. Unbelievable!" (*Id.*) On August 1, 2020, Plaintiff received a prorated refund of $1,850.01. (Graham Dec., Ex.  R.) The refund represents a prorated refund of services not yet rendered, as Plaintiff had already completed two match cycles and was transitioning into a third match cycle. (Schultz Decl., Ex. F; *See e.g.*, Thane Depo., at 96:20-97:4)

**J.     Plaintiff Threatens Litigation.**

On August 4, 2020, Plaintiff emailed the CS team demanding that he be refunded the full $3,700 he had paid. (Graham Dec., Ex. S.) After several back and forth exchanges on August 7, 2020, Tawkify directed Plaintiff to Tawkify's Refund Policy, stating, "[w]e don't refund for services rendered for any reason. You were given a non-refundable bonus match to make up for one of the two dates, but this was forfeited given you chose to [*sic*] refund." (Graham Dec., Ex.  T.) Plaintiff was even provided screenshots of when, and how, he had previously agreed to Tawkify's refund policy. (*Id.*)

Plaintiff responded to the email by stating, "that's cool, prepared [sic] to get sued and I'll make sure it's a class action because you clearly miss representing [*sic*] and taking advantage of people! Enjoy the loss of business and money that's coming to you!!" (*Id*.) On August 26, 2020,

Tawkify refunded Plaintiff the remaining $1,849.98 that he had paid for Tawkify's services—**before** Tawkify was served with the summons and complaint in this action. (Graham Dec., Ex.  U.) At his deposition, Plaintiff made clear that he has no desire to ever purchase or use Tawkify's services again in the future. (Stanfield Depo. at 260:16-20.)

K.     **Plaintiff Admits to Violating Tawkify's Terms of Use by Sharing His Account Login Information Without Permission**

Plaintiff admits he agreed to Tawkify's Terms of Use and that it was his general practice to read documents he agrees to. (Stanfield Depo. at 35:11-36:1; 49:4-17; and 209:15-25.) The Terms of Use included a provision stating that the account he creates "is for your personal use only. You may not authorize others to use your account, and you may not assign or otherwise transfer your account to any other person or entity." (Schultz Decl., Ex. H.) The Terms of Use further states that Plaintiff is "responsible for keeping your password for the Website confidential **. . .** [and] fully responsible for all actions and activities that occur under [his] username and password**"** and he was prohibited from sharing his login credentials with "anyone." (*Id.*) Plaintiff's activity log for his Tawkify profile, however, confirms that after he sought cancellation, different IP (Internet Protocol) addresses began logging into his Tawkify account. (Schultz Decl., Ex. G.) When asked to confirm that he "did not give your password or username to any person *other than your* attorneys**,"** Plaintiff responded, "no."  (*Id.* at 218:13-23.) Tawkify also requested clarification from Plaintiff through written discovery, which appears to confirm that Plaintiff did in fact share his login and password with his attorneys—although he does not specify specifically which attorney.[8]

L.        **Plaintiff Cannot Articulate Having Suffered Any Actual Damages**

Plaintiff admits that Tawkify has since refunded him all moneys he paid Tawkify, which includes the prorated refund previously issued on August 1, 2020. (Stanfield Depo., at 247:14-23.) The full $3,700 he paid for the Client Package has been returned to him. (*Id.* at 247:14-23.) When asked to detail what basis Plaintiff believes entitles him to additional money from Tawkify, other

---

[8] As of the date of this filing, Tawkify has e-filed a Discovery Dispute letter with the Court, detailing Plaintiff's ongoing resistance to producing the information and/or documents requested in response to its discovery requests on this issue. (Dkt. 70-70-5.) A hearing is set for July 7, 2021 to resolve this pending discovery dispute.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1  than what his counsel would say, Plaintiff identifies "the stress" of the matchmaking experience,

2  "losing" money for months (for services that were rendered in which the total amount paid was

3  ultimately refunded to him in full), and the money he spent on the dates. Plaintiff further admits that

4  he "can't quantify it." (*Id.* at 249:3-11.)

5      In total, Plaintiff states he spent approximately $40 on gas to travel from his home to the

6  restaurants, approximately $50 from his first date and approximately $80-$100 for his second date.

7  (*Id.* at 250:7-251:22.)  In the first date, Plaintiff bought drinks for himself and his date, though only

8  he ate an appetizer. (*Id.*)  Both he and his second match ate during dinner. (*Id.* at 250:7-251:22.)

9  Plaintiff could not identify any further "out-of-pocket" costs he claims to have spent in relation to

10  his interactions with Tawkify or use of its services. (*Id.* at 253:8-11.)

11  ## III.   LEGAL STANDARD

12      Summary judgment "must be granted under FRCP 56 when 'the pleadings, the discovery and

13  disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

14  fact and that the movant is entitled to judgment as a matter of law.'" *Apple Inc. v. Psystar Corp.*, --

15  -F.Supp.2d--, 2009 WL 3809798, at *2 (N.D. Cal. Nov. 13, 2009) (Alsup, W.); Fed. R. Civ. P. 56(a).

16  Where a defendant moves for summary judgment on a claim for which the plaintiff bears the burden

17  of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to

18  establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*,

19  477 U.S. 317, 322 (1986).

20      The burden then shifts to plaintiff, who must "go beyond the pleadings and by [his] own

21  affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

22  'specific facts showing that there is a genuine issue for trial." *Id.* at 323-24 (explaining that "[o]ne

23  of the principal purposes of the summary judgment rule is to isolate and dispose of factually

24  unsupported claims").  Unsupported conjecture or conclusory statements do not create a genuine

25  dispute of material fact and will not defeat summary judgment. *Surrell v. California Water Serv.*

26  *Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). A dispute is "material" only if it could affect the outcome

27  of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

28  A party cannot defeat summary judgment by arguing "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome a summary judgment motion, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Id.* at 256.

## IV.  ARGUMENT

### A.  Plaintiff Lacks Standing to Pursue His Claims.[9]

#### 1.  Plaintiff lacks constitutional standing under Article III

Article III standing requires that a plaintiff allege an injury in fact that is fairly traceable to the challenged conduct.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In order to allege an injury in fact, Plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, [ ] and (b) 'actual and imminent, not 'conjectural' or 'hypothetical.'" *Id.* (internal citations omitted).  Alleging current exposure to a risk of injury does not show future injury is "imminent." *Id.*  563-64.  Rather, "imminent" means "certainly impending," not just "possible" or even "likely." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1145, 1147 (2013).

The U.S. Supreme Court's *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) decision is particularly instructive on whether allegations of purely procedural violations, such as those alleged here, constitute an Article III injury-in-fact.  "Particularized" injuries must "affect the plaintiff in a personal and individual way." *Id.* at 1543 (internal citations omitted).  Even if Plaintiff's conclusory grievances of being "subjected to policies and practices" (that had no impact on his own individual circumstances) or that his request for a full refund—which Tawkify was not required to provide under the DSCA as a matter of law—took longer than he'd like could be considered "particularized" injuries, this determination alone is insufficient to satisfy Article III standing. *See id.* at 1548 ("we have made it clear time and time again that an injury in fact must be **both** concrete and particularized") (emphasis in original).  "A concrete injury must be '*de facto*'; that is, it must actually exist[,]" and a plaintiff cannot "automatically satisf[y] the injury-in-fact requirement"

---

[9] Plaintiff asserts three claims against Tawkify: (1) a purported violation of the DSCA; (2) UCL; and (3) CLRA. (*See* FAC.) Each of these claims fail as a matter of law. Plaintiff has the burden of proof at trial on the issue of damages or cognizable harm, which is an essential element. *See McClinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988). A failure to present a triable question of fact on the issue of damages (or cognizable harm) is sufficient to justify granting a motion for summary judgement in full. *Philips v. Ford Motor Co.*, 2017 WL 635469.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1    simply because a "statute grants a person a statutory right and purports to authorize that person to

2    sue to vindicate the right." *Id.* at 1548-49 (internal citations omitted). The *Spokeo* Court defined

3    "concrete" injuries as those that are "real, and not abstract," finding that a plaintiff cannot merely

4    "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact

5    requirement of Article III." 136 S. Ct. at 1549; *accord Summers v. Earth Island Inst.*, 555 U.S. 488,

6    496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the

7    deprivation . . . is insufficient to create Article III standing").

8        The U.S. Supreme Court has recently affirmed (just last week on June 25, 2021) that under

9    Article III, "a federal court may resolve only 'a real controversy with real impact on real persons.'"

10   *TransUnion LLC v. Ramirez*, Case No. 20-297, 2021 WL 2599472 (U.S. Jun. 25, 2021) (citing to

11   American *Legion v. American Humanist Assn.*, 139 S. Ct. 2067 (2019) [Gorsuch, J., concurring in

12   judgment]). The Court reiterated that "federal courts do not adjudicate hypothetical or abstract

13   disputes. Federal courts do not possess a roving commission to publicly opine on every legal

14   question. Federal courts do not exercise general legal oversight of the Legislative and Executive

15   branches, or of private entities. And federal courts do not issue advisory opinions." *Id.* at *6. That

16   is what Plaintiff seeks here.

17       The Supreme Court cautioned in *TransUnion* that "**an injury in law is not an injury in**

18   **fact**." *Id.* at *7-*8 (emphasis added). Citing to *Spokeo*, the Court explained that it "has rejected the

19   proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute

20   grants a person a statutory right and purports to authorize that person to sue to vindicate that right."

21   *Id.* at *8 (citing to *Spokeo*, 578 U.S., at 341.) Constitutional standing requires proof of a concrete

22   injury "***even in the context of a statutory violation.***" *Id.* "Article III is not a "freewheeling power

23   to hold defendants accountable for legal infractions." *Casillas*, 926 F.3d, at 332 (full cite). In order

24   to vindicate a statutory violation, the alleged violation must "personally harm the plaintiff . . . ."

25   *TransUnion*, at *8. Without evidence that the plaintiff "suffered any physical, monetary or

26   cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American

27   courts," an "uninjured plaintiff" such as Plaintiff Jeremy Stanfield— "in those circumstances is, by

28   definition, ***not seeking to remedy any harm to [him/]herself*** but instead is merely seeking to ensure

a defendant's compliance with regulatory law (and of course, to obtain some money via the statutory damages)." *Id.* (citing to *Spokeo*, 578 U.S. at 345 [Thomas, J., concurring]) (internal quotation marks omitted). The Supreme Court is clear that these are **not** grounds for Article III standing, and that "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* at *9 (citing to *Lujan* (full cite), 504 U.S. at 577); *c.f.*, Plaintiff Stanfield's FAC, ¶ 65 ("Plaintiff . . . ha[s] lost money or property, including . . . costs associated with efforts to respond to or challenge Tawkify's policies").

   The FAC, Plaintiff's deposition testimony, and his responses to written discovery all confirm what this Court suspected during the hearing on Tawkify's Motion to Dismiss—that there not only is a question on standing, but an entire lack thereof to maintain this action. Plaintiff has suffered no monetary damages. He confirms that he received a prorated refund and then ultimately the full $3,700 he paid for the Client Package. (*Id.* at 247:14-23.) *At most*, Plaintiff can only quantify that he voluntarily spent approximately $190 out-of-pocket on gas to drive to his dates, drinks for his dates, an appetizer for himself during the first date, and dinner for his match and himself in the second date. (Stanfield Depo. at 250:7-251:22.) These costs, however, are entirely unrelated to any alleged DSCA violations and amount to items for which Plaintiff himself received a benefit, *e.g.*, food and beverages that he consumed. (*Id.*) Plaintiff cannot plausibly seek to recover such costs from Tawkify simply because he subjectively disliked his two matches. *See Gertz v. Toyota Motor Corp.*, 2011 WL 13142144, *12 (C.D. Cal. Apr. 28, 2011) ("Gertz I") (general allegations of disappointed expectations insufficient to establish a cognizable harm.) Plaintiff also has not suffered any physical or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts (such as reputational harm i.e. defamation). *See TransUnion* LLC, 2021 WL 2599472, at *7 (citing to *Spokeo*, 578 U.S. at 345 [Thomas, J., concurring]). At most, Plaintiff admits to feeling "stress" over the matchmaking experience, which he admits he "can't put a dollar

1   amount on it." (Stanfield Depo., at 251:23-252:10.).[10] The law does not provide remedies to any of

2   these idiosyncratic and hypothetical "injuries."

3           **a.    Plaintiff was only entitled to a prompt, prorated refund under**
4                  **the DSCA,[11] which he received before filing suit.**

5           It is undisputed that, under the DSCA, if a buyer cancels a dating service contract within a

6   three-day cooling period, he is entitled to a full refund within ten days of cancellation of all moneys

7   paid, regardless of whether services have already been rendered.   Cal. Civ. Code § 1694.1(e).

8   Plaintiff, however, misconstrues the law by combining two unrelated sections of the DSCA,

9   California Civil Code sections 1694.1(e) and 1694.2(e)[12] to assert that, if read together, a client who

10  cancels a dating service contract without required disclosures at any time is thus entitled to a refund

11  of "all moneys paid" within ten days, regardless of whether services have already been rendered.[13]

12  By this flawed logic, Plaintiff could hypothetically meet all six matches (or eight, when including

13  the two bonus non-refundable matches he was offered but ultimately declined), "cancel" for lack of

14  disclosures that do not apply to him, and somehow still be entitled to a refund of all six (or eight)

15  matches used. As the DSCA's legislative history, the statute's construction, and analogous case law

16  all make clear, the DSCA does not provide for such relief. (*See* Dkt. 59 at pp. 4-6.) Indeed, even

17  this Court questioned—and Plaintiff's counsel conceded—such a peculiar reading of the DSCA, as

18

19  ───────────────

   [10] This "stress" however is, as evidenced by Plaintiff's own deposition testimony, is entirely self-inflicted and
20  conjectural. Plaintiff alleges to being frustrated from (1) purportedly having to either meet his matches remotely in the
   midst of a global pandemic or be foreclosed from meeting a percentage of women who prefer Zoom dates due to his
21  non-negotiable requirement for in-person dates; (2) being matched with women who appeared too "skinny" for his
   personal liking despite other commonalities and his representation that he wanted a fit, active, and healthy woman
22  (among a host of other misrepresentations about what he values and seeks in a partner—which guided how his
   matchmaker searched and screened for candidates); and (3) being refused a full refund he was not entitled to after
23  having already met with two matches on dates his matchmaker arranged, and even wanting to continue the date after
   dinner, which undermines his claim that he received no value or viable matches from Tawkify.
24  [11] For the Court's reference, a more extensive discussion and analysis of the California Legislature's history as it
   relates to the DSCA is in Tawkify's Motion to Dismiss (Dkt. 59 at pp. 4-6.) This Motion contains an abridged version
   of the arguments made therein.
25  [12] Section 1694.1(e) follows subsections discussing cancelations made within the three-day cooling period and states
   that "All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the
26  notice of cancellation." Cal. Civ. Code § 1694.1(e). Section 1694.2(e) states that "If a dating service contract is not in
   compliance with this chapter, the buyer may, at any time, cancel the contract." Cal. Civ. Code § 1694.2(e).
27  [13] Of note, Plaintiff's position is inconsistent on this point, as he both argues that "all moneys paid" must be refunded
   within 10 days of cancelation (seemingly regardless of services already rendered) and yet maintains that he deserves
28  more than the prorated amount anyhow because of the bonus matches Tawkify offered. (*See* Opp. at 7:19-25, 6:15-25.)
   Plaintiff cannot have it both ways.

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1  it would inevitably result in a windfall of money and services unjustly earned by the uninjured

2  plaintiff. (Graham Decl., Ex.  H, at 28:13-29:4.)

3       As set forth more fully in Tawkify's reply brief in support of its motion to dismiss (Dkt. 59

4  at pp. 4-6.),  providing a consumer with a full refund within days, even for services already rendered,

5  was an extraordinary remedy meant only to close a unique and specific loophole that allowed dating

6  service providers to undermine the three-day cooling period by withholding a portion of what a

7  buyer had pre-paid. Such is plainly not the case here with Plaintiff Stanfield.

8       This interpretation of the DSCA is further supported by *Adelman v. Spark Networks Ltd.*,

9  Nos. B195332, B197097, 2008 WL 2108667 (2008).[14] There, the plaintiff, similar to Plaintiff

10  Stanfield here, filed a putative class action complaint alleging that his dating membership contract

11  was void because it did not include the disclosure provisions required by the DSCA, therefore

12  entitling him "to either a full refund or a refund of the price minus the reasonable value of the

13  services received." *Id.* at *1-2. The appellate court affirmed the trial court's dismissal of the

14  complaint with prejudice, concluding that the record supported a finding that no actual injury

15  existed, that plaintiff decided to keep paying for the service, that the price paid was "worth the

16  services" he received, and that plaintiff was an inadequate class representative. *Id.* It further noted

17  that "[plaintiff] does not explain why the services he received were any less valuable because of the

18  omission from the contract of certain allegedly required provisions that he never sought to invoke

19  and were of no value to him." *Id.* at *7. These exact deficiencies are also present here.

20       Under the DSCA, Plaintiff's circumstances for canceling merely "entitled [him] to receive

21  a refund or refund credit of that portion of the cash price as is allocable to the services not actually

22  received by" him.  Cal. Civ. Code § 1694.4(d).  That amount is what he received within ten days

23  after he unequivocally turned down Tawkify's offer to credit his Tawkify account with non-

24  refundable bonus matches. (Graham Dec., Ex.  R.)

25

26  [14] The Ninth Circuit has held that courts may consider unpublished California state court opinions as persuasive authority when no published California opinion controls. *See Emp'rs Ins. Of Wausau v. Granite St. Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) (stating that the court "may consider unpublished state decisions" and that unpublished opinions, "while certainly not dispositive of how the California Supreme Court would rule," may still "lend[] support" to a certain position regarding California law). Regarding this issue, there are no controlling published California opinions. Therefore, the Court can and should treat *Adelman* as persuasive authority.

27

28

DEFENDANT TAWKIFY, INC.'S CORRECTED SUPPLEMENTAL BRIEFING RE:
CONVERTED MOTION FOR SUMMARY JUDGMENT

1

2

**b.      Plaintiff's right to a full three-day cooling period also does not toll based on a lack of notice.**

3      During the hearing on Tawkify's Motion to Dismiss, Plaintiff raised a case it did not cite to

4   in his papers—*Weatherall Aluminum Prod. Co. v. Scott*, 71 Cal. App. 3d 245, 249 (1977)—and

5   claimed that it stood for the proposition that the three-day cooling period for Plaintiff "doesn't start

6   to run until you give notice"—an implication that Plaintiff's right to a full refund of all moneys

7   prepaid for the Client Package within 10 days of canceling would somehow continue in perpetuity.

8   As a preliminary matter, *Weatherall* is wholly distinguishable and does not stand for such a broad

9   proposition. Moreover, such an interpretation of the DSCA would contradict the California appellate

10  court's holding in *Adelman*.  *Adelman, supra.*, 2008 WL 2108667 at *2 ("They stipulated, among

11  other things, that Spark's membership contracts do not expressly provide a three-day right of

12  rescission…"). Likewise, in *Howell v. Grindr*, No. 15-cv-1337, 2016 WL 1668243, *3 (S.D. Cal.

13  Apr. 27, 2016) (*Howell II*), the Southern District of California ruled that "[w]hen a dating service

14  violates the DSCA and a buyer cancels the contract, the dating service shall **refund a pro rata**

15  **portion of the services not received**." *Id.* at *3 (emphasis added).

16      In *Weatherall*, the contract at issue was **not** a DSCA contract, but a "home solicitation

17  contract" as defined by  Cal. Civ. Code, § 1689.5.  *Weatherall*, 71 Cal. App. 3d at 246.  These sorts

18  of contracts require certain disclosures, including a party's cancellation rights. *Id.* at 247. As the

19  court in *Weatherall* held, however, if the right to cancel is not disclosed, a party "retain[s] a right to

20  cancel." *Id.* This is not an issue in dispute in this matter. Tawkify does not dispute that Plaintiff

21  retains a right to cancel; in fact, Plaintiff admits that Tawkify allowed him to cancel without issue

22  or penalty and he received a prorated refund. Plaintiff's retained right to cancel is not the same as a

23  retained right to a refund of all moneys paid (or for the post-3-day-cooling-period refund to be issued

24  within ten days). In *Weatherall*, the cancelling party was not required to pay for any services

25  rendered under a statute that is unique *only* to the home buying context with "home solicitation

26  contracts"—Cal. Civ. Code, § 1689.11(c).  *Weatherall*, 71 Cal. App. 3d at 248. Under Cal. Civ.

27  Code, § 1689.11(c), "If the seller has performed any services pursuant to a home solicitation contract

28  or offer prior to its cancellation, the seller is entitled to no compensation." (Emphasis added.) That

is not what the DSCA provides.

Even if this Court determines that home solicitation contracts are somehow similar to the DSCA—which they are not, the California appellate court's decision in *Beley v. Mun. Ct.*, 100 Cal. App. 3d 5 (1979) is far more analogous to the facts in the instant action. *Beley* affirmed the holding in *Weatherall* that a buyer's right to cancel is "technically extended indefinitely (until the Seller complied with the notice requirement)," it disagreed with the buyer's claim that the statute thus gives him a unfettered right to retain the substantial benefits conferred by the seller's performance without payment. *Id.* at 9. The court held that even if the seller cannot recover payment under the contract, nothing in *Weatherall* or in the relevant statute precluded seller from recovering, on a quantum meruit basis, the reasonable value of the improvements buyer received. *Id.* The court further commented that the facts of that case—a buyer's invocation of his technical right under the statute to cancel **after** substantial completion of a project by the seller—is different than what was contemplated by the legislature, and that "[i]t would be grossly inequitable to interpret the statute to mean that Seller gets no compensation even though Buyer has the benefit of several thousand dollars' worth of home improvements. *Id.*

As evidenced above, Tawkify's alleged procedural violations of the DSCA's requirements "result[ed] in no harm" to Plaintiff Stanfield.[15] District courts have routinely rejected efforts to establish standing through mere statutory violations, including in the context of the DSCA. *Howell v. Grindr,* No. 15-cv-1337, 2015 WL 9008801, at *4 (S.D. Cal. Dec. 15, 2015) ("*Howell I*") ; *and see Boorstein*, 2012 WL 2152815; *see also Miller v. Hearst Communications, Inc.*, No. 12-0733, 2012 WL 320524, at *7 (C.D. Cal. Aug. 3, 2012) ("[b]ecause Plaintiff fails to allege a cognizable injury, she lacks statutory standing . . . regardless of whether her allegations are sufficient to state a violation of the STL [Shine the Light] law"). *Howell* is instructive, as it involves a dating service provider and the exact same procedural violations under the DSCA. In *Howell I*, the court dismissed plaintiff's amended complaint because the DSCA "requires a showing that the economic injury suffered by him was *due to* a violation of the statute." *Howell I*, 2015 WL 9008801, at *4 (emphasis

---

[15] *See e.g.*, *Spokeo*, 136 S. Ct. at 1550 ("not all inaccuracies [under the applicable statute] cause harm or present any material risk of harm"). Merely being "deprived of a procedural right . . . alone, is not enough to create standing." *See Boorstein v. Men's Journal, LLC*, No. 12-771, 2012 WL 2152815 (C.D. Cal. June 14, 2012).

added). Similar to Plaintiff Stanfield's complaint, the plaintiff in *Howell I* alleged that "Defendant's dating service contract does not include a three-day cancellation provision and does not include the name and address to which the notice of cancellation is to be mailed." *Id.* The court concluded that those allegations were **<u>not enough</u>** to constitute an injury, commenting that the operative complaint "alleges a violation of the statute and monetary injury, but does not allege that the injury resulted from a violation of the statute. The FAC does not allege the facts surrounding the cancellation of the contract . . . ." *Id.* Such is the case here. Further, just like in *Adelman*, the mere fact that Plaintiff entered into a contract that allegedly violated the DSCA does not mean the services he received were less valuable than what he initially paid (and was ultimately refunded). *See Adelman*, 2008 WL 2108667, at *7.

Plaintiff does not allege, nor has he provided any evidence to support, a theory that *had* Tawkify disclosed that he may cancel within three days of signing the agreement, he *would have* done so. Moreover, Plaintiff did not cancel due to any alleged disability, death, or relocation (*i.e.*, the other DSCA disclosures he alleged are missing from Tawkify's contracts but which do not apply to his personal circumstances), or had any issues getting in contact with Tawkify. (Graham Decl., Ex. V.) Rather, as alleged in the FAC and borne out through discovery, Plaintiff's sole reasoning for canceling had nothing to do with the alleged DSCA violations at issue. It also revealed that whenever given an opportunity to cancel, he indicated a willingness to continue using Tawkify's services—until he ultimately did not anymore.

### 2.   Plaintiff lacks Statutory Standing.

As the U.S. Supreme Court held in *TransUnion*, "standing is not dispensed in gross; rather, plaintiff must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages). *TransUnion* (cite) (citing to Davis, 554 U.S. at 734 and *Friends of the Earth Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Beyond Article III and the DSCA, Plaintiff likewise lacks standing under California's UCL and CLRA—both of which are tethered to the alleged DSCA violations and thus also fail.  As to the UCL, standing "requires more than mere allegations that a defendant engaged in fraudulent or

deceitful business practices. Standing also requires a plausible claim of causation, which in turn requires a showing of reliance." *Kaing v. Pulte Homes, Inc.*, No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010); Bus. & Prof. Code § 17204 ("Action for relief pursuant to this chapter shall be prosecuted exclusively . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition"); *see Hall v. Time Inc.*, 158 Cal. App. 4th 847, 856-57 (2007) (collecting cases that have addressed reliance as a prerequisite to standing under Section 17200).  Similarly, the CLRA requires that Plaintiff tie Tawkify's alleged DSCA violations to an economic loss that he suffered.  *See Doe v. SUCCESSFULMATCH.COM*, 70 F.Supp. 3d 1066, 1075 (N.D. Cal. 2014) ("to adequately plead a CLRA claim, a plaintiff must allege that she relied on the defendant's alleged misrepresentation and that she suffered economic injury as a result."); *see also Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) ("plaintiffs meet this requirement [pleading a sufficient CLRA claim] if they show that, by relying on a misrepresentation . . . they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'").[16]

As discussed *supra*, Plaintiff lacks standing because he received the appropriate relief he was entitled to under the DSCA (a prompt, prorated refund) before filing suit, and even more (a full refund prior to serving Tawkify with the summons and complaint). Plaintiff's UCL and CLRA claims further fail because Plaintiff does not (and cannot) allege or prove reliance. No evidence supports that Plaintiff relied on any alleged misrepresentations by Tawkify relating to the DSCA, or otherwise, to his detriment, and would have acted differently if he had notice of what the DSCA requires. These undisputed facts are fatal to Plaintiff's UCL and CLRA claims, too.

### 3.   Plaintiff's Claims for Injunctive Relief Fails

"Absent any intent to purchase [t]he products in the future, Plaintiffs cannot" justify injunctive relief." *See, e.g., Swearingen v. Late July Snacks LLC*, 2017 WL 1806483, at *10 (N.D. Cal. May 5, 2017) (quotation and citation omitted)). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir.

---

[16] As discussed at length in Tawkify's Motion to Dismiss and Reply Briefs, These claims further fail for lack of specificity required under Federal Rules of Civil Procedure 9. (Dkt. 59, at pp. 10-11.)

2010) (internal quotations and citations omitted). "Thus, a plaintiff who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief" such as an injunction. *See id*. "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'" *Id*. at 970 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Here, Plaintiff has testified in no uncertain terms that he has no intention of ever using Tawkify's services again.  Plaintiff testified that he will never use Tawkify's services in the future. (Stanfield Depo at 260:16-20.) His prayer and claims for injunctive relief, therefore, should be dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Tawkify's motion for summary judgment on all of Plaintiffs' claims for lack of standing, damages, or any cognizable injury.

Dated:   July 9, 2021                    Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:    Jahmy S. Graham
       Jahmy S. Graham
       Priscilla Szeto
       Crispin L. Collins

       Attorneys for Defendant
       TAWKIFY, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2021, I electronically filed the forgoing with the Clerk of court using the CM/ECF system and I served a copy of the forgoing pleading on all counsel for all parties via the CM/ECF system and/or mailing same by United States Mail, properly addressed, and first class postage prepaid, to all counsel of record in this matter.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed  July 9, 2021 at Torrance, California.


By:   /s/ Jahmy S. Graham
         Jahmy S. Graham

EXHIBIT 2



# EXHIBIT 3



CONFIDENTIAL



**CONFIDENTIAL**                                                                                    **TAWKIFY_STANFIELD_00180**



**CONFIDENTIAL**



**CONFIDENTIAL**

**TAWKIFY_STANFIELD_00182**



CONFIDENTIAL

TAWKIFY_STANFIELD_00183



CONFIDENTIAL



CONFIDENTIAL

# EXHIBIT 4



**CONFIDENTIAL**                              **TAWKIFY_STANFIELD_00202**



CONFIDENTIAL



 TAWKIFY_STANFIELD_00204

# EXHIBIT 5



CONFIDENTIAL

# EXHIBIT 6



CONFIDENTIAL



CONFIDENTIAL

# EXHIBIT 7



CONFIDENTIAL                    TAWKIFY_STANFIELD_00205



CONFIDENTIAL                    TAWKIFY_STANFIELD_00206



CONFIDENTIAL                    TAWKIFY_STANFIELD_00207





TAWKIFY_STANFIELD_00209



TAWKIFY_STANFIELD_00210

# EXHIBIT 8







# EXHIBIT 9



**From:** Jeremy Stanfield ███████████████████
**Date:** July 15, 2020 at 8:38:51 AM PDT
**To:** Tawkify Customer Success <customersuccess@tawkify.com>
**Subject: Re:  [Customer Request] For Jeremy Stanfield**

Hi ████

Yeah I definitely need a new matchmaker. I'll fill out the feedback form for both today.

Plz send me your appointment availability link when possible.

Thank you
Sent from my iPhone

> On Jul 14, 2020, at 7:41 AM, Jeremy Stanfield
> ██████████████████████ wrote:
>
> I can do 12:30 today, let me know if that works for you.
>
> Sent from my iPhone

>> On Jul 14, 2020, at 7:30 AM, ████ (Tawkify Customer
>> Success) <customersuccess@tawkify.com> wrote:

>> ##- Please type your reply above this line -##

>> 
>> Jul 14, 2020, 9:30 AM CDT

>> Hi Jeremy,

# EXHIBIT 10

Hi Jeremy,

I truly care about your experience and noticed you hadn't responded so I'm following up to ensure you got my email and better understand how I can be of assistance.

Warm regards,



Tawkify Customer Success Team
customersuccess@tawkify.com

---

 (Tawkify)

Jul 19, 2020, 10:56 AM CDT

Hi Jeremy,

My apologies, as I just saw your communication with my colleague, ███  I am so sorry that you have had this experience.  Prior to being promoted to customer success, I was a veteran matchmaker for the company for years.  I understand your frustration and your displeasure is valid.

I would love the opportunity to bonus your account back for the 2 matches you went on and start fresh with a different match maker that will take better care with your matches.  I can assure you that this is not the experience we aim to provide.  I hope you will reconsider and allow me to help.

Please let me know what you decide.  Customer success is here to help.

Warmly,

Tawkify Customer Success Team
customersuccess@tawkify.com

STANFIELD000085

 **(Tawkify)**

Jul 19, 2020, 9:28 AM CDT

Hi Jeremy,

My name is ▓▓▓▓ and I'm from the Tawkify Customer Success Team. I am a Client Experience Specialist, working with clients before, during and after their experience to collect imperative feedback. I am so sorry to hear that you would like to cancel your experience and I am here to support you.

We remedy a variety of challenges every day and have a multitude of tools at our disposal. I'm so sorry that you have not had the experience you signed up for and am here to help.  Are you able to discuss your experience with me so I can get a better understanding?

Here is a link to my schedule so you can choose a time that works best for you: https://calendly.com/▓▓▓▓▓▓▓▓/talk-to-▓▓▓▓

Warmly,

▓▓▓▓

Tawkify Customer Success Team
customersuccess@tawkify.com

This email is a service from Tawkify. Delivered by **Zendesk** | **Privacy Policy**

‹ **Inbox**              **26 Messages**                ⌃  ⌄



9:15 AM

**To: ME** ›

# Re: Tawkify Customer Success Reaching Out

##- Please type your reply above this line -##

 (Tawkify)

Aug 7, 2020, 11:15 AM CDT

Hi Jeremy

Thanks for making us aware of your intentions.

I will need to echo what ▮▮▮▮▮ has previously told you.

Our refund policy isn't negotiable. Its agreed to multiple times, twice at account set up (screenshot below):

**tawkify**                            Get $100. Give $100    Randy Rico ⌄

We know you're busy. This only takes 2-minutes. Don't waste precious time.

Email                                    Create a Password

[                    ]              [                    ]
Please enter an email address.

☐ By continuing, I certify that I am over 18 and have read and agreed to the Terms of Use, Privacy Policy, and Refund Policy.     CONTINUE ›

🗑        📁        ↩        ✎

# EXHIBIT 11

12:43        LTE

Hi █████ I'm going to do the credit card on Monday. Heading out of town with ████ for the weekend. I'm committed though. To recap it's $3700 for 6 potential dates in a 40 mile radius.

4:28 PM

That's correct. You've got those numbers right. I'll give you a million dollars if you do it today. Please! 😁

4:40 PM

End of the week or me. Would be really awesome. Somewhat unprofessional of me but I know you get it.

4:41 PM

Text Message

STANFIELD000099

**From:** Tawkify Customer Success <customersuccess@tawkify.com>
**To:** Jeremy Stanfield██████████████
**Sent:** Monday, June 29, 2020, 04:48:29 PM PDT
**Subject:** Thank you for your purchase on Tawkify

Hi Jeremy,

Thank you for your purchase on Tawkify.

If you have any questions, feel free to contact us at
customersuccess@tawkify.com.

Warmly,
Your Tawkify Team

## Order Details

Order #: 0000354204
Placed on ██████████████████

**6 Match Standard Client Package**
ALL INCLUSIVE PACKAGE Full service matchmaking, all work
performed throughout each match cycle: matchmaker meetings
& check-ins, match searches throughout client's local area,
candidate pre-screenings, date planning for each in-person
and/or video introduction and post-date feedback.

| | |
|---|---|
| **Balance of Package:** | **$5400.00** |
| **Credits/Discount:** | **$1700.00** |
| **Your Total:** | **$3700.00** |

This receipt confirms your purchase and agreement with our Terms of Use, Privacy
Policy, and Refund Policy.

STANFIELD000005

# EXHIBIT 12

**From:** Tawkify Customer Success <customersuccess@tawkify.com>
**To:** Jeremy Stanfield
**Sent:** Tuesday, June 30, 2020, 10:00:25 AM PDT
**Subject:** Now that you've purchased, what's next in your Tawkify experience?



Hi Jeremy,

We've reviewed your profile and we are excited to begin working with you as a Tawkify client.

Your experience includes 6 matches within **LA San Bernardino County** and the surrounding area. Our matchmaking concierge team will reach out to you via text by **Jul 6, 2020** to coordinate your Welcome Meeting with your matchmaker.

We've kicked off the search for your potential matches using what we already know about you. The welcome meeting will help your matchmaker get to know the real you — your values, interests, and priorities. They will then apply their special brand of secret sauce to bring a new, smart, and fun approach to matchmaking.

STANFIELD000009

Think of your matchmaker as equal parts romantic clairvoyant, personal dating concierge, and always-has-your-back confidant. They will be focused on your dating life every step of the way and will provide feedback after each match to reassess priorities and recalibrate when necessary.

We are excited to share this journey with you. To log into your Tawkify account, click here.

Warmly,

Tawkify Customer Success
(415) 843-2832
customersuccess@tawkify.com



READ OUR LOVE STORIES

We've collected
a few stories to share!

JOIN OUR SOCIAL COMMUNITY

HAVE A QUESTION?

(415) 843-2832
customersuccess@tawkify.com

STANFIELD000010

# EXHIBIT 13

12:45

LTE

 

Well that's not what was presented to me. You never mentioned zoom dates and said we would meet somewhere. I'm not good with it

2:59 PM

Tue, Jul 7, 4:21 PM

You CAN meet somewhere as long as your match is okay with it. I did mention Zoom dates. It's what we were doing for months during Covid but now are officially giving people the option to do either. I'm sorry that wasn't made clear but it's kind

4:21 PM

  Text Message 

      

STANFIELD000113

12:45       LTE

doing for months during Covid but now are officially giving people the option to do either. I'm sorry that wasn't made clear but it's kind of moot because we are offering in person dates now.

4:21 PM

And ██████, by the way, is one of the most experienced matchmakers on the team to you've got a goodie!

4:28 PM

We specifically talked about your company picking the place and setting it up and we

Text Message

12:45   LTE

We specifically talked about your company picking the place and setting it up and we meet there. There was no mention that it might just be a zoom date and then that counts. You can't represent yourself fully on a zoom call and it shouldn't count towards the 6. So again if there is no budging on that, then I want to cancel. This isn't negotiable for me.

4:31 PM

You don't HAVE to do Zoom dates. That's all I'm saying. Just do an in-person date that

4:39 PM

Text Message

STANFIELD000115

12:45   LTE

can't represent yourself fully on a zoom call and it shouldn't count towards the 6. So again if there is no budging on that, then I want to cancel. This isn't negotiable for me.

You don't HAVE to do Zoom dates. That's all I'm saying. Just do an in-person date that ███ will set up for you.

4:39 PM

And by the way, I'm not yelling - just wanted to emphasize the "have". 😄

4:58 PM

Text Message

STANFIELD000116

EXHIBIT 14

12:47 ▪▪▪ LTE



Sat, Jul 11, 7:53 PM

ETA 8:05 😊 👍   7:53 PM

Here parking   8:05 PM

████ @ Tawkify: Have fun   8:08 PM

Sun, Jul 12, 8:02 AM

How was your date with ████? Give me your thoughts here: www.tawkify.com/users/feedbackDate.php and I'll be in touch after!   8:02 AM

Sun, Jul 12, 1:06 PM

████ @ Tawkify: Hey!

Text Message

STANFIELD000130

# EXHIBIT 15

**From:** ████████████████████████████████████████████
**Date:** July 14, 2020 at 8:06:57 AM PDT
**To:** Tawkify Customer Success <support@tawkify.com>
**Subject: Re:  Tawkify Customer Success Reaching Out**


Here is the email I sent, I fixed some typo's and added names so it will make more sense:

Hello there  I'm very concerned about my experience so far. On the original sales call with ███ there was no mention that a date might only be a zoom date and that would count as one of my official dates. ███ mentioned at one point they were doing zoom dates, but now that restaurants opened, that we would meet somewhere booked by the matchmaker. Then I spoke to my matchmaker ███ and she said that 70% of the Women only want to do zoom first and that it would count against me if they didn't want to meet in person after the zoom. I didn't like that policy and contacted ███. I spoke to ███ about how it wasn't presented to me that way and I felt it was miss-representation on her part. We went back and forth about it in a circle and she kept saying that I don't have to accept a zoom date and just do an in person. Then I said well that takes me out of 70% of your dating pool. So there was no resolution for me and I was about to request to cancel the service when ███ text me that she not only had one date already, but two lines up. So I decided to go on the first date. I sent pics to ███ of me ex's as well as people that I was attracted to. I told ███ that I liked a healthy looking women with curves. I also made it clear that health in my partner is paramount and that I want someone that doesn't look there age. I was ok with someone up to 55, as long as they looked healthy and younger for their age like myself. I pass for early 30's all the time. The date ██████ even mentioned that I probably get asked if my █ year old son is my brother when we are together. Even though ████ was a nice person and we had kids in common, there was nothing else we had in common. First of all, when I first saw her, I thought she was 55 and that she looked sickly or anorexic. She might have weighed 85 lbs and her face was sunken in and she was all skin and bones. There was a glaring difference in our age looks, even though we are only two years apart. I also made it clear to ████ that dancing is a big part of my life and I want someone that loves to do that! ██████ was not big on dancing. I also made it clear to ███ that I don't like to travel and I won't ever be into that. ██████ was really into traveling and just went to Costa Rica and Iceland in the past year. I mean I get that ███ doesn't spend a huge amount of time with a person, but ███ really picked this person

STANFIELD000016

for me? When ▮▮▮▮▮ clearly doesn't look healthy, isn't my type look or body type wise and we literally have opposite passions and things we like to do. I feel embarrassed for ▮▮▮ and I don't even feel comfortable giving her any feedback. She was a really nice person and seems like she really cares. But this is the worst job professionally I've ever dealt with in any area. How do you decide so quickly that this severally unhealthy looking, skin and bones person, that has little to nothing in common with me, would be a good match for me?? So I'm supposed to have another date tomorrow night (which is now tonight). But I'm afraid to see what that's going to be like. I'm extremely unhappy with all facets of this service so far and I think we should just call it quits huh? I'd prefer you not share any of this with ▮▮▮▮ or ▮▮▮ in any way that I expressed myself. If I really have to, I can try and do a PC way of giving ▮▮▮ feedback on ▮▮▮▮▮ But I'm racking my brain on how to say it right without making it seem like she has no idea what she's doing. It took me a while just to try and get the words right to say all this.

I've been contacted by another person in customer service already and she tried to book with me at 11:30. I asked her for 12:30 today instead. Maybe you can coordinate with her and see who can accommodate that time.

Thank you

Sent from my iPhone

> On Jul 14, 2020, at 6:56 AM, ▮▮▮ (Tawkify Customer Success) <support@tawkify.com> wrote:

##- Please type your reply above this line -##

 ▮▮▮ (Tawkify)
Jul 14, 2020, 8:56 AM CDT

Hi Jeremy,

My name is ▮▮▮ and I'm from the Tawkify Customer Success Team. I am a Client Experience Specialist, working with clients before, during and after their experience to collect imperative feedback. I am so sorry to hear that you would like to cancel your experience and I am here to support you.

We remedy a variety of challenges every day and have a multitude of tools at our disposal. My apologies for not being able to find the original

# EXHIBIT 16

Warmly,

███

Tawkify Customer Success Team
customersuccess@tawkify.com

 Jeremy Stanfield

Jul 13, 2020, 6:23 PM CDT

Hello there  I'm very concerned about my experience so far. On the original sales call there was no mention that a date might only be a zoom date and that would count as one of my official dates. She mentioned at one point they were doing zoom dates, but now that restaurants opened, that we would meet somewhere booked by the matchmaker. Then I spoke to my matchmaker ███ and she said that 70% of the Women only want to do zoom first and that it would count against me if they didn't want to meet in person after that. I didn't like that policy and contacted the salesperson. It wasn't presented to me that way and I felt it was miss-representation on her part. We went back and forth about it in a circle and she kept saying that I don't have to accept a zoom date and just do in person. Then I said well that takes me out of 70% of your dating pool. So there was no resolution for me and I was about to request to cancel the service when ███ text me that she not only had that's already, but two. So I decided to go on the first date. I sent pics of me ex's as well as people that I was attracted to. I told ███ that I liked a healthy women with curves. I also made it clear that health in my partner is paramount and that I want someone that doesn't look there age. I was ok with someone up to 55, as long as they looked healthy and younger for their age like myself. I pass for early 30's all the time. The date ███ even mentioned that I probably get asked if my ██ year old son is

STANFIELD000013

my brother when we are together. Even though ▇▇▇▇ was a nice person and we had kids in common, there was nothing else we had in common. When I first saw her, I thought she was 55 and that she looked sickly or anorexic. She might have weighed 85 lbls and her face was sunken in and she was all skin and bones. It was a glaring difference in our age looks, even though we are only two years apart. I also made it clear that dancing is a big part of my life and I want someone that loves to that! She was not big on dancing. I also made it clear that I don't like to travel and I won't ever be into that. She was really into travel and just went to Costa Rica and Iceland in the past year. I mean I get that you don't spend a huge amount of time with a person, but you really picked this person for me? When she clearly doesn't look healthy, isn't my type look or body type wise and we literally have opposite passions and things we like to do. I feel embarrassed for ▇▇▇ and I don't even feel comfortable giving her any feedback. She was a really nice person and seems like she really cares. But this is the worst job professionally I've ever dealt with in any area. How do you decide so quickly that this severally unhealthy looking skin and bones person that has little to nothing in common with me, would be a good match for me?? So I'm supposed to use another date tomorrow night. But I'm afraid to see what that's going to be like. I'm greatly unhappy with all facets of this service so far and maybe we should just call it huh? I'd prefer you not share any of this with ▇▇▇▇ or ▇▇▇ in any way that I expressed myself. If I really have to, I can try and do a PC way of giving ▇▇▇ feedback on ▇▇▇▇. But I'm racking my brain on how to say it right. It took me a while just to try and get the words right to say all this.

STANFIELD000014

# EXHIBIT 17

[REDACTED]

**From:** Jeremy Stanfield [REDACTED]
**Date:** July 15, 2020 at 12:36:25 PM PDT
**To:** [REDACTED]
**Subject: Feedback on** [REDACTED]

I'll just email the feedback:

[REDACTED], that was a real connection for us. 90% of what we talked about was about that.

She didn't seem to have much passion or interest in much besides work and making
money. Although she did have a desire to sell her company and start a family and
be a stay at home mom.

She did have a beautiful face and looked healthy for her age. But she was also
extremely thin and wasn't curvy at all. Her demeanor was very reserved and
wasn't big on joking around much.

She wasn't into dancing and wasn't into socializing or doing much besides work.
She didn't seem thrilled that I already had two kids, being that she wants to start a
family herself.

It seems like everything that's important to me was ignored again and I was put
with someone that is the opposite of what I'm looking for. Besides her looking
healthy and good looking, there wasn't anything we had in common besides the
[REDACTED] thing.

I'd be down to go on a date to chat more about [REDACTED] stuff, but I don't see any
future between us at all. But that isn't fair to her and would be just for stimulating
conversation on the subject.
Sent from my iPhone

# EXHIBIT 18

12:47   LTE

< 

██████████████

Sure   1:39 PM

Tue, Jul 14, 5:30 PM

████ @ Tawkify: Get ready for your date at 7:30 pm PST. How are you feeling?   5:30 PM

Tue, Jul 14, 7:00 PM

I feel good, omw there. 😊👍   7:00 PM

Looking for parking   7:33 PM

Wed, Jul 15, 8:01 AM

How was your date with ████? Give me your thoughts here:

Text Message

STANFIELD000134

12:47     LTE



██████████████

**Wed, Jul 15**, 8:01 AM

How was your date with ████ Give me your thoughts here: www.tawkify.com/users/feedbackDate.php and I'll be in touch after!

8:01 AM

**Fri, Jul 17**, 2:11 PM

████@ Tawkify: Hey Jeremy! It's ████ from Tawkify CS. Are you still able to chat?

2:11 PM

I got into something else. You folks aren't then best with communication or following a schedule. It

Text Message

# EXHIBIT 19

Tawkify Customer Success Team
customersuccess@tawkify.com

---

 Jeremy Stanfield

Jul 22, 2020, 4:51 PM CDT

Well my cancellation isn't because of Covid! It's because your reps misrepresented and lied to me and ignored everything that I wanted!

This needs to be prioritized over some lame Covid cancellation!

Cancelling over Covid isn't even a legit reason to cancel if you signed up during Covid.

Unbelievable!

Sent from my iPhone

> On Jul 22, 2020, at 2:17 PM, ▇▇▇▇ (Tawkify Customer Success) <support@tawkify.com> wrote:

---

  (Tawkify)

Jul 22, 2020, 4:17 PM CDT

I apologize and understand the frustration.  We are processing a higher than usual amount of refunds due to covid and are trying to expedite as quickly as we can.  Thanks for understanding.

Wishing you the best.

Warmly,

▇▇▇▇

Tawkify Customer Success Team
customersuccess@tawkify.com

---

 Jeremy Stanfield
Jul 22, 2020, 1:36 PM CDT

Why does it take almost two months for you to refund me?

That's ludicrous!!

Sent from my iPhone

> On Jul 22, 2020, at 11:32 AM, ███ (Tawkify Customer Success) <support@tawkify.com> wrote:

---

  (Tawkify)
Jul 22, 2020, 1:32 PM CDT

Hi Jeremy,

Your feelings are completely valid. I appreciate you taking the time to detail your experience with me. We are committed to delivering an exceptional experience and your feedback goes a long way in doing so.

Your refund has been submitted to Accounting. Once your refund is cleared it takes 45–60 days for processing and will be returned to the card used for purchase. More information can be found about the refund policy in the Tawkify Terms of Use.

We appreciate the opportunity to have worked with you and wish you the best in life and love.

STANFIELD000051

Warmly,



Tawkify Customer Success Team
customersuccess@tawkify.com

---

 Jeremy Stanfield
Jul 22, 2020, 11:13 AM CDT

Yes I want a full refund and it was much more than a disconnect with my matchmaker. Anyways, please refund all $3700 of my money today.

Thanks

Sent from my iPhone

> On Jul 22, 2020, at 6:18 AM,  (Tawkify Customer Success) <support@tawkify.com> wrote:

---

 (Tawkify)
Jul 22, 2020, 8:17 AM CDT

Hi Jeremy,

Thank you for sending in your feedback and account of events.  After reading through your messages, I'm sorry that your experience has not met your expectations. It sounds do me like your mind is made up and you would like to cancel and request a refund.  I am sorry to hear that and was hoping we could turn things around for you. Either way, I am here to help you with next steps.

STANFIELD000052

Prior to being promoted to customer success, I was a veteran match maker for the company for years. It seems to me that there was a disconnect between you and your match maker.  I believe chemistry is so important in this relationship.  I took a look at your profile and I feel as if she didn't understand your priorities and what you are looking for. You do have the option to change to a different match maker and I'd be happy to personally oversee that as well as give you a non-refundable bonus match to make up for your bad date.

I completely understand your frustration and would like to assist in any way I can.  Please let me know what you decide.  I'm also available for a phone call if that works better for you.

I look forward to hearing back and helping you today.

Warmly,



Tawkify Customer Success Team
customersuccess@tawkify.com

---

Jeremy Stanfield

Jul 21, 2020, 3:37 PM CDT

One more thing, I have all of this either in writing or saves on voicemails that were left to me. Including one form  after both dates trying to defend herself saying "I KNOW YOU WANTED CURVY, but I didn't realize how much dancing was important to you, I'll put that in your file".

The fact that she knew it was important to me, it's listed on my profile as important and yet she willingly ignored it means there is something shady going on with this business!

STANFIELD000053

# EXHIBIT 20

TAWKIFY - PAYOUT HTTPSTAWKIFY.,
████████  United States of America          08/01/2020      ████████      Purchase
                                                                          Return        $ 1,850 01

Stanfield000146

# EXHIBIT 21

counts.

Again I have all this in writing and I'll be contacting my lawyer to start legal action against your company.

I have what I need to proceed legally and I promise you it will cost you a lot less to just give me my money back in full!

You have wasted enough of my time and you need to give me the rest of my money back or prepared to get sued and it's going to cost you A LOT MORE than the $1800 you owe me!

Sent from my iPhone

On Aug 4, 2020, at 7:55 AM, ███████ (Tawkify Customer Success) <support@tawkify.com> wrote:

---

 Jeremy Stanfield
Aug 4, 2020, 10:37 AM CDT

Are you even reading what I just said. The two dates I went on were bs and your reps admitted that and said I would get credit for both.

Meaning they don't count and I should get all my money back! This isn't about my feelings, this is about your company miss-representing itself and admitting that they didn't do there job properly.

I have this in writing from representatives at your company. Your company Is putting

# EXHIBIT 22

**From:** Jeremy Stanfield ██████████████████
**Date:** August 7, 2020 at 9:58:49 AM PDT
**To:** Tawkify Customer Success <support@tawkify.com>
**Subject: Re: Tawkify Customer Success Reaching Out**

that's cool, prepared to get sued and I'll make sure it's a class action because you are clearly miss representing and taking advantage of people!

Enjoy the loss of business and money that's coming to you!!

Sent from my iPhone

> On Aug 7, 2020, at 9:15 AM, █████ (Tawkify Customer Success) <support@tawkify.com> wrote:

##- Please type your reply above this line -##

 █████ (Tawkify)

Aug 7, 2020, 11:15 AM CDT

Hi Jeremy

Thanks for making us aware of your intentions.

I will need to echo what █████ has previously told you.

Our refund policy isn't negotiable. Its agreed to multiple times, twice at account set up (screenshot below):

STANFIELD000040



You also agreed a 3rd time on July 7th (screenshot from your account):

We offered to let you use the two matches but given where we are now I think retracting that offer is best

STANFIELD000041

for both parties.

Additionally, we don't refund for services rendered for any reason. You were given a non-refundable bonus match to make up for one of the two dates, but this was forfeited given you chose to refund. You agreed to this here also on July 7th by agreeing to our user agreement:



Our refund policy is also available by a quick google search. The user agreement can be viewed again by clicking the date next to the User Agreement: in your account.

I'm sorry you feel that Tawkify is a scam we've been in business for over 8 years now, we have thousands of committed relationships and marriages under our belt.
We wish you the best in life and love.

Thank you,


Tawkify Customer Success Team
customersuccess@tawkify.com

---



Jeremy Stanfield

Aug 7, 2020, 12:43 AM CDT

STANFIELD000042

# EXHIBIT 23



| TAWKIFY - PAYOUT HTTPSTAWKIFY., ███████ United States of America | 08/26/2020 | ████████ | Purchase Return | $ 0.01 |
| TAWKIFY - PAYOUT HTTPSTAWKIFY., ███████ United States of America | 08/26/2020 | ████████ | Purchase Return | $ 1,849.98 |

# EXHIBIT 24

**From:** Jeremy Stanfield
**Date:** July 15, 2020 at 1:07:53 PM PDT
**To:**
**Subject: Your vm**

Got your vm and you can take out the dancing part and they are both still horrible matches for me because plenty of other things were ignored as well.

I've requested a credit for those two matches and a different matchmaker or a full refund.

Thanks and take care

Sent from my iPhone

STANFIELD000039

# EXHIBIT 25

12:47        .ıl LTE 🔋

<

**Wed, Jul 15**, 8:01 AM

How was your date with █? Give me your thoughts here: www.tawkify.com/users/feedbackDate.php and I'll be in touch after!

8:01 AM

**Fri, Jul 17**, 2:11 PM

█ @ Tawkify: Hey █! It's █ from Tawkify CS. Are you still able to chat?

2:11 PM

I got into something else. You folks aren't then best with communication or following a schedule.  It

Text Message

STANFIELD000135

12:47     LTE



then best with communication or following a schedule.  It trying to be a jerk about it. But there's a consistency there now by multiple people. I'd like a full refund processed today. I don't wish to discuss this or book time again for someone to be late and/or not communicate with me in a timely fashion. You're dealing with people on a high level, yet you are not at a high standard when it comes to communication or performance.

2:16 PM

Text Message

STANFIELD000136

# EXHIBIT 26

**From:** Jeremy Stanfield █████████████████████████
**Date:** July 21, 2020 at 1:14:19 PM PDT
**To:** Tawkify Customer Success <support@tawkify.com>
**Subject: Re:  Tawkify Customer Success Reaching Out**

Hello ██████

I read through your emails and even though it seems as if you are being sincere and that you care, it seems that way with ████ as well.

Unfortunately ████ got on the phone with me after my first date and reassured me that the second date was a better fit for me on a physical level. That was a lie and the second date was almost as skinny as the first and was maybe a size 0. Not sure of women's sizes can go below 0, but I wouldn't be surprised if these first two dates were a size -1 or -2.

I was very disappointed with her and the fact that I was set up with two people that have the same body type as my ████████ daughter.

Besides physical things MULTIPLE personality things and hobbies and interest things were COMPLETELY ignored.

I then complained again and asked for a second matchmaker and wanted to speak to ███i about how she lied to me and wasted my time and money by going on that second date.

Then ███i calls me 10 minutes late when I booked an appointment on HER schedule system and then had the audacity to tell me "she forgot the appointment was at 2 and thought it was at 3".

WOW!!! I mean I've had some bad experiences in my life with service companies, but I've NEVER had this level of incompetence and lack of genuine care or urgency to try and satisfy a rightfully upset customer.

So I let her know that I'm done with the service and that I want a full refund. She has the THE NERVE to barely say anything to me about and just give me this brief PC response and then send me a general form response about "my options".

STANFIELD000082

I should have trustee my gut when the first person didn't keep her appointment with me at 12pm and text me at 12:03 telling me she was running long on an appointment. Then tried to call me 30 minutes late and then tells me she tried to call me and couldn't get through. LoL   How do you try to call someone at 12, then text them at 12:03 and say you are running late??? Haha

If you really tried to call me at 12, then your text would have said " hi we just tried to reach out to you and weren't able to connect".

That was lie number one and the first time your people didn't know how to communicate properly or follow a schedule.

Then when I was upset between the first date and second date, your people contacted me super early in the morning and suggested 11:30. I responded very quickly and asked for 12:30. I didn't get a confirmation until 12pm for the 12:30 call. Another wow! Then ███ somehow forgets to follow a basic schedule and forgets the time of the call.

Also your salesperson didn't disclose that most women want a zoom call and that it counts. All she said was they WERE doing zoom dates because of Covid, but they aren't now. The I speak to ███ and she tells me that 70% of the women want zoom first and that it counts. So clearly your salespeople and matchmakers aren't on the same page at all!

Then when I address this with ███, we go in a big circle with her telling me that I don't have to do a zoom date and to just do an in person date, but completely ignored my concern that I wouldn't be in 70% of your dating pool.

The I get these dates that are ridiculous and are clearly a way of your company just trying to use up dates for Tawkify members to increase your profit margin. It's a shady business practice and I'm appalled at what you are doing to people!

The first date completely ignored the body type I'm attracted to. Ignored that I want someone healthy looking and young for their age. Ignored that I like an outgoing person that likes to joke around, go dancing etc. ignored the fact that I don't like to travel abroad and the date loves to travel and just went to Costa Rica and Iceland in the PAST 12 MONTHS!

I can pretty much guarantee that I wasn't why she wanted either. We had 0 similar interests. She was very reserved and introverted and I have NO IDEA why anyone in their right mind would match me with this person.

The second date at least looked healthy for her age.  It again she had a extremely skinny body and wasn't anything close to my body type.

She also was reserved and introverted and mostly just worked and made money. She wasn't into dancing and didn't have many interests outside of work. Also I specifically told ███ that I want someone that already has a kid or has a step kid. People without kids don't get it and it's VERY hard to date them! I told her I was just about to get a vasectomy and wasn't totally against kids, but I already had 3

STANFIELD000083

and wasn't big on another one. The dates biggest goal was to sell her business and be a stay at home mom and have kids. WOW!!!

She was a tawkify member and I bet I wasn't a good match for her either!

It's clear what is going on and I want no part of it. Your company has wasted my time and money going out on these bs dates and wasted my time on more than one occasion having me book time IN YOUR calendar system and being very late or just plain unprofessional and dropping the ball on basic schedule following.

 I was willing to give your company another chance with another matchmaker before ███ "forgot" the time of our call and then sent me this cold dismissive form email response.

I don't trust your company or anyone I've dealt with so far! I can do MUCH BETTER on my own and have no problem finding beautiful curvy women that have a kid and likes to dance and joke around and are outgoing, successful and stable. I was hoping this would save me time and effort, but all it's done is waste my time, money and emotional effort!

I'm sure you can tell me all kinds of great and nice things about other matchmakers or whatever to get me to keep giving more and more chances. But I've given your company over 5 chances to be professional and do right by me and all I have gotten was this horrible experience!

I'd like a full refund processed today and if you want me to sign a non disclosure agreement or gag order to get all my money back, I'll be happy to do so.

I spoke to my attorney this morning and he suggested I offer that to your company.

Please someone respond to me today and let me know what direction you are going so that I can either proceed or put this nightmare to rest!

Thank you

Sent from my iPhone

> On Jul 21, 2020, at 6:10 AM ███ (Tawkify Customer Success)
> <support@tawkify.com> wrote:



##- Please type your reply above this line -##



███ (Tawkify)
Jul 21, 2020, 8:10 AM CDT

STANFIELD000084

# EXHIBIT 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

JEREMY STANFIELD, on behalf of )
himself and all others )
similarly situated, )
                                )
            Plaintiff, )
                                )
        vs. ) Case No. 3:20-cv-
                          ) 07000-WHA
TAWKIFY, INC., et al.; and )
DOES 1-25, )
                                )
          Defendants. )
_____ )

REMOTE VIDEOTAPED DEPOSITION OF JEREMY STANFIELD

WEDNESDAY, MAY 26, 2021, 10:01 A.M.

MURRIETA, CALIFORNIA

REPORTED BY:
Tami L. Le
CSR No. 8716, RPR

Job No. 60670

1    Mr. Stanfield, how old are you?

2        A    ███

3        Q    Okay.  And where did you grow up?

4        A    **Where did I grow up?**

5        Q    Yes.

6        A    **I was born in the** ███████████

7    **California, and then I moved down here.**

8        Q    Okay.  And by here, you're referring to

9    Chino, California, or do you live somewhere else?

10       A    **Currently I live in** ██████.





```
 1      Q    And who, if anyone, lives with you at your
 2   current address?
 3      A    Just my daughter.
```

███████████████████████████████████████████████████

```
 6      Q    How old is she currently?
```

███████████████████████████████████████████████████

```
 8      Q    How many kids do you have in total?
 9      A    I have three kids.
```

███████████████████████████████████████████████████

```
15      Q    And what are their ages, respectively,
16   ████████   first?
17      A    ███████████████████████████████
18      Q    And for ████████ does ████████ live with --
19   with his mom or...
20      A    Yeah.  ███████████████████████████████
21   ███████████████████████████.
22      Q    All right.  What's ████████ mom's name?
23      A    ████████   mom's name?
24      Q    Yeah.
25      A    ████████████
```

```
 1      Q    What about ████████ mom?

 2      A        ████

 3      Q    And then ███s mom?

 4      A       ████████

 5      Q    Okay.  Are you currently married?

 6      A    No.

 7      Q    Okay.  Were you married to either ████,

 8   █████████ (sic) or ████████?

 9      A    I was married to ████████

10      Q    And how long were you married to ████████

11      A    Say four years, roughly.  We've been

12   divorced for six.

13      Q    Divorced for six.

14           Do you remember when you got married, just

15   the year?

16      A    The year?  2010.

17      Q    Okay.  Did you file for divorce or did she

18   file?

19      A    I'm trying to remember who was it.  I want

20   to say she filed, but it was mutual.  We -- we

21   didn't have, like, a -- any kind of issue or battle

22   as far as, like, assets.  It was mutual.

23      Q    The reason for wanting the divorce, it was

24   mutual?

25      A    Right, yeah.
```

JEREMY STANFIELD

May 26, 2021

```
 1      Q    Okay.  What college did you go to?
 2      A    Heald.
 3      Q    Can you spell that, please?
 4      A    Heald is H-E-A-L-D.
 5      Q    And where is Heald?
 6      A    San Francisco.  Well, they're all over, but
 7   the campus I was at was San Francisco.
 8      Q    Is that a four-year university?  A
 9   community college?  What type of school?
10      A    It's more of a focus vocational college,
11   focus on computers, computer engineering.
12      Q    And was that what you studied?
13      A    Is that what I studied?
14      Q    Yeah, at Heald, computer engineering?
15      A    Right.  Yeah, it was -- it was the hardware
16   side of computers, building computers.
17      Q    And that's not the line of work you're in
18   currently; correct?
19      A    No.
20      Q    What line of business are you in now?
21      A    Solar sales.
22      Q    You said solar sales?
23      A    Yes, solar, like, solar panels.
24      Q    For a home, solar panels for homes?
25      A    Correct.
```

1      Q     About how long have you been in that line

2   of business?

**3      A     I've been in solar about nine years.**

4      Q     And do you work for an employer?  Do you

5   employ yourself?  What's your arrangement?

**6**

JEREMY STANFIELD

May 26, 2021

1       A       Independently review?

2       Q       Meaning other than --

3       A       Sorry.

4       Q       Meaning other than what your attorney sent

5    you, did you affirmatively look for documents to

6    review for this deposition today?

7       A       No.

8       Q       Other than with your attorney, did you

9    discuss this deposition with anyone else?

10      A       No.

11      Q       Mr. Stanfield, you are aware that a

12   lawsuit's been filed by you against my client,

13   Tawkify, Inc.; that's correct?

14      A       Yes.

15      Q       And it relates to your interactions with

16   Tawkify representatives regarding matchmaking

17   services; is that a fair statement?

18      A       Yes.

19      Q       Okay.  So let's go back a little bit for --

20   to the year 2020.  We're now in 2021.

21              What made you decide that you wanted to use

22   matchmaking services from any company?

23      A       I was on Facebook and they advertised on

24   Facebook, and I was inquiring about it.  It was --

25   we were in the middle of a pandemic and obviously we

JEREMY STANFIELD

May 26, 2021

1   were -- very difficult to go out and meet people.

2   So I thought it might -- might be something that

3   could work for me as far as having a company do --

4   do the work or find a -- find a match.  So I

5   inquired on their -- on their advertisement on

6   Facebook.

7        Q    Okay.  And before seeing the advertisement

8   on Facebook, were you interested in matchmaking

9   services generally?

10       A    No.

11       Q    All right.  What was it about the ad that

12  drew your attention, if you can recall?

13       A    They just offered a concierge service to

14  help you find a mate, so it basically made sense

15  during COVID for me.

16       Q    And when you say "a mate," are you

17  referring to someone to date or are you thinking

18  marriage or something -- something else?

19       A    I mean, I'm a relationship type of person,

20  so I -- any time I bring anyone into my life, it's

21  typically for the long haul, hopefully.

22       Q    Were you looking to settle down and get

23  married?

24       A    Sure, yeah.  Sorry.  Yes.

25       Q    Do you recall when you saw that ad on

JEREMY STANFIELD

May 26, 2021

1    Facebook, what day in particular in 2020?

2    **A    I don't remember the exact date, but it was**

3    **in the middle of June of 2020.**

4    Q    If I were to say June 15th, would that date

5    strike you as not being the correct date or?

6    **A    I couldn't -- I couldn't really say**

7    **specifically, but it -- it was around there, pretty**

8    **close.  I'm sure -- you might have documents that**

9    **prove so.  If you want to pull them up or show them**

10    **to me, I can verify.**

11    Q    Yeah, we'll get there.

12    **A    Sure.**

13    Q    Actually, walk me through the process a

14    little bit that you went through when you actually

15    made contact with someone from Tawkify.  So let's

16    start with viewing the ad.

17         What did you do, physically or otherwise,

18    directly after seeing the ad to initiate contact

19    with Tawkify?

20    **A    Basically it was just a contact form that**

21    **you filled out so somebody would get in touch with**

22    **you.  It's a pretty common form for any -- anything**

23    **on Facebook.**

24    Q    So you clicked on the ad on Facebook and it

25    took you to some other page with some, you know --

JEREMY STANFIELD

May 26, 2021

```
 1              (Simultaneous speaking.)

 2       A    It took you to a contact form, so you just

 3  fill out basic contact info for someone to get in

 4  contact with you.

 5       Q    I apologize.  Give me one second.  I'm

 6  getting an alert that my battery's low on a

 7  computer.

 8              Can we go off the record just a minute so I

 9  can pull something else up on my computer?

10              MR. CONN:  Sure.  That's not a problem.

11              THE VIDEOGRAPHER:  We are off the video

12  record.  The time is 10:32 a.m.

13              (Discussion held off the record.)

14              THE VIDEOGRAPHER:  Okay.  We are now back

15  on the video record.  The time is 10:36 a.m.

16       Q    BY MR. GRAHAM:  Okay.  Mr. Stanfield, just

17  wanted to circle back on something before we go

18  forward.

19              So during the deposition, we have to be

20  sure that you're not communicating with anyone else,

21  including your lawyer, via text, email or any other

22  means.

23              Can you confirm that you have not been

24  doing that so far?

25       A    So I run a sales team for Solar, so, I
```

```
 1   right?
 2       A    Yes.
 3       Q    And then that took you to some page where
 4   you had to put in contact information, information
 5   about you; is that right?
 6       A    Yeah.  It was a basic contact form.
 7       Q    Okay.  And then once you put in that
 8   information on that contact form, what did you do
 9   next?
10       A    I waited for them to contact me.
11       Q    Okay.  If we can pause for one second, I'm
12   going to pull up another exhibit.
13            (Defendant's Exhibit 2 was subsequently
14            marked for identification.)
15       Q    BY MR. GRAHAM:  Okay.  Can you see what's
16   on my screen right now, Mr. Stanfield?
17       A    Hold on.
18            Yes, I can.
19            MR. GRAHAM:  Just for the record, this is a
20   document that was produced by plaintiff.  It's
21   Bates-labeled here at the bottom right,
22   STANFIELD000087 --
23            THE DEPONENT:  Okay.
24            MR. GRAHAM:  -- and then just at the moment
25   going through 00087 through -- actually, just that
```

```
 1   page.
 2        Q    So --
 3        A    Which page?
 4        Q    -- 000- -- I apologize.
 5             Just to make sure the record's clear,
 6   STANFIELD00087 through 000088.  Okay.
 7        A    So two pages?
 8        Q    Yeah.  Well, we'll come to the other pages
 9   of this later, but I want to zone in here on this
10   part of the page.
11             Do you see what's on my screen now,
12   Mr. Stanfield?
13        A    Sure, yes.
14        Q    It appears to be a box that says "Tawkify"
15   in the top left corner.
16        A    Uh-huh.
17        Q    It has some words in the middle, "We know
18   you're busy.  This only takes 2 minutes.  Don't
19   waste precious time."
20             And then it has a box for email address and
21   then it has a box for "Create Password."
22             Do you see that?
23        A    Yes.
24        Q    And then it has a button that says
25   "Continue" on the bottom right.
```

JEREMY STANFIELD

May 26, 2021

```
 1            Do you see that?
 2       A    Yes.
 3       Q    Was this the form that you put in your
 4  contact information where you clicked on that link
 5  on Facebook?
 6       A    Yeah, it looks familiar.
 7       Q    That's "yes"; correct?
 8       A    Yes, yes.
 9       Q    Okay.  All right.  We can stop that for
10  now.
11            All right.  So then you clicked on that
12  box, you put in that information that was on that
13  screen and you clicked "Continue," right, to
14  continue the information on?
15       A    Uh-huh.  Yes.
16       Q    And did you click anything else on that
17  screen?  Like, there was a box that said "Click to
18  Continue."  Did you click --
19            Let me pull that back up.  I apologize.
20            Okay.  Do you see here, little check box
21  and then "Continue"?
22       A    Right.
23       Q    You clicked there?
24       A    Yes.
25       Q    Okay.  And then you clicked "Continue" to
```

JEREMY STANFIELD

May 26, 2021

```
1    move on; correct?
2        A    Yes.
3        Q    Okay.  All right.
4             And then you -- then what was the next
5    thing that happened in terms of your interaction
6    with Tawkify?  Did you then call someone?  Did
7    someone call you?
8        A    No, I didn't call anyone.  Someone called
9    me.
10       Q    Do you remember the name of the person that
11   called you?
12       A    I don't.
13       Q    Do you know if it was a male or female, man
14   or woman, someone else?
15       A    It was female.
16       Q    Okay.  And was it the same day that you
17   clicked on the ad and filled that information the
18   person called you or was it the next day or some
19   other day?
20       A    I think it was the next day.
21       Q    Okay.
22       A    I can't be sure, though.  I'm not a
23   hundred percent on that.
24       Q    Okay.  And then what -- if you can just
25   walk through -- I'm not asking you to transcribe the
```

JEREMY STANFIELD

May 26, 2021

```
 1   call, but just kind of give us the general gist of
 2   what was discussed on that initial call.
 3       A    So the initial call actually didn't happen.
 4   The person was late, and I had to get rescheduled.
 5   So the first person didn't keep the appointment and
 6   made a bunch of excuses on why they couldn't keep
 7   the appointment.
 8            And so I let them know that I have a -- I'm
 9   a busy person, I stick to schedules and calendars,
10   and that if they're going to try to get my business,
11   they need to, like, be on time.
12            So then a second person called me, so just
13   wanted to clarify.  It wasn't -- the first person
14   was -- didn't talk to me.
15            So the second person -- to answer your
16   question, the second person, we talked for about 45
17   minutes, I want to say, to an hour.  And she
18   basically went over the -- what the service
19   provides.  She spoke about COVID and that COVID --
20   now that they're -- at that time they were allowing
21   certain businesses to be open.  So prior to that,
22   they were only doing Zoom dates and -- but now she
23   clarified that they were doing in-person now.
24            And then she mentioned that they had a huge
25   database of people to choose from.  There was a
```

JEREMY STANFIELD

May 26, 2021

```
 1   couple different options that I could go with.  I
 2   could either be part of the database for a nominal
 3   fee.  It was a small fee.  I don't remember exactly
 4   what it was.  But -- or I could have a concierge
 5   service where they help me find someone.  She gave
 6   me different packages, amounts of dates, different
 7   regions and areas that I could be in the pool of
 8   people, whether it be all of California or Southern
 9   California.
10          We went over the price a little bit.  She
11   said that she would give me some special discount,
12   so she dropped the price, and basically talked about
13   how they have a special matchmaker that talks to you
14   for an extended amount of period and gets your
15   needs, wants and desires; talks about, you know,
16   your personality type, your prospective
17   personality -- person's personality type, all that
18   stuff; and that they'll set you up with someone that
19   would be a good match for you.
20          I let her know that I was interested and --
21   but I -- you know, I needed to take a day or two to
22   think about it, but more than likely, I would be
23   going forward.  So that was -- that was the end of
24   that.
25      Q   Okay.  And just to clarify a couple things.
```

JEREMY STANFIELD

May 26, 2021

1     A    I did decide to move forward and I let her

2  know that it would be the following week.  And then

3  she text me basically offering me -- I don't know,

4  she offered me money or something.  I can't remember

5  exactly what she did.  But she said, "I'll offer

6  you" -- I think she said, "I'll offer you a million

7  dollars if you pay today."  She needed some kind of

8  bonus or something.  I don't know.  And she even

9  said it was unprofessional for her to ask that.  I

10  thought it was really strange that she would do

11  that.

12         But I told her that I'm not going to pay

13  today.  It's not going to happen.  And so she backed

14  off her pressure at that point and said, "Okay.  You

15  can go next week."

16     Q    Okay.  When you said she offered you money,

17  you said she offered you a million dollars or

18  something like that?

19     A    Yeah.  I want to say that she text me

20  something about "If you can sign up today, I'll

21  offer you a million dollars," like it was a --

22  obviously, she wasn't going to offer me a million

23  dollars, but semantics, it was a joke or, I don't

24  know, some kind of thing.  But she went on to say

25  that it's the end of the week for her and that

1    it's -- it would really help her out or something if
2    I paid right away, so -- and she said it was
3    unprofessional.  She actually said that in the text.
4         Q    Okay.  And just to be clear, you didn't
5    interpret her saying that to mean that she was
6    actually going to give you a million dollars to sign
7    up for Tawkify; correct?
8         A    I mean, no, it wouldn't make any sense for
9    her to pay me a million dollars for a $3700 service.
10        Q    Right.
11        A    Yeah.  I mean, obviously, it was just her
12   just saying "I'll be your best friend" or, you know,
13   "I'll give you a million dollars," whatever people
14   say to get people to move forward to get in their
15   minds or whatever.  I don't know why she said
16   that -- said that specifically, but, anyway, it was
17   definitely unprofessional.  She was right.
18        Q    To be clear, you did not interpret that as
19   a serious offer; correct?
20        A    The money part, no, but the --
21        Q    Yeah.
22        A    The million-dollar part, no.  I didn't
23   think that was a serious offer.  But her needing
24   the -- something for her commission or being
25   end-of-week bonus or whatever, that seemed totally

JEREMY STANFIELD

May 26, 2021

1    legit.

2         Q     Do you recall how the $3700 price tag came

3    about?  Let me clarify.

4         A     Yeah, yeah, so --

5         Q     Go ahead.

6         A     -- it was six dates for X amount of dollars

7    and it was over four grand initially, and I said,

8    "That's too much.  I'm not really interested in that

9    price."

10             So then she tried to negotiate and said,

11   "I'll give you some special discount" and that's how

12   it got down to that amount.

13        Q     Okay.  So it started a higher amount and

14   then, through negotiation between you and her, you

15   mutually arrive at the lower amount of 3700?

16        A     That's what she offered and I agreed to it,

17   so, yeah, I guess, yes.

18        Q     You mentioned not paying it right there on

19   the spot but waiting a few days.  What was the

20   reason for you wanting to wait to make the payment?

21        A     Well, couple things.  I mean, I wanted to

22   take the weekend to really think about it and make

23   sure it's something I wanted to do and also I needed

24   to transfer funds into a certain account to be able

25   to pay it, so it's twofold.

```
1        Q    You mentioned that you wanted to transfer
2   funds into a certain account to be able to pay it.
3   What do you mean by that?
4
```

May 26, 2021

```
 1   Mr. Stanfield?
 2       A     Yeah.  Yes.
 3       Q     Okay.  What's your understanding of a
 4   hyperlink?
 5       A     When you click on it, it opens up a
 6   document.
 7       Q     Okay.  And just looking at this, this
 8   appears to have hyperlink documents for Terms of
 9   Use, Privacy Policy and Refund Policy.
10           Do you see that?
11       A     Yes.
12       Q     When you received this email, did you click
13   on any of those links there?
14       A     I did.
15       Q     Did or did not?
16       A     Did.
17       Q     You did.  Okay.
18           And so you clicked on -- for each of those,
19   did you review each document in full when you
20   clicked on them?
21       A     Yes.
22       Q     All right.  Now, I want to go back for a
23   second.
24           When you first signed up for Tawkify, did
25   you click on any hyperlinks to review documents on
```

JEREMY STANFIELD

May 26, 2021

1    that -- you know, that landing page that we looked

2    at earlier?

3        **A    I don't recall doing that at that time.**

4        Q    Okay.  Is it your general practice to click

5    on hyperlinks and review documents before you, you

6    know, click to move forward when you're on the

7    Internet?

8        **A    Usually, yes.**

9        Q    But you don't always do it?

10       **A    Not a hundred percent of the time, but**

11   **not -- you know, most of the time, I do, usually.**

12       Q    Okay.  And when you do that, why do you do

13   it?

14       **A    Why do I do it?**

15       Q    Yeah.

16       **A    Just to understand, like, the details of**

17   **what I'm getting.**

18       Q    All right.

19            Pull this document down.

20            Okay.  You see, from the date on this

21   document, that you ultimately made your purchase on

22   June 29th, so a couple weeks after your initial

23   clicking of the Tawkify ad; is that right?

24       **A    Yeah.**

25       Q    Okay.

JEREMY STANFIELD

May 26, 2021

1    not accepted, then I would get a full refund.  So, I

2    mean, to me that -- like, nothing's concrete until I

3    get approved.

4        Q    Right.  I understand that.

5            But specifically, my question was did

6    Tawkify tell you that?  Did they tell you that

7    before --

8            (Simultaneous speaking.)

9        A    Yeah, they said --

10       Q    I'm sorry, Mr. Stanfield.  I apologize.  I

11   want to get it all out just for the record so it's

12   clear.

13       A    Go ahead.

14       Q    Did anyone at Tawkify tell you that before

15   you were ultimately accepted as a client, approved

16   as a client, that if you were not accepted as a

17   client, you would get a full refund of everything

18   you paid?

19       A    Sure, yeah.  I mean, why would they keep my

20   money if I wasn't accepted?

21       Q    They told you that; right?

22       A    I believe so, yes.

23       Q    Okay.  And do you recall about how long it

24   took for you to be formally approved as a Tawkify

25   client after you received that email on the 29th of

JEREMY STANFIELD

1       **A       Yes.**

2       Q       Okay.  Because up until now, you've been

3   talking to, like, the member services people; right?

4   You call them salespeople?

5       **A       Yeah, the salespeople.  They are**

6   **salespeople.**

7       Q       And to be fair, you're quite familiar with

8   sales because you're in sales; right?

9       **A       Indeed.**

10       Q       Right.  So up until then, you've been

11   talking to member services/salespeople.  You had not

12   talked to a matchmaker formally yet?

13       **A       Correct.**

14       Q       So the next step, as we saw in that email,

15   was for you to schedule a talk with an actual

16   matchmaker.

17           Did you actually have a conversation with a

18   matchmaker?

19       **A       Yes.**

20       Q       Okay.  And do you recall about when that

21   conversation took place?

22       **A       I want to say it was about a week --**

23   **roughly around a week from when I paid or when they**

24   **accepted me or whatever.**

25       Q       Okay.  Do you recall the name of that

```
 1              (Recess taken.)
 2              THE VIDEOGRAPHER:  Okay.  We are now back
 3     on the video record.  The time is 11:38 a.m.
 4        Q    BY MR. GRAHAM:  Okay.  Mr. Stanfield, I
 5     wanted to pull up a different exhibit now.  Give me
 6     one second.
 7              Okay.  I'll come back to that.
 8              All right.  So you had the initial
 9     conversation with ████ your matchmaker, on or
10     around July 6; is that right?
11        A    That sounds right.
12        Q    Okay.  And this would have been the
13     conversation with your matchmaker where you get into
14     more detail about your preferences and things of
15     that sort; correct?
16        A    Yes.
17        Q    Because you did -- you did some of that
18     with ████, the member services representative that
19     you talked to a couple weeks prior; isn't that
20     right?
21        A    Yes.
22        Q    But this meeting with your matchmaker was
23     intended to kind of fill in the gaps and give more
24     information so she can try to match you with
25     someone; isn't that right?
```

1      A      Yeah.   It was a very thorough and detailed
2  conversation.
3      Q      Okay.   Do you recall what were -- I'm not
4  saying give a play-by-play, but the high points of
5  kind of what you told her that you were interested
6  in finding in a mate?
7      A      The high points?
8      Q      Yes, like, your overall summary of what you
9  were looking for that you told to ███████
10     A      So I wanted someone that was outgoing and
11  had kind of, like, a bubbly, outgoing personality;
12  someone that preferably had children already because
13  it's difficult for people that don't have children
14  to understand someone that does, so that was
15  something I wanted; for them to not really want any
16  more children because I already have three; and I
17  don't really like to travel, kind of a home-based
18  person.
19            As far as body type, I'm a big dude.   I'm
20  ███████.   And I like someone that's about the
21  same -- roughly the same size -- not same size,
22  like, obviously, I'm ████, that's huge, but, like, a
23  bigger person, like, someone that has meat on their
24  bones like I do and is healthy looking as far as
25  physical aspects of it.

JEREMY STANFIELD

May 26, 2021

```
 1              Someone that's -- basically is -- I'm
 2    trying to remember right now, so someone that
 3    basically is -- you know, likes to laugh, is
 4    outgoing, kind of a goofy personality, someone like
 5    myself; you know, clean, respectful; doesn't
 6    necessarily have to be super successful, but -- and
 7    someone that's not really into politics or religion
 8    deeply because, you know, those things aren't really
 9    drivers for me.
10              So that was kind of the gist of it, if that
11    answers your question.
12       Q    It does.  Thank you.
13              Anything else that you pointed out to her
14    that you thought was really important, you wanted to
15    make sure she knew before she launched into matching
16    you with someone?
17       A    From my memory, I can't recall anything
18    else.
19       Q    And if it was particularly important, you
20    would remember it; right?  It would stand out to
21    you?
22       A    Yes.
23       Q    Okay.  All right.
24              Okay.  I want to pull up a document now.
25    ///
```

1      **A    Yes.**

2      Q    Okay.  So that was on July 7.  So that was

3    after you had your initial consult with ███; isn't

4    that right?

5      **A    Yes.**

6      Q    Okay.  When you received that message with

7    ███ do you recall having a reaction to it within

8    yourself?

9           MR. CONN:  Object to the form.

10           MR. GRAHAM:  I'll clarify.

11      Q    When you received that email from ███ that

12    we just walked through, that message from ███ did

13    it raise any thoughts in your mind, either positive

14    or negative?

15           MR. CONN:  Same objection.

16           THE DEPONENT:  Do I -- am I supposed to

17    answer?

18      Q    BY MR. GRAHAM:  Yes, you can answer.

19      **A    Okay.  I actually was kind of shocked that**

20    **she sent me this because I had an interaction the**

21    **day prior that I wasn't happy with what was said**

22    **during my interview or my consultation with ███**

23    **and I actually tried to cancel the day before, on**

24    **July 8th.  I don't know if you have that text**

25    **message.  But I was shocked when I saw this.**

1      Q    I just want to make sure we're talking

2   about the same days of the week or days of the

3   month.

4           So you said you tried to cancel on

5   July 8th; is that right?

6      **A    I believe so.  It was before -- before I**

7   **had this match, I let the salesperson know that I**

8   **wasn't happy with Zoom dates counting towards my**

9   **package, and that's what ▆▆▆ said, that I could**

10  **have a Zoom date and it's going to count.  And that**

11  **wasn't discussed and I wasn't cool with it.  I**

12  **actually was texting back and forth trying to**

13  **cancel.**

14     Q    Okay.  We'll get to that in a second, but I

15  just want to make sure we're on the same page --

16     **A    Sure.**

17     Q    -- because you mentioned July 8th.

18          This email from ▆▆▆ is on July 7th, so

19  this is before the 8th.

20          So on July 7th, after you got this email or

21  this message from ▆▆▆, did you have any reaction to

22  it, positively or negatively?

23          MR. CONN:  Same objection.

24          THE DEPONENT:  Positively or negatively,

25  no.  I mean, it was just -- basically just outlining

1  things that she -- just kind of like terms really.

2  It wasn't -- I was just neutral, wasn't positive or

3  negative.

4      Q    BY MR. GRAHAM:  And you understood her

5  comments here to mean she couldn't guarantee a

6  particular experience on a date, but that you would

7  work through this process collectively to get to the

8  right place ultimately; right?

9      **A    Yes.**

10     Q    All right.  So you mentioned that you

11 discussed Zoom dates with her, and that that left

12 you -- I don't want -- I'm not quoting you here, I'm

13 paraphrasing, so feel free to correct me once you

14 start talking.

15         The topic of Zoom dates came up with ▮▮▮

16 and you were not happy about it counting --

17         (Simultaneous speaking.)

18     **A    Yeah, and I expressed that to ▮▮▮ too.  I**

19 **said, "This wasn't what was discussed with me during**

20 **the sales call, and I don't think Zoom dates should**

21 **count."**

22         **And then she said, "Well, I put as much**

23 **work into that -- to find that person as I do an**

24 **in-person date."**

25         **And I said, "Well, I'm not -- you know, I'm**

1   not going to -- to me, it's not a full experience if

2   it's over Zoom, so it shouldn't count.  And I

3   don't -- I'm not cool with it."

4          So it was an awkward interaction between me

5   and ███.  And I don't know if it was -- it could

6   have been -- could have been on the 7th -- 7th or

7   8th, I texted the salesperson that I wasn't happy

8   and that I don't want Zoom dates to count and I

9   wanted to cancel.

10      Q    Okay.  When you say salesperson, you're

11  referring to ███ in member services that you talked

12  to previously?

13      A    Right, yep.

14      Q    All right.  We're going to get to that in a

15  second, but before we get there, I just want to

16  clarify.

17          So you were opposed to having Zoom dates

18  because you felt like it wouldn't be the same

19  experience for you as going on an in-person date; is

20  that fair?

21      A    Yeah.  I mean, a Zoom date is -- I mean,

22  it's not even half of the same experience as an

23  in-person date.

24      Q    Okay.  And did ███ tell you why Zoom dates

25  were happening?

1      A    She mentioned and so did the salesperson,
2   they said they were doing Zoom dates because of
3   COVID.  But the salesperson was really clear that
4   because of the new guidance from the government,
5   that they were doing in-person dates now.
6          So, to me, the way it was explained to me
7   was a transition from all Zoom dates to now doing
8   in-person dates.
9          ███ said that some people are still
10   uncomfortable with meeting in person.  And I was,
11   like, "Well, I don't want to -- then, you know,
12   that's not going to work for me."
13          So, you know, in retrospect, it -- it
14   actually limits my -- limits the amount of people
15   that I have access to in their pool because if half
16   the people want Zoom only and the other half are
17   okay with in-person, then it takes 50 percent of the
18   dating pool, which, again, it's not -- that's not
19   what I signed up for.  I signed up for the full --
20   full thing, every possible person that's supposed to
21   match me or match -- you know, someone match -- to
22   some level, someone that would be compatible with
23   me.
24          So I didn't feel like it was a fair thing
25   for them to count towards Zoom dates.  And because I

JEREMY STANFIELD

May 26, 2021

1      A      I did, yes.

2      Q      All right.  Did you go on any Zoom dates

3   using Tawkify services?

4      A      No.

5      Q      How many dates did you go on using Tawkify

6   services?

7      A      Two.

8      Q      Were they both in person?

9      A      Yes.

10     Q      Okay.  All right.

11            Rather than go into another document right

12   now because I would bet that it's going to take more

13   than three minutes, and I promised you a break at

14   noon for your daughter --

15     A      Appreciate it.

16     Q      -- so I'm going to honor that, we'll break

17   three minutes early.

18            If you can be back online at 12:45 p.m.

19   Pacific, that would be great.

20     A      Okay.  No problem.

21     Q      Thank you, Mr. Stanfield.

22     A      Just leave this open or how does it work?

23     Q      I'm going to defer to the court reporter on

24   what we do about --

25            MR. CONN:  I would leave it open.

1      Q     And ultimately what we resolved was that

2      ███ told you you had to do Zoom dates or at least

3      it was what some dates were preferring because of

4      COVID?

5      **A     She told me specifically it was, like,**

6      **7- -- it was like a high number, like, 70 percent of**

7      **people want to do Zoom, and I told her I wasn't okay**

8      **with that.**

9      Q     Okay.  And you reached out to ███, the

10     member services rep you talked to initially, to

11     complain about that because you had a different

12     understanding than ███ or ███ about whether the

13     Zoom dates were still happening during COVID;

14     correct?

15     **A     Right.**

16     Q     Okay.  And so you reached out to ███ to

17     clarify, but also to voice your concerns as to

18     whether you -- Zoom dates should count against your

19     official match totals; right?

20     **A     Yeah.  I didn't like the policy and I**

21     **didn't -- I didn't think it was fair.  And that**

22     **based on what ███ said to me, I wanted to cancel**

23     **because it didn't give me an opportunity to have --**

24     **if only 30 percent of the dating pool is available**

25     **to me because 70 percent was through Zoom only, then**

```
 1              "I see your point but the same
 2       amount of work - screening and
 3       vetting - is done by ███ whether
 4       it's a Zoom or in-person date.
 5              "Did she say that people aren't
 6       wanting IP dates because of Covid?"
 7       And you say:
 8              "Well that's not what was
 9       presented to me.  You never
10       mentioned zoom dates and said we
11       would meet somewhere.  I'm not good
12       with it."
13       Did I read that correctly, sir?
14   A   Yes.
15   Q   Okay.  She says:
16              "You can" -- and she emphasizes
17       by using all caps CAN -- "meet
18       somewhere as long as your match is
19       okay with it.  I did mention Zoom
20       dates.  It's what we were doing for
21       months during Covid but now we (sic)
22       are officially giving people the
23       option to do either.  I'm sorry that
24       wasn't made clear but it's kind of
25       moot because we are offering in
```

1    six dates, were you?

2        **A    They -- it was an in-person date, but it**

3    **was still part of the smaller dating pool.  So it**

4    **still -- they still didn't address my concern and**

5    **they still took that in-person date from 30 percent,**

6    **according to ██████, 30 percent of the dating pool,**

7    **which is a misrepresentation to me.**

8            MR. GRAHAM:  Objection; nonresponsive.

9        Q    Sir, I just want to be clear here because

10   this is an important point.  All right?  So --

11   because ultimately, you would agree with me that

12   Tawkify can't force a woman to go on an in-person

13   date if she's uncomfortable because of COVID?  You

14   agree with that; right?

15       **A    Yes, I agree with that.**

16       Q    Because Tawkify can't force you to go on an

17   in-person date if you're uncomfortable with that;

18   right?

19       **A    I agree.**

20       Q    Just like Tawkify couldn't force you to go

21   on a Zoom date if you were uncomfortable doing it;

22   right?

23       **A    Yes.**

24       Q    Okay.  So ultimately, it's up to the people

25   in the dating market to decide what they're

JEREMY STANFIELD

May 26, 2021

1   comfortable with; isn't that a fair statement?

2        A    Right.  And that should have been presented

3   before I spent my money.  It wasn't.

4        Q    Sir, but my question simply is they can't

5   force you to do it, can they?

6        A    No, they cannot.

7        Q    Okay.  So at this point in the conversation

8   where you're telling them "if you don't budge on

9   charging me a date for a Zoom date as opposed to an

10  in-person date, then I want to cancel," they then

11  budged on it?  They said, "Okay, well, here's an

12  in-person date."  They didn't give you a Zoom date

13  after that, did they?

14       A    I don't consider that budging when they

15  told me that I could have an in-person date, but it

16  would be from a small percentage of the dating pool.

17  It wasn't -- like, again, it's not binary.  I'm not

18  sure why we have to keep going in circles about

19  this.  But they told me there's an opportunity for

20  an in-person date.  It's not like they said there

21  was -- no one's doing Zoom dates -- or no one's

22  doing in-person, it's a hundred percent Zoom dates

23  and they had to budge on an in-person.  There was an

24  option for in-person, but it's only 30 percent of

25  the dating pool.  So it's not a -- the true budging

```
 1    is not -- still not taking care of all my concerns
 2    with their service and their misrepresentation.  My
 3    concern was never addressed.
 4            So, like, I'm not sure what you're trying
 5    to get to, but I'm going to keep responding this
 6    way.
 7       Q    Sir, you can respond however you want.  We
 8    have a court reporter here to record your answer.
 9    That's the whole point, is to do a question and
10    answer.  So my question --
11       A    Sounds good.
12       Q    -- coming back to the issue that we're
13    discussing here is --
14       A    Sure.
15       Q    -- ultimately, you decided, knowing that,
16    according to ████ that 30 percent of people here
17    were okay doing in-person and 70 percent were not,
18    you still decided to go on an in-person date, didn't
19    you?
20       A    I did.
21       Q    You could have told her, "You know what,
22    given what you told me about the approximate
23    70 percent, no more dates, no more budging,
24    nothing's negotiable, I want to stop right now and I
25    don't want to go on an in-person date because it's
```

1      A      **Yes.**

2      Q      Does that text represent what I just said?

3      A      **Yes.**

4      Q      Okay.  All right.

5             So would it be fair to say, then, that your

6      first date was on July 11th?

7      A      **Yes.**

8      Q      If you can just take a look at this text

9      from you in response to ██████ text, where you say:

10            "Do you know if ██████ has

11            time to do something after dinner or

12            is this just supposed to be a

13            dinner?"

14            Does that refresh your recollection on what

15     the name of the date was?

16     A      **Yes.**

17     Q      And was her name ██████

18     A      **Yes.**

19     Q      Okay.  So can you tell us a little bit

20     about your date with ██████ how it went, in your

21     eyes?

22     **A      How our date went?  Yeah.  So when I met up**

23     **with ██████, she didn't look healthy.  She looked**

24     **sickly.  She looked way older than me.  Complete**

25     **opposite of the body type that I'd said I prefer.**

JEREMY STANFIELD

May 26, 2021

1    We had nothing in common.  She liked to travel.  I

2    do not like to travel.  Her personality was very

3    reserved, wasn't outgoing at all.  It was not great.

4    It was probably one of the worst dates I ever had in

5    my life, so...

6         Q    Okay.  Where did you all go for dinner?

7         A    Some restaurant by the beach.  I'm not sure

8    exactly.  I can't remember what it was.  It was

9    outdoors.

10             And we -- we didn't actually end up having

11   dinner.  We just had drinks.  I mean, that was it.

12        Q    Okay.  Was your date scheduled for

13   8:00 p.m.?

14        A    Yes.

15        Q    Okay.  I have up on the screen still

16   Exhibit 5 but the preceding page, the one that ends

17   in 128.  It appears there that the name of the

18   restaurant was Parkers' Lighthouse.

19             Does that sound familiar?

20        A    Yes.

21        Q    The date was set for 8:00 p.m.  Did you

22   show up on time?

23        A    I was a few minutes late.  She was a little

24   later.  I think she got there at 8:20.

25        Q    Okay.  So you were late to your first date?

1       A    **By five minutes.**

2       Q    Okay.  Is that a "yes"?

3       A    **Yes, five minutes.**

4       Q    Okay.  So you said that you guys had

5    nothing in common; is that your testimony?

6       A    **Yes.**

7       Q    And you mentioned that her body type wasn't

8    the body type that you liked?

9       A    **The polar opposite of what I like.**

10      Q    So what was the body type that you liked?

11      A    **I like -- as I said in the beginning of our**

12   **deposition, I'm a bigger guy, I'm a thicker dude.**

13   **So I like women that are also thicker and big like**

14   **me.  And this person was anorexic.  She didn't even**

15   **look healthy.  She looked like she needed to go to**

16   **the hospital.  She looked maybe 80 pounds.  She**

17   **looked sickly.**

18      Q    Okay.  Beyond physical appearance, what

19   else did you -- were you dissatisfied about

20   Jeanette?

21      A    **Her personality was very reserved, she's**

22   **very conservative.  She didn't have much to say.  It**

23   **was just a train wreck.  I'm very outgoing, I'm very**

24   **personable, I laugh a lot, joke around.  I made it**

25   **super clear to ████ that I need someone else that's**

1    like that that's compatible with me, you know, to a

2    certain level.  This person was, again, polar

3    opposite personality-wise, just -- I mean, this --

4    this person was also a Tawkify member.  I can't

5    imagine I was anything close to her match.  I mean,

6    I don't know what this company's trying to do.  But,

7    anyway, sorry.

8              MR. GRAHAM:  Object as nonresponsive.

9              THE DEPONENT:  I did respond.

10    Q    BY MR. GRAHAM:  Sir, that's for the record.

11    That's not for you to respond to.  That's for the

12    court.

13              So back to my question.

14    A    Sure.

15    Q    Other than physical attributes, was there

16    anything else you wanted to mention about what you

17    were dissatisfied about █████████

18    A    Yes.  I will repeat myself and say that her

19    personality wasn't outgoing, she was very reserved,

20    she's very conservative.  She didn't like to laugh

21    or joke around.  She loved to travel.  And I told

22    ██████ specifically that I don't like to travel.  I

23    don't ever want to travel.  And that was a big

24    passion of hers, something that she made clear that

25    that was, like, a huge thing for her.

```
 1   tell Tawkify "It's over.  I want a full refund.
 2   Let's just end it now," did you?
 3        A    No.
 4        Q    Okay.  Let me continue reading.
 5                 "I'd prefer you not share any of
 6             this with ███████ or ██████ in any
 7             way that I expressed myself.  If I
 8             really have to, I can try to do a PC
 9             way of giving ██████ feedback on
10             ██████.  But I'm racking my brain
11             on how to say it right.  It took me
12             a while just to try and get the
13             words right to say all this."
14             Did I read that correctly, sir?
15        A    Yes.
16        Q    All right.  So it's fair to say,
17   Mr. Stanfield, that you were struggling to find the
18   right words to express your frustration with Tawkify
19   services; right?
20        A    Yes, that's what I said.
21        Q    But you ultimately hadn't given up on the
22   service just yet.  You were close to it, but you
23   hadn't really given up on the service just yet?
24        A    Yes.
25        Q    Yes, you have not -- you had not given up;
```

1    hundred percent necessary.  They're both -- I'm

2    trying to find the words.  They're both requirements

3    and paramount.  So you can't have one without the

4    other, as far as I'm concerned.

5         Q    Okay.  And I think you described yourself

6    as fit.  Would you characterize yourself as being

7    fit, Mr. Stanfield?

8         A    Fit?

9         Q    Yes.

10        A    I mean, right now I'm not as fit as I was,

11   but, yeah, I mean, I -- I usually work out three to

12   four times a week.

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

██████████████████████████

████████████████████████████████████████████

18        A    My BMI?

19        Q    Body mass index.

20        A    No, I don't.  I don't know what it is.

21        Q    Okay.  Now, so the characteristics that you

22   discussed with ████, for your first date, ████████

23   you said that she didn't fit any of those really, in

24   your view; is that right?

25        A    Yeah.  I mean, the biggest things were

1    Q    What about the next date?  Did the next

2  date fit any of the characteristics that you

3  outlined for ████

4    **A    No, no.  The next date was, again, very,**

5  **very, very, very, very small, very unhealthy**

6  **looking, maybe weighed five pounds heavier than**

7  **████████    I don't remember the second date's name.**

8  **I apologize.  Probably review that later.  She**

9  **really wanted kids.  She was very, very much into**

10  **work, had a business.  Didn't do anything socially.**

11  **She was very reserved, wasn't outgoing.**

12        **Again, polar opposite of pretty much every**

13  **aspect that I -- I -- I'm into and what -- her**

14  **passions and drivers versus my passions and drivers.**

15    Q    Okay.  Give me one second, please, while I

16  grab the next exhibit.

17    **A    We did have -- excuse me.  We did have**

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

21  **have that aspect, to be honest, but that was it.**

22    Q    The first or second date?

23    **A    Second date.**

24    Q    Okay.  I'm going to pull up another

25  exhibit.  Just give me one second.

 1    refund.  So, I mean, throughout this whole process,

 2    I keep saying I want to cancel, I want a refund, I

 3    don't want the dates to count.  So I -- you know, I

 4    was probably -- if you want percentages, I was

 5    90 percent wanting to cancel and 10 percent wanting

 6    to give them another shot.  That's -- in my mind,

 7    that's where my head was at, split between the two

 8    choices.

 9         Q    Okay.  We can move on from this document.

10              Did you ever describe your second date --

11    did you -- strike that.

12              Do you remember the name of your second

13    date?  Did we determine that yet?

14         A    I don't.  I'm sorry.

15         Q    If I said her name was ███ would you have

16    any reason to dispute that, her name was ███

17         A    I wouldn't have any reason to dispute that.

18         Q    Okay.  Did you ever describe ███ as being

19    beautiful?

20         A    Yes.  She had a pretty face.

21         Q    And you told ███ that it was important to

22    you that a woman have a pretty face; correct?

23         A    Yes.

24         Q    So there was at least one thing about ███

25    that you thought was appealing?

1    introduction and post-date feedback."

2            It seems to mention that there's a video

3    option potentially for a date.  When you read that,

4    did that give you pause?

5        A    "Introduction" doesn't -- to me, doesn't

6    seem -- "post-date feedback."  Yeah, I must not have

7    read that because I immediate -- as soon as I

8    heard --

9            Oh, shoot, my battery.  Hold on a second.

10   I need to plug my -- one second.

11           As soon as I discussed it with ███, I

12   immediately complained about it.

13           Are you guys still here?

14       Q    We're here.

15       A    Okay.  Cool.

16           I might have read it.  I can't recall a

17   hundred percent, but I don't think it connected, if

18   I did read it, that a Zoom date would count because

19   I clearly had concern immediately, like, the same

20   day after I spoke with ███   So whether -- whether

21   I read it or not, it wasn't something that I was

22   okay with.

23       Q    Okay.  All right.

24           I'm going to turn to another document that

25   was produced by you.  It's -- we'll mark this as

JEREMY STANFIELD

1    to log in to upload pictures and do -- like, do the

2    credit card stuff.  So for sure, like -- and it

3    sounds like it was, you know, the dashboard.

4        Q    Okay.  Beyond the initial sign-up that you

5    talk about with your credit card information and

6    photos, did you have to log in or did you ever log

7    in to Tawkify's website after, let's say in the

8    month of July?

9        A    It's -- it's feasible that I did.  I'm sure

10   I had to to -- to do the feedback form when they

11   sent me the link.  So, I mean, it makes sense but --

12   that I would have because I did do feedback forms.

13       Q    Okay.  I'd like to focus your attention on

14   the bottom of this page -- let me scroll down --

15   where it says:

16            "Meanwhile, we're so very

17            excited to step-in and create an

18            effortless dating experience for

19            you!  Feel free to email or call us

20            at (415) 843-2832 with any

21            additional questions."

22            Do you see that information there, sir?

23       A    I do.

24       Q    Did you ever have trouble contacting

25   Tawkify -- and when I say "trouble," meaning you

JEREMY STANFIELD

May 26, 2021

```
 1   were not able to contact them -- regarding any
 2   concern that you had?
 3       A    I sent them emails and left voice mails for
 4   them, and they typically always responded.
 5       Q    Okay.  So it's fair to say that you were
 6   able to get into contact with Tawkify if you wanted
 7   to express frustration or notify them that you
 8   wanted to cancel?
 9       A    Yes.
10       Q    Okay.  All right.  We can pull this
11   document down.
12            I'm going to mark as Exhibit 13 a document
13   Bates-labeled as STANFIELD000082, is the beginning
14   Bates, and the ending Bates is STANFIELD000086.
15            (Defendant's Exhibit 13 was subsequently
16       marked for identification.)
17       Q    BY MR. GRAHAM:  Mr. Stanfield, can you see
18   that there's a document up on the screen?
19       A    I do.
20       Q    Okay.  I'm just going to scroll to the
21   bottom right-hand corner so we can see the Bates
22   number.  That's STANFIELD000082, the beginning
23   Bates.
24            And then this top portion here
25   (indicating), is that your email address there?
```

JEREMY STANFIELD

May 26, 2021

1    sign up for a matchmaking service to begin with?

2        A    As I stated before, it was COVID and it was

3    more restrictive and harder to meet people because

4    of COVID.  And that's, you know, really the main

5    reason why I used a matchmaking service because of

6    that circumstance.  But typically when there's not a

7    pandemic happening, I have no problem finding anyone

8    that matches me.  So that sentence is accurate.

9        Q    Okay.  And other than the one woman who you

10    married, did any of those relationships that you

11    were able to find on your own result in a lifelong

12    committed relationship?

13        A    A lifelong?  Well, I -- I'm single right

14    now, so, no, I'm not in a lifelong relationship

15    currently.

16        Q    Okay.  You mentioned here that:

17             (As Read) "I'd like a full

18             refund processed today and if you

19             would want me to sign a non

20             disclosure agreement or gag order to

21             get all my money back, I'll be happy

22             to do so."

23             Is that an accurate read of what you say

24    there?

25        A    Yes.

JEREMY STANFIELD

May 26, 2021

1          So I was just trying to get some kind of

2    response to -- to get them to do something because I

3    wasn't getting anywhere, just the constant emails

4    and text messaging, I wasn't getting any resolution.

5    So I just -- I -- I stated that to -- to put some

6    teeth into what I was saying, but I didn't have an

7    attorney at that point.

8        Q    So you lied to Tawkify?

9        A    On that particular sentence, yes.

10       Q    So you misrepresented the facts to Tawkify?

11       A    I -- I did not have an attorney, if that's

12   your question.

13       Q    Did you misrepresent the fact that you

14   spoke to your attorney this morning and he suggested

15   that you offer what you said there to Tawkify?

16           MR. CONN:  Objection; asked and answered.

17       Q   BY MR. GRAHAM:  You can still answer, sir.

18   Did you misrepresent the facts there, "yes" or "no"?

19       A    Yes.

20           MR. GRAHAM:  Okay.  All right.  We'll pull

21   this document down.

22           All right.  What number are we at?

23           THE REPORTER:  14.

24           MR. GRAHAM:  Marking as Exhibit 14 a

25   document that's Bates-labeled STANFIELD000038.  One

JEREMY STANFIELD

May 26, 2021

```
 1        A    They ignored 99 percent of my preferences.
 2        Q    I'm going to ask -- "yes" or "no," sir --
 3   is it --
 4        A    It's not a "yes" or "no" question -- it's
 5   not a "yes" or "no" answer.
 6        Q    It actually is.
 7        A    It's not binary.
 8        Q    It actually is.  When you say --
 9             (Simultaneous speaking.)
10        Q    This is the question, sir:  When you say
11   they completely ignored your preferences, is that an
12   accurate statement or is that an inaccurate
13   statement?
14        A    Completely ignored my preferences, I guess
15   in that one aspect, then it's not accurate.
16             MR. CONN:  Hey, Priscilla, I'm having
17   trouble downloading about half of these.  At the end
18   when you send everything to the court reporter,
19   would you mind sending them to me as well?
20             MS. SZETO:  I'll copy you.
21             MR. CONN:  Cool.  Thanks.
22             MS. SZETO:  Uh-huh.
23        Q    BY MR. GRAHAM:  I want to go back to
24   Exhibit 2, which has already been entered.  Let me
25   pull it back up for you, Mr. Stanfield.
```

May 26, 2021

```
 1    accurately so far, sir?
 2        A    Yes.
 3        Q    Okay.  So prior to this date, you demanded
 4    from Tawkify a full refund of every single penny
 5    that you had paid to the company up until that
 6    point; is that right?
 7        A    Correct, yes.
 8        Q    And it was your view that you were entitled
 9    to a refund of every single cent that you had paid
10    to the company before; right?
11        A    Correct.
12        Q    Okay.  And why were you, in your view,
13    entitled to a full refund of everything you had paid
14    up until that point to Tawkify?
15        A    Because they didn't provide the service
16    that they said they would.  They misrepresented
17    themselves.  Their communication was horrible.
18    That's the smallest part of it.
19             The biggest part is them admitting that the
20    match -- the matches weren't good and that I should
21    get credits.  And when I didn't want to deal with it
22    anymore, that went away, and now all of a sudden,
23    those matches are good.
24             So it's just a lot of lies and BS and
25    misrepresentation and, you know, them completely not
```

1    doing their job, and, like, 99 percent of their job
2    wasn't done.
3              So, you know, it seemed like they were --
4    they're scamming people and purposely setting them
5    up on bad dates so they can get their money.  So
6    that's why I felt that way.
7         Q    Okay.  Were there any other reasons why you
8    felt like you were entitled to a full refund of
9    every cent that you had paid to Tawkify up until
10   that point?
11        A    Were there any other reasons?
12        Q    Correct.
13        A    No.  I mean, they -- they -- anyway.  Go
14   ahead.  Ask your question.
15        Q    Were you done?  I don't want to interrupt
16   you.
17        A    I'm done.  That's fine.
18        Q    Okay.  Isn't it true, Mr. Stanfield, that
19   Tawkify informed you on multiple occasions in
20   multiple ways that you would not get a refund for
21   services that were actually rendered to you?
22        A    Services were not rendered to me.  I
23   wouldn't call those services.  I would call that a
24   scam.
25        Q    Okay.  So it's your position that going on

JEREMY STANFIELD

May 26, 2021

1    two dates, even if you didn't completely like each

2    date, means that services were not provided to you?

3        A    Correct.

4        Q    And in terms of the work on the

5    matchmaker's part of screening potential dates,

6    talking to you about your preferences and other

7    sorts of predate activities, that none of that

8    constitutes services or work in your view?

9        A    So the -- we -- we -- everybody put in --

10   time in on this, and my time is also valuable.  As

11   my -- as my email stated, they wasted my time, they

12   lied to me and misrepresented themselves.  So they

13   actually spent time doing these shady business

14   practices, so I still don't call that services.  I

15   call that a scam.

16            So, you know, to me, that doesn't consist

17   of services when you're deliberately putting out a

18   bad product and misrepresenting.

19       Q    Okay.  Let me now scroll.  We're still on

20   Exhibit 2.  Let me scroll down.  So she says:

21            "Our refund policy isn't

22            negotiable.  It's agreed to multiple

23            times, twice at account set up

24            (screenshot below)."

25            I'm going to zoom in so you can see this a

JEREMY STANFIELD

May 26, 2021

1      Q    Okay.  Did you read -- did you actually

2  read the refund policy when you signed up for

3  Tawkify services?

4      A    I -- I can't recall really.  I think I did,

5  but I'm pretty -- yeah, I might have -- probably was

6  on my phone.  I might have looked at it briefly, but

7  regardless -- I mean, regardless of their policy,

8  they admitted that the service wasn't good.  It

9  should be credited back, so...

10          MR. GRAHAM:  Objection; nonresponsive.

11      Q    I just want to go back to my question, sir.

12  Did you read the refund policy when you signed up to

13  use Tawkify services?

14      A    I can't recall if I actually read it.

15      Q    But you clicked to affirm that you read and

16  agreed to it, didn't you?

17      A    That's the only way you can continue so

18  obviously I clicked on it, yes.

19      Q    And is it customarily your practice to not

20  read things that you say you're agreeing to read?

21      A    I didn't say that I didn't read it.  I said

22  I don't remember reading it.

23      Q    Okay.  So are you saying that you might

24  have read it?

25      A    It's possible.

JEREMY STANFIELD

May 26, 2021

| | | |
|---|---|---|
| 1 | A | **Right, right, right.** |
| 2 | | (Simultaneous speaking.) |
| 3 | A | **So that's on their website.   Okay.** |
| 4 | Q | That's a "yes," you used Tawkify's |
| 5 | | website -- |
| 6 | A | **Yes.** |
| 7 | Q | -- correct? |
| 8 | A | **Yes.** |
| 9 | Q | "The account you create is for your |
| 10 | | personal use only.  You may not |
| 11 | | authorize users to use your |
| 12 | | account, you may not assign or |
| 13 | | otherwise transfer your account to |
| 14 | | any other person or entity. |
| 15 | | Illegal and/or unauthorized use of |
| 16 | | the Website, including but not |
| 17 | | limited to collecting personal |
| 18 | | information, usernames, and email |
| 19 | | addresses of users by electronic or |
| 20 | | other means for the purpose of |
| 21 | | sending unsolicited email, |
| 22 | | unauthorized embedding, |
| 23 | | unauthorized framing of or linking |
| 24 | | to the Website may be investigated, |
| 25 | | and appropriate legal action will |

JEREMY STANFIELD

May 26, 2021

```
 1              be taken, including without
 2              limitation, civil, criminal, and
 3              injunctive compensation.  Tawkify
 4              has the right to investigate and
 5              refer you to applicable law
 6              enforcement authorities if you have
 7              misused the Services, taken any
 8              actions in defiance of this Terms
 9              of Use or the Privacy Policy, or if
10              you have conducted actions that are
11              fraudulent, abusive, harmful,
12              unlawful or illegal."
13              Did I read that correctly, sir?
14      A       Yes, you read the paragraph.
15      Q       So at any time after you joined Tawkify's
16  service and logged onto their website, did you share
17  your username or password with any person?
18              MR. CONN:  Objection to the extent it calls
19  for attorney-client privilege.  Do not disclose --
20  Mr. Stanfield, I'm instructing you not to disclose
21  any communications made to your attorneys.  Other
22  than communications made to your attorneys, go ahead
23  and answer the question.
24              THE DEPONENT:  No.
25      Q       BY MR. GRAHAM:  All right.  So I want to be
```

1      Q    And then the second amount is for

2    $1,849.98; correct?

**3      A    Yes.**

4      Q    Also from Tawkify; correct?

**5      A    Yes.**

6      Q    Also described as a purchase return?

**7      A    Yes.**

8      Q    Okay.  I'm not asking you to do the math

9    here, sir, but let's just say this amount here --

10   these two amounts here put together with the amount

11   on the preceding page, that amounts to $3,700 as far

12   as you know?

**13     A    Yeah, that adds up to 3,700.**

14     Q    Okay.  So based on your bank statements,

15   you received a complete and full refund of all

16   monies you ever paid to Tawkify to the same ▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮ that you used to purchase Tawkify

18   services; correct?

**19     A    Yes.**

20     Q    Part of that hit your bank account on

21   August 1st of 2020 in about half of the amount; is

22   that correct?

**23     A    Yes.**

24     Q    And the other half hit your bank account on

25   or around -- what's the date here --

JEREMY STANFIELD

May 26, 2021

1   me further, and that's up to my attorney to figure

2   out.

3       Q    Okay.  Other than what your attorney would

4   say, is there any other basis that you would assert

5   entitles you to additional money from Tawkify?

6       A    I just stated what other situations.

7   This -- the stress, losing the money for months,

8   emotional stress, the money I spent on the dates.  I

9   mean, I can't quantify it.  That's not -- that's not

10  up to me to quantify it, but, I mean, I don't know

11  how many times you want me to say the same thing.

12      Q    Well, I just want to get the full breadth

13  of what you say you're entitled to financially.

14      A    Okay.

15      Q    All right.  So let's walk through that.

16  You mentioned a couple things.

17           You said the money you spent on dates.  So

18  how much money did you spend on the dates?

19      A    How much money did I spend?  3,700.

20      Q    No, no, no.  Let's just be clear.  So just

21  Tawkify services.

22           When you said the money you spent on the

23  dates, are you referring to the money you spent

24  going on the dates in terms of buying drinks or

25  dinner or something like that?

JEREMY STANFIELD

1        A     My time, gas, what I spent on the dates.

2    Just the stress of going through it and going

3    through two situations that I should have never been

4    put into.  I mean, you know, other than that, I

5    mean, there's no other factors that I can think of

6    right now as far as the dates are concerned.

7        Q     Okay.  Let's walk through each of those.

8              So you mentioned -- how much did you spend

9    on gas for each date?

10       A     Gas.  So it's about a two-hour drive each

11   way, so my time -- gas alone was probably like, I

12   don't know, 10, 20 bucks.

13       Q     Okay.  Per date?

14       A     Per date.

15       Q     Okay.  10 to $20 per date.  So that's a

16   maximum of $40 in gas for two dates.

17             You said the cost of the dates.  What money

18   did you pay during the date that you believe you're

19   entitled to from Tawkify?

20       A     I don't know if I'm entitled to that.  I --

21   but I'll tell you -- I mean, that's for the judge

22   and my lawyer to figure out.

23             But I'll tell you the first date, I spent

24   like 40 -- 40, 50 bucks offhand.  I can find the

25   receipts later.  I don't know the exact amount.  And

JEREMY STANFIELD

May 26, 2021

1    the second date was around, I want to say, 80 to a
2    hundred dollars.
3         Q    You said $87?
4         A    80 to a hundred.  I can't remember the
5    exact, but it was in that range.
6         Q    Okay.  All right.  So let's walk through
7    the first date.  So what did you spend 40 to $50 on
8    for the first date?
9         A    Basically drinks.  And I had an appetizer,
10   but she didn't eat.
11        Q    So you paid for drinks for both of you or
12   just for yourself?
13        A    For both of us.
14        Q    All right.  And then you said you had an
15   appetizer, but she did not eat; correct?
16        A    Correct.
17        Q    Okay.  And then the second date that you
18   spent 80 to a hundred dollars for, what did you
19   spend that on?
20        A    Dinner and drinks for both of us.
21        Q    And you both ate and drank?
22        A    Yes.
23        Q    Okay.  You mentioned your time and your
24   emotional -- I don't want to put words in your
25   mouth.  How did you phrase it?  Having to go through

```
 1    don't understand what this question's for.

 2         Q    Okay.  22.

 3              Marking as Exhibit 22 a document that's

 4    Bates-labeled STANFIELD000050.  Again, that's

 5    000050.  One second while I pull it up.

 6              (Defendant's Exhibit 22 was subsequently

 7         marked for identification.)

 8         Q    BY MR. GRAHAM:  Okay.  Let me know,

 9    Mr. Stanfield, when you can see a document on the

10    screen.  Can you see a document on the screen, sir?

11         A    Yep.

12         Q    Bates label on the bottom right-hand corner

13    is STANFIELD000050.

14              This appears to be an email from you, sir,

15    on July 22nd, 2020 at 4:51 p.m. Central sent from

16    your iPhone to ███████ at Tawkify.

17              Do you see that?

18         A    Yes.

19         Q    Didn't you say to her:

20              "Well my cancelation isn't

21         because of Covid!  It's because your

22         reps misrepresented and lied to me

23         and ignored everything that I

24         wanted!

25              "This needs to be prioritized
```

JEREMY STANFIELD

May 26, 2021

```
 1        Q    BY MR. GRAHAM:  Okay.  Mr. Stanfield, so
 2   having used Tawkify's services for a little over a
 3   month or so, how would you rate Tawkify as a company
 4   on a scale from one to ten, ten being great, one
 5   being trash?
 6        A    Zero.
 7        Q    Okay.  So your view, it's a horrible
 8   company; correct?
 9        A    Yes.
10        Q    Would you recommend Tawkify to any of your
11   friends or family or someone who's important to you?
12        A    No.
13        Q    Would you recommend to any consumer that
14   they use Tawkify services going forward?
15        A    If someone -- no, no.
16        Q    Okay.  How about yourself, do you want to
17   use Tawkify services?
18        A    No.
19        Q    Would you ever use Tawkify services again?
20        A    No.
21             MR. GRAHAM:  Okay.  All right.  I have no
22   further questions.
23             Elliot, I don't know if you want to
24   stipulate or agree to a stipulation about the
25   transcript.
```

JEREMY STANFIELD

May 26, 2021

1    a true record of the testimony given by the witness.

2    (Fed. R. Civ. P. 30(f)(1)).

3          Before completion of the deposition, a review

4    of the transcript [x] was  [ ] was not requested.

5    If requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed,

7    are appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated:  May 28, 2021.

10

11

12                                   TAMI L. LE

13

            Certified Shorthand Reporter No. 8716, RPR

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


JEREMY STANFIELD,          )
individually and on      )
behalf of all others     )
similarly situated,      )
                          )
    Plaintiff,        ) Case No.
                          )
vs.                ) 3:20-cv-07000-WHA
                          )
TAWKIFY, INC.,         )
                          )
    Defendant.        )
_____  )


Contains Portions Designated as Confidential


VIDEO-RECORDED 30(b)6 DEPOSITION OF

THANE SCHULTZ ON BEHALF OF TAWKIFY, INC.

June 23, 2021

Conducted Via Video Conference


Pages 1 - 196

Reported by:

Lisa O'Sullivan
Ca CSR No. 7822
Az CR No. 50952
RMR, CRR

THANE SCHULTZ

1  back to where we left off, which was Exhibit 5.

2      A.   Yes.  Apologies, Counsel.  It looks like

3  when I logged out entirely, I lost that record of

4  exhibits.  So I've got Exhibit 6 up here, but nothing

5  else.  If you could put that back up for me, it would

6  be great.

7      Q.   Yeah, for sure.  And I'll go ahead and --

8  so I just uploaded Exhibit 5 again.

9      A.   Yes.

10      Q.   And I will -- I'll put up 3 just so that

11  you can get it if you need it.  But for now, let's

12  just you turn to Exhibit 5.

13      A.   Okay.  Okay.  I have it up.

14      Q.   Okay.  Where we left off was the

15  penultimate paragraph there that begins, "You may

16  cancel."  And I was asking you about the prorated

17  payment for match cycles used or in progress, and I

18  asked you what prorated payment meant in the context

19  of Mr. Stanfield's six-date package.

20          So in June of 2020, what did Tawkify

21  consider a prorated payment for match cycles for date

22  packages such as Mr. Stanfield's six-date package for

23  $3700?

24      A.   So prorated.  Prorated payment would have

25  been for match cycles -- I mean, it sounds like I'm

THANE SCHULTZ

June 23, 2021

 1   repeating the language, but I don't know how else to

 2   explain it -- for match cycles used or the next date

 3   cycle would have started for the date.  That's what

 4   that means.

 5       Q.   So with respect to Tawkify's policy in June

 6   of 2020 as reflected here in Exhibit 5, the

 7   October '19 client agreement, is it correct that a

 8   prorated match cycle would mean that one match cycle

 9   is one sixth of Mr. Stanfield's six-date package?

10       A.   Yes, you could look at it that way.

11       Q.   Well, it's not how I look at it.  It's how

12   Tawkify looked at it in June of 2020, July of 2020,

13   and August of 2020.  How did Tawkify look at it?

14       A.   Yeah, I understand.  I guess, Counsel, it's

15   the terminology "one sixth" that you're using.  I've

16   never seen or heard that terminology in Tawkify.

17   We've never used it, to the best of my recollection.

18           So a match cycle would have been how we --

19   how we defined a match cycle, and if it was complete,

20   then it would have been used, essentially if

21   Mr. Stanfield had gone on a date.

22       Q.   Right.  But if he had gone on one date and

23   paid for six dates, that's where the one sixth is

24   coming from.  That's what I'm trying to get at.  If

25   the denominator were different, it would be because

1    BY MR. SCHREIBER:

2       Q.   Just a couple of very quick questions, and

3    then we'll wrap it up.

4            Does Tawkify have a moment in time in that

5    customer journey map when it considers somebody to go

6    from sort of potential client to client?  And I'll be

7    more specific.

8            Does Tawkify consider someone a client when

9    they are approved by the committee or when they've

10   purchased the package or some other marker?

11      A.   Yeah.  So it would really be post --

12   postapproval, when we would send an email to the

13   client telling them that they were approved.  That

14   would be the moment in time.

15      Q.   And they pay before they go to the

16   committee.  Is that right?

17      A.   That is correct.

18      Q.   So in June of 2020, Mr. Stanfield had a

19   sales call with ████████████, then paid, and he was

20   still not a client until Tawkify approved him.  Is

21   that correct?

22      A.   That would be correct, yes.

23      Q.   Is there a reason why the refund policy

24   changed on August 1st, 2020?

25           MR. GRAHAM:  Objection.  Asked and

THANE SCHULTZ

June 23, 2021

```
 1                  REPORTER CERTIFICATION

 2

 3       I, the undersigned certified court reporter

 4  licensed in the states of California and Arizona, do

 5  hereby certify:

 6       That the foregoing deposition of Thane Schultz

 7  was taken remotely before me at the date and time

 8  therein set forth, at which time the witness was put

 9  under oath or affirmation by me;

10       That the foregoing pages constitute a full, true,

11  and accurate transcript of all proceedings had in the

12  matter.

13       I further certify that I am not related to nor

14  employed by any of the parties hereto and have no

15  interest in the outcome of the action.

16       In witness whereof, I have subscribed my name

17  this date: June 28, 2021.

18

19

20

21       _____

22            Lisa O'Sullivan
              Ca CSR No. 7822
23            Az CR No. 50952
              RMR, CRR
24

25
```