Christian Schreiber (Bar No. 245597)
christian@osclegal.com
Monique Olivier (Bar No. 190385)
monique@osclegal.com
Hannah Shirey (Bar No. 332187)
hannah@osclegal.com
OLIVIER SCHREIBER & CHAO LLP
201 Filbert Street, Suite 201
San Francisco, California 94133
Tel: (415) 484-0980
Fax: (415) 658-7758

Elliot Conn (Bar No. 279920)
elliot@connlawpc.com
CONN LAW, PC
354 Pine Street, 5th Floor
San Francisco, California 94104
Tel: (415) 417-2780
Fax: (415) 358-4941

*Attorneys for Plaintiff Jeremy Stanfield
and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JEREMY STANFIELD, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TAWKIFY, INC.,<br><br>                    Defendant. | **Case No. 3:20-cv-07000-WHA**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT TAWKIFY, INC.S' CONVERTED MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:     August 12, 2021<br>Hearing Time:    8:00 a.m.<br>Courtroom:        12<br>Judge:                Hon. William H. Alsup |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

    A.    Tawkify's Uniform Policies and Practices................................................. 2

    B.    Tawkify Applied its Policies and Practices in its Interactions with Plaintiff............ 4

III.  STATUTORY BACKGROUND ............................................................................ 6

    A.    The Dating Services Contracts Act Provides For Unwaivable Rights in Dating Service Contracts. ................................................................................ 6

    B.    Relevant Legislative History of the DSCA. ............................................. 7

IV.   ARGUMENT ..................................................................................................... 10

    A.    Tawkify Violated the DSCA and its Interpretation of the DSCA is Wrong. ........... 10

    B.    Plaintiff Has Constitutional Standing to Pursue His Claims.................... 14

    C.    Plaintiff Has Statutory Standing to Pursue His Claims............................ 16

    D.    Plaintiff Has Standing To Pursue His Injunctive Relief Claim. .............. 18

    E.    There Is No Equitable Basis for the Court to Refuse to Enforce the DSCA. .......... 19

    F.    Defendant's Evidence is Objectionable and Disputed. ........................... 22

V.    CONCLUSION .................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelman v. Spark Networks Ltd.*,
No. B195332, 2008 WL 2108667 (Cal. Ct. App. May 20, 2008)...........................................14

*Ayala v. Sixt Rent a Car, LLC*,
No. CV191514FMOMRWX, 2019 WL 2914063, at *2 (C.D. Cal. July 8, 2019) ...................16

*Beley v. Mun. Ct.*,
100 Cal. App. 3d 5 (1979)....................................................................................11, 20, 21

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal. 4th 1106 (1999) .............................................................................................13

Cal. Civ. C. § 1694.4(d) ............................................................................................13, 15

*Castillo v. Barrera*,
146 Cal. App. 4th 1317 (2007) ...................................................................................21

*Chen v. Allstate Ins. Co.*, 819 F.3d 1136 (9th Cir. 2016).........................................................17

*Collier v. SP Plus Corp.*,
889 F.3d 894, 897 (7th Cir. 2018)..............................................................................16

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) ................................................................................................16

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018)................................................................................18, 19

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018)......................................................................................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..................................................................................................16

*Hadida v. King*,
No. 2:11-CV-8648-SVW-VBK, 2012 WL 13012701 (C.D. Cal. Feb. 2, 2012) ......................22

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013)....................................................................................17

*Howell v. Grindr, LLC*,
No. 15CV1337-GPC(NLS), 2016 WL 1668243 (S.D. Cal. Apr. 27, 2016) ............................13

*Hunt v. Superior Ct.*,
21 Cal. 4th 984 (1999) ...............................................................................................10

*In re Lloyd*,
369 B.R. 549 (Bankr. N.D. Cal. 2007)........................................................................12

*Johnson v. Advanced Air Sols. Inc.*,
No. 19-CV-00613-LHK, 2020 WL 2084898 (N.D. Cal. Apr. 30, 2020)................................12

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310 (2011) ................................................................................... 16, 17

*Louis Luskin & Sons, Inc. v. Samovitz*,
   166 Cal. App. 3d 533 (1985)..................................................................... 12, 20, 21

*Luman v. NAC Mktg. Co., LLC*,
   No. 2:13-CV-00656-KJM-AC, 2017 WL 3394117 (E.D. Cal. Aug. 8, 2017).......................... 17

*Mocek v. Allsaints USA Ltd.*,
   220 F. Supp. 3d 910 (N.D. Ill. 2016) ............................................................... 16

*Nordeman v. Dish Network LLC*,
   No. 21-CV-00923-TSH, 2021 WL 949418 (N.D. Cal. Mar. 12, 2021)................................... 12

*Polo v. Innoventions Int'l, LLC*,
   833 F.3d 1193 (9th Cir. 2016)......................................................................... 1, 19

*Reams v. Cooley*
   171 Cal. 150 (1915) .................................................................................. 22

*Retired Emps. Assn. of Orange Cty., Inc. v. Cty. of Orange*,
   52 Cal. 4th 1171 (2011) ............................................................................... 22

*Sand v. Superior Ct.*,
   34 Cal. 3d 567 (1983) ................................................................................. 10

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540, 1545 (2016)........................................................................... 16

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ................................................................................... 18

*Van v. LLR, Inc.*,
   962 F.3d 1160 (9th Cir. 2020).......................................................................... 15

*Weatherall Aluminum Prod. Co. v. Scott*,
   71 Cal. App. 3d 245, 247 (1977)................................................................... 12, 20

**Statutes & Rules**

28 U.S.C. § 1447(c) ...................................................................................... 19

Cal. Bus. & Prof. C. § 17200, *et seq.* ................................................................... 1

Cal. Bus. & Prof. C. § 17204 ............................................................................ 16

Cal. Bus. & Prof. C. § 17500, *et seq.* ................................................................. 18

Cal. Bus. & Prof. C. § 7031(a)........................................................................... 22

Cal. Civ. C. § 1689.10(a)................................................................................ 11

Cal. Civ. C. § 1689.11.................................................................................. 21

Cal. Civ. C. § 1689.11(c) ........................................................................................... 11

Cal. Civ. C. § 1689.5, *et seq.* ............................................................................ 6, 7, 11

Cal. Civ. C. § 1689.7(g) ............................................................................................ 11

Cal. Civ. C. § 1694(a) ............................................................................................... 14

Cal. Civ. C. § 1694(b) ............................................................................................... 14

Cal. Civ. C. § 1694, *et seq.* ........................................................................................ 1

Cal. Civ. C. § 1694.1 ........................................................................................... 10, 11

Cal. Civ. C. § 1694.1(e) ...................................................................................... passim

Cal. Civ. C. § 1694.2 ...................................................................................... 10, 13, 15

Cal. Civ. C. § 1694.2(b) ........................................................................................ 7, 10

Cal. Civ. C. § 1694.2(e) ...................................................................................... passim

Cal. Civ. C. § 1694.3 ........................................................................................... 13, 15

Cal. Civ. C. § 1694.3(a) ............................................................................................. 13

Cal. Civ. C. § 1694.3(a)(1) ........................................................................................... 7

Cal. Civ. C. § 1694.3(b) ............................................................................................... 7

Cal. Civ. C. § 1694.3(c) ............................................................................................. 13

Cal. Civ. C. § 1694.4(a) ......................................................................................... 7, 22

Cal. Civ. C. § 1694.4(c) ................................................................................... 15, 17, 18

Cal. Civ. C. § 1694.4(e) ............................................................................................... 7

Cal. Civ. C. § 1695, *et seq.* ......................................................................................... 7

Cal. Civ. C. § 1750, *et seq.* ......................................................................................... 1

Cal. Civ. C. § 1780 .................................................................................................... 17

Cal. Civ. C. § 1812.300 ................................................................................................ 6

Cal. Civ. C. § 1812.80, *et seq.* .................................................................................... 6

Cal. Pen. C. § 632(e) ................................................................................................. 22

Fed. R. Civ. Proc. 12(b)(6) ......................................................................................... 13

Fed. R. Civ. Proc. 30(b)(6) ........................................................................................... 2

United States Constitution Article III .................................................................... passim

**Other Authorities**

14 Cal. Jur. 3d Contracts § 170 (2021) ........................................................................................ 21

## I.    INTRODUCTION

Defendant Tawkify, Inc.'s ("Tawkify") converted Motion for Summary Judgment ("Motion") fails to grapple with the material facts of its unlawful conduct or the relevant law that it should have followed. The Motion offers pages of extraneous details in a protracted ad hominem attack designed to distract from Tawkify's liability for systematic violations of the Dating Service Contracts Act ("DSCA"), Cal. Civ. C. § 1694, *et seq*. Tawkify's sparse legal arguments are at odds with the evidence, and the relief it seeks cannot be granted. Its Motion should be denied.

First, Plaintiff Jeremy Stanfield ("Plaintiff") has Constitutional standing to sue. Plaintiff has not only alleged concrete and particularized injury in the form of Tawkify's failure to timely reimburse his full $3,700 for the six-date package that he cancelled, but the parties have now provided undisputed evidence of Tawkify's conduct that proves Plaintiff's claims. Plaintiff has unassailable Article III standing, and Tawkify's efforts to distort the record and pay him off do not alter that fact.

Second, Plaintiff has satisfied the standing requirements under the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. C. § 17200, *et seq*., and the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. C. § 1750, *et seq*. The evidence demonstrates that Plaintiff has suffered a loss of "money or property," and has satisfied the standing requirements for pleading (and proving) a CLRA damages and injunctive relief class action.

Third, Tawkify has failed to prove that Plaintiff lacks standing to pursue public injunctive relief under the UCL and the CLRA. The likelihood of Plaintiff purchasing Tawkify services in the future is not the relevant inquiry in the Ninth Circuit to determine standing under Article III. Furthermore, even if the Court were to find that Plaintiff lacked standing under Article III, the Court may not grant the relief Tawkify seeks. This is because Plaintiff's claims would not be dismissed with prejudice, but would be remanded to state court. *See Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016).

Tawkify's desperate lashing out at Plaintiff is, at best, a thinly veiled effort to distract the Court from applying straightforward facts to an unambiguous law. The DSCA is a decades-old consumer protection statute that regulates the contracts of dating services companies like Tawkify. The California Legislature provided for express disclosures and express remedies in the DSCA to encourage compliance with the law and to ensure consumers were treated fairly. Plaintiff is a California resident. Tawkify is a California-based company that has instituted a California choice of law provision into its Terms of Use. As a result, Plaintiff is entitled to invoke his statutory remedies, including a right to cancel and a right to a speedy refund of all money he paid. Despite this, and for reasons that remain unclear, Tawkify ignored the law.

Tawkify has tried to make this Motion a referendum on Plaintiff. But the law focuses on Tawkify's conduct, not Plaintiff's. The evidence leaves no doubt of Tawkify' liability. Tawkify's Motion must be denied.

## II.    FACTUAL BACKGROUND

### A.    Tawkify's Uniform Policies and Practices

Tawkify is a San Francisco-based online matchmaking service. Mtn. 10:9-13. Individuals can pay an "annual fee" of "$100 or $99" to become "members" and "form the pool . . . from which client matches are sourced." *See* Declaration of Elliot Conn ("Conn Dec.") Ex. B (Schultz Dep., 49:12-20). For "clients," Tawkify charges for "packages" of guaranteed "matches" – *i.e.*, to be set up on dates. Mtn. 10:9-20. According to the deposition testimony of Tawkify corporate representative Thane Schultz designated pursuant to Fed. R. Civ. Proc. 30(b)(6), the value of one date within a package "would be the value of the total cost divided by the - - by the number of dates." Conn Dec. Ex. B (Schultz Dep., 58:17-59:16; 59:17-63:23). Thus, Tawkify prices the cost of each "match" within a package equally. *Id*. 61:5-15.

According to Mr. Schultz, "[t]he client agreement is the agreement between Tawkify and the client about the services to be rendered." *Id*. 86:1-3.

During the summer of 2020, the time period during which Plaintiff was a Tawkify "client," neither the Tawkify Client Agreement, nor any other document that Tawkify provides to

its "clients" contained disclosures regarding, *inter alia*, (1) the right to cancel within three days of signing; or (2) the right to elect to be relieved of the obligation to make payments due to death or disability. Conn Dec. Ex B (Schultz Dep., 145:1-150:5; 180:18-181:4); Ex. F (July 7, 2020 Client Agreement); Ex. G (July 13, 2020 Client Agreement); Ex. H (May to August 2020 Tawkify Refund Policy); Ex. I (October 2019 Terms of Use); Ex. J (Tawkify Online Privacy Policy); Declaration of Jeremy Stanfield ("Stanfield Dec.") Ex. B (June 30, 2020 User Agreement); Ex. C (July 13, 2020 Client Agreement). Mr. Schultz testified that these documents "describe [Plaintiff's] rights and remedies with respect to Tawkify." Conn Dec. Ex B (Schultz Dep. 180:18-181:4.)

Tawkify admits that it failed to make certain disclosures. Its discovery responses state in relevant part, "Tawkify did not provide in its operative agreements with users or clients language regarding the right to cancel the agreement(s) until midnight of the third business day after the day on which Tawkify's services were purchased." Conn Dec. Ex. C (Resp. Nos. 7, 8 at p. 17-19).

When clients cancel, Tawkify makes a record of the "refund cancellation request" "on the client's profile page" in the "activity feed. . ." Conn Dec. Ex. B (Schultz Dep. 35:7-36:13). However, rather than honor the initial cancellation request, Tawkify has a "policy to try to save the client and find out what's going on, see if they can get their experience back on track." *Id*. at 172:11-19. Before processing a cancellation request, Tawkify had a requirement of a certain "level of dissatisfaction the client was expressing about the service, and perhaps the level of unwillingness to accept either a - - you know, a gesture of goodwill, such as a nonrefundable bonus match and a transition to a new matchmaker. . . So if a client was unwilling to accept any sort of remedy, then I guess you could call that requirements." *Id*. 174:4-175:14; 175:23-176:12.

It was Tawkify's policy in June through August 2020 to inform clients who cancelled their contract that any refund would take "up to 60 days" to process. *Id*. 175:16-177:19. This was the "realistic time frame for how long it would take to process." *Id*. Mr. Schultz testified that he could not identify any policies "that provided for a timeline of less than 60 days for the processing of a refund from a client who cancelled a package . . ." *Id*.

Upon cancellation, Tawkify does not provide clients with a full refund. Instead, Tawkify's policy (until August 1, 2020) was to "retain pro-rated payment for any match cycles started or used, plus one additional. A minimum of two match cycles [we]re, therefore, retained for all multi-match packages." Conn Dec. Ex. H (May to August 2020 Refund Policy); *see also* Dkt. 50-1, at 4. Mr. Schultz also testified that Tawkify changed its Refund Policy as of August 1, 2020 because "Tawkify had decided to retain -- to just have a three-match retainer policy, so in all -- in all cases, we would retain three matches." Conn Dec. Ex. B (Schultz Dep. 38:14-24).

## B. Tawkify Applied its Policies and Practices in its Interactions with Plaintiff.

Plaintiff's experience with Tawkify lasted from June to August 2020.[1] After viewing an online Facebook advertisement for Tawkify's "concierge service to help you find a mate," Plaintiff filled out a form online and provided Tawkify with his contact information. Conn Dec. Ex. A (Stanfield Dep., 27:21-29:10; 29:13-30:4). Following a lengthy sales call that was secretly recorded on June 29, 2020, Plaintiff paid Tawkify $3,700 for a six-date package. *Id*., 69:1-19; Stanfield Dec. Ex. A (June 29, 2020 Receipt).

Plaintiff quickly became dissatisfied with Tawkify's services. Beginning on July 7, 2020, Plaintiff contacted Tawkify numerous times to request that his account be cancelled. *See* Stanfield Dec. Ex. D (July 7, 2020 Text Exchange); Conn Dec. Ex. K (July 7, 2020 Text Exchange.) In fact, on July 7, 2020, Plaintiff wrote to the salesperson, "My expectations are to have a in person date or it doesn't count. So if it has to be that way, I'm afraid I'm going to have to cancel." *Id.* Plaintiff attempted numerous other times to cancel. Stanfield Dec. Ex. E (July 13, 2020 Email exchange); Conn Dec. Ex. L (July 13, 2020 "ticket"). In his July 13, 2020 correspondence, Plaintiff emailed Tawkify, "I'm greatly unhappy with all facets of this service so far and maybe we should just call it huh?" *Id.*

---

[1] Plaintiff does not respond to the many irrelevant and inaccurate attacks and allegations leveled against him by Tawkify, but contends that Tawkify's Motion violates this Court's civility guidelines (*see* https://www.cand.uscourts.gov/forms/guidelines-for-professional-conduct), which prohibit "unfairly attacking the opposing party" by, *inter alia*, introducing statements that are not properly part of the record.

On July 14, 2020, Tawkify finally acknowledged the request. That day, Plaintiff received an email from Lacy "from the Tawkify Customer Success Team" stating, "*I am so sorry to hear that you would like to cancel your experience and I am here to support you.*" *Id.* (emphasis added). *See* Stanfield Dec. Ex. F. (July 14, 2020 email correspondence). Plaintiff made additional requests on July 15, 2020 ("I think I just want a full refund"); July 17, 2020 ("I'd like a full refund processed today"); July 21, 2020 (requesting "a full refund processed today"); and July 22, 2020 ("please refund all $3700 of my money today . . ."). Stanfield Dec. Ex. G (July 15, 2020 Email), Ex. H, (July 17, 2020 Text), Ex. I, (July 19, 2020 through August 7, 2020 Correspondence); Conn Dec. Ex. M (July 15, 2020 "ticket"); Ex. N (July 19, 2020 "ticket").

Tawkify did not honor the cancellation requests, but instead, consistent with its internal policies, attempted to pressure Plaintiff into remaining a Tawkify client. For example, the July 19, 2020 email to Plaintiff states in relevant part, "I would love the opportunity to bonus your account back for the 2 matches you went on and start fresh with a different match maker that will take better care with your matches." Stanfield Dec. Ex. I, (July 19, 2020 through August 7, 2020 correspondence.); Conn Dec. Ex. N (July 19, 2020 "ticket"). Three days later, on July 22, 2020, Tawkify emailed Plaintiff, "You do have the option to change to a different match maker and I'd be happy to personally oversee that as well as give you a non-refundable bonus match to make up for your bad date." *Id.*; *see also* Stanfield Dec. Ex. F (responding to July 14, 2020 cancellation request with "[w]e remedy a variety of challenges every day and have a multitude of tools at our disposal").

Tawkify's failure to honor the cancellation request contributed to an escalation in the tone of the parties' communications. Tawkify finally relented and confirmed via email on July 22, 2020 that Plaintiff's "refund has been submitted to Accounting. Once your refund is cleared it takes 45-60 days for processing and will be returned to the card used for purchase." Stanfield Dec. Ex. I; Conn Dec. Ex. N (July 19, 2020 "ticket"). After further complaints by Plaintiff, a Tawkify agent wrote to Plaintiff, "I've reached out to Accounting asking them to prioritize your

refund based on your experience. They let me know there's a chance they can get it out in the next three weeks or less." *Id.*

Ultimately, rather than provide a full refund of the $3,700 paid, Tawkify refunded Plaintiff only $1,850 on August 1, 2020. *Id.*; Conn Dec. Ex. D; *see also* Dkt. 50-1 at 8. Tawkify's failure to refund the full amount of Plaintiff's purchase was consistent with both its June-July Refund Policy of retaining matches used plus one and it August 2020 Refund Policy of retaining the value of three "matches." Conn Dec. Ex. B (Schultz Dep. 38:14-24); Ex. H (May to August 2020 Refund Policy).

Despite further complaints, Tawkify refused to refund the remainder of the money. Stanfield Dec. Ex. I; Conn Dec. Ex. N (July 19, 2020 "ticket").

Plaintiff filed a putative class action against Tawkify in San Francisco County Superior Court on August 15, 2020. Dkt. 1-1. On August 26, 2020, Tawkify processed a refund the remainder of Plaintiff's purchase in two transactions (of $1849.98 and $0.01), which it notated in its internal records as "Nonstandard Alexis Rico – additional refund, legal." Dkt. 50-1, at 8; Conn Dec. Ex. D (Payment Records).

## III.     STATUTORY BACKGROUND

### A.     The Dating Services Contracts Act Provides For Unwaivable Rights in Dating Service Contracts.

The DSCA was enacted by the Legislature in 1989 in response to "many complaints from consumers who oftentimes are most vulnerable when they turn to such services and have no protection from unfair, deceptive and high-pressured sales practices." *See* Request for Judicial Notice ("RJN"), Ex. A (DSCA Legislative History for Assembly Bill 320 of 1989, p. 39, Policy Committee File). The Legislature recognized that "[t]hese particular services are very expensive, often costing over $1,000 for membership." *Id.*

The statute established heightened consumer protections for dating service contracts. Similar protections were already in place under laws that provided for three-day rights of rescission for, *inter alia*, door-to-door sales over $25 (Cal. Civ. C. § 1689.5, *et seq.*), health spas and studios (Cal. Civ. C. § 1812.80, *et seq.*), camp sites (Cal. Civ. C. § 1812.300), home

improvements where contract is signed in home (Cal. Civ. C. § 1689.5, *et seq*.), and home equity loans (Cal. Civ. C. § 1695, *et seq*.). As with these laws, the DSCA was intended to "safeguard the public against fraud, deceit, imposition, and financial hardship," and to "help to encourage and foster competition and fair dealing in [this] particular [area] of service by restricting false and misleading advertising, onerous contract terms, and other unfair and deceptive practices." *Id*.

The DSCA requires that all dating service contracts contain certain disclosures and substantive rights. The statute mirrors other California consumer protection statues and requires that contracts contain a cancellation *disclosure* and a cancellation *right*. *Cf.* Cal. Civ. C. § 1694.2(b) (disclosure must be provided "in a clear and conspicuous manner in a stand-alone first paragraph of the contract…"), *and* Cal. Civ. C. § 1694.1(e) ("Notice of cancellation …is effective if it indicates the intention of the buyer not to be bound by the dating service contract."). The DSCA also prescribes that refunds must be provided "within 10 days of receipt of the notice of cancellation." Cal. Civ. C. § 1694.1(e).[2]

The Legislature also prescribed express remedies for violations of the disclosure requirements. First, any non-compliant contract is "void and unenforceable." Cal. Civ. C. § 1694.4(a). Second, the DSCA extends the consumer's right of cancellation indefinitely. Cal. Civ. C. § 1694.2(e) ("If a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract."). These rights and remedies are unwaivable. Cal. Civ. C. § 1694.4(e).

**B.     Relevant Legislative History of the DSCA.**

The original language of the DSCA as enacted in 1989 left a loophole in the statute that allowed unscrupulous dating service providers to "frontload" the cost of dating services and take significant deductions from cancellation refunds. The 1989 version of the DSCA provided in relevant part that "[a]ll moneys paid pursuant to any contract for dating services shall be refunded

---

[2] In addition to the right of cancellation, the DSCA also requires that dating services contracts contain language providing for rights that arise in the event of "death or disability" and "relocation" that makes the service untenable. Cal. Civ. C. § 1694.3(a)(1), (b).

within 10 days of receipt of the notice of cancellation, *except that payment shall be made for any services covered by the contract and received by the buyer prior to cancellation*." RJN, Ex. A (p. 31, Chapter 138, Statutes of 1989) (emphasis added).

The statute was amended in 1993 to close this loophole. *See* RJN, Ex. B (DSCA Legislative History for Assembly Bill 1323 of 1993, p. 293, Chapter 359, Statutes of 1993). Then-Attorney General Daniel E. Lungren sponsored the bill and explained the purpose of the proposed amendments:

> Cooling off periods are utilized in many types of transactions to counter hard sell and misleading solicitations which tend to take advantage of consumers. Our office took no position in 1989 when the three day cooling off period regarding dating services and weight reducing statute was established. Unfortunately, that legislation has created a trap for the unwary, or even the wary, and the statute has been misused by some companies.

> In all standard cooling off statutes, consumers are given a period of time to cancel a contract without liability. In the 1989 statute, the consumer faces liability for cancellation. If the consumer must pay money to cancel, the purpose of a cancellation period is negated.

> In addition to providing consumer protection, those statutes have been properly used by sellers as sales tools. The salesperson may tell the consumer: "You don't have to worry about signing this contract. You have [for example] three business days to think it over." Many consumers are familiar with cooling off period statutes in general and assume that they may cancel without liability.

> Unlike the other cancellation statutes, the 1989 dating and weight reduction law allows the seller to retain "payment made for services covered by the contract and received by the buyer prior to the cancellation." Some dating services claim that 2/3 of the charge for the entire contract is for the introductory questionnaire analysis done at or even before the time the contract is signed. Surprised consumers find that if they cancel, they only receive back only 1/3 of the hundreds or thousands of dollars they paid and would received for the lost money no meaningful services - no dates, no introductions.

> Consumers relying on this statute have been led to be less cautious about signing because the contract refers to a cooling off period and they have thus been blindsided. Somewhere in the contract, there is a disclosure that there will be costs and that there really isn't any meaningful opportunity to cancel. However, many consumers do not notice this disclosure and rely on their general understanding that a cooling statutes provides consumer protection. In addition, the purpose of the present law was to provide meaningful protection and not a trap for consumers.

> AB 1323 would provide the protection anticipated by the 1989 statute by deleting the provision for payment of services prior to cancellation as exists in the other cooling off statutes.

RJN, Ex. B (p. 359).

The 1993 amendment to the DSCA eliminated the practice of "frontloading" dating contracts with bogus valuations. As described by the committee analysis, the amendments "[require] any refund to a consumer who cancels the contract in accordance with the provisions of the act to be 100% by not allowing deductions for services provided to the consumer prior to cancellation." RJN, Ex. B (p. 344). Notably, the Legislature also declined to establish a "prorated" offset for contracts cancelled after three days. One opponent of the bill – Great Expectations, which billed itself as "the largest single introduction service in the world" – proposed an amendment that would have allowed a dating service company to "retain a pro rata portion of the contract price for services rendered to the Buyer prior to cancellation." RJN, Ex. B, p. 340. Its suggestion was viewed with skepticism by the Department of Consumer Affairs, which described its view of Great Expectations' proposed amendment:

> Currently, dating and weight loss service sellers can retain an amount to cover services provided prior to cancellation. The example cited by the AG, however, seems to show that unreasonable amounts are being withheld from the consumer. One dating service (Great Expectations) objects to having to refund all of the money and wants to retain a pro rata amount for services rendered prior to cancellation. However, in our view allowing an unspecified pro rata portion to be retained would not be an improvement over the current law, since the amount would not be limited and would be subject to the discretion or whim of the seller.

RJN, Ex. B, p. 389.

The DSCA was amended again in 2017 to make clear that the statute applies to online dating services. Dkt. 59-1, p. 18.[3]

//

//

//

//

//

---

[3] *See* https://leginfo.legislature.ca.gov/faces/billVersionsCompareClient.xhtml?bill_id=201720180AB314&cversion=20170AB31499INT (last visited July 14, 2021).

## IV.      ARGUMENT

### A.   Tawkify Violated the DSCA and its Interpretation of the DSCA is Wrong.

Tawkify's erroneous interpretation of the DSCA ignores the statute's plain language and legislative history. Importantly, Tawkify does <u>not</u> dispute that its failure to include the required disclosures under the DSCA afforded Plaintiff the right to cancel at any time. Mtn. 26:3-7; 28:17-22. Nor can Tawkify dispute Plaintiff's entitlement to a refund within 10 days. Cal. Civ. C. § 1694.1(e). Instead, Tawkify contends that the DSCA empowered it to retain a portion of the money Plaintiff paid for "services rendered" because the actual language of the statute must be disregarded as an "extraordinary remedy." *See* Dkt. 59 (Tawkify Mtn. to Dismiss at 6:11-14). Tawkify's interpretation is contrary to the plain and express language of the statute, which required Tawkify to provide Plaintiff with a full refund within 10 days of cancellation.

Tawkify's interpretation cannot sow uncertainty into the statute where there is none. The DSCA vests buyers with an unambiguous right to "cancel" under certain circumstances. Cal. Civ. C. §§ 1694.1, 1694.2. The statute is clear that "[i]f a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract." Cal. Civ. C. § 1694.2(e). The law also provides that "*[a]ll moneys paid* pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation." Cal. Civ. C. § 1694.1(e) (emphasis added). The DSCA defines "cancel" – for purposes of how the term must be disclosed to consumers – as an act "without any penalty or obligation." Cal. Civ. C. § 1694.2(b)(1).

The plain language of the DSCA's cancellation provisions should end the inquiry about the meaning of § 1694.1(e). "In determining intent, [the Court should] look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, [the Court may] presume the Legislature meant what it said, and the plain meaning of the statute governs." *Hunt v. Superior Ct.*, 21 Cal. 4th 984, 1000 (1999) (citations omitted). However, even if the Court were inclined to conduct further inquiry into the meaning of the cancellation right, the statute's legislative history would compel the same conclusion. *Sand v. Superior Ct.*, 34 Cal. 3d 567, 570 (1983) ("Where the language [of a statute] is susceptible of

more than one meaning, it is the duty of the courts to accept that intended by the framers of the legislation, so far as its intention can be ascertained. . . The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . To discern legislative intent, we must examine the legislative history and statutory context of the act under scrutiny." (internal citations and quotations omitted)).

Here, the legislative history of the DSCA establishes that cancellation requires a full refund of all monies paid by a consumer within 10 days. In fact, the Legislature amended the DSCA in 1993 in order to *eliminate* the practice of offering consumers partial refunds for "frontloaded" services. RJN, Ex. B.

Plaintiff's interpretation of the DSCA is also consistent with the way in which other consumer protection statutes, with substantially similar language, have been interpreted. For example, the body of published California appellate decisions arising under the Home Solicitation Sales Act, Cal. Civ. C. § 1689.5, *et seq*. ("HSSA"), is instructive because it contains language substantially identical to that set forth in the DSCA. *Cf.* Cal. Civ. C. § 1689.7(g) ("Until the seller has complied with this section the buyer may cancel the home solicitation contract or offer."); Cal. Civ. C. § 1694.2(e) ("If a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract."). Other provisions of the HSSA and the DSCA also track. *See, e.g.*, Cal. Civ. C. § 1689.10(a) ("[W]ithin 10 days after a home solicitation contract or offer has been canceled, the seller must tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness."); and Cal. Civ. C. § 1694.1 ("All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation.").[4] Courts have consistently found that

---

[4] The HSSA contains additional language that makes clear the consumer protection purposes of these statutes: "If the seller has performed any services pursuant to a home solicitation contract or offer prior to its cancellation, the seller is entitled to no compensation. If the seller's services result in the alteration of property of the buyer, the seller shall restore the property to substantially as good condition as it was at the time the services were rendered." Cal. Civ. C. § 1689.11(c). In *Beley v. Mun. Ct.*, 100 Cal. App. 3d 5 (1979), the Court of Appeal explained how fulsome this protection was intended to be:

consumers retain a continuing right to cancel and receive a refund of <u>all</u> amounts paid when the underlying contracts that do not comply with the HSSA. *See Nordeman v. Dish Network LLC*, No. 21-CV-00923-TSH, 2021 WL 949418, at *4 (N.D. Cal. Mar. 12, 2021) ("The HSSA allows a buyer in such a transaction to cancel it within three business days after signing the contract. Further, '[u]ntil the seller has complied with this section the buyer may cancel the home solicitation contract or offer.' A violation of the statute precludes any obligation of the buyer to pay for services from the seller prior to cancellation." (citations omitted)); *Johnson v. Advanced Air Sols. Inc.*, No. 19-CV-00613-LHK, 2020 WL 2084898, at *7 (N.D. Cal. Apr. 30, 2020) (entering default judgment under HSSA); *Louis Luskin & Sons, Inc. v. Samovitz*, 166 Cal. App. 3d 533, 535 (1985) (affirming judgment entered in favor of buyer arising out of contract that did not contain the cancellation notice required in home solicitation contracts under Civil Code sections 1689.7 and 1689.8); *Weatherall Aluminum Prod. Co. v. Scott*,  71 Cal. App. 3d 245, 247 (1977) ("If the contract was a home solicitation contract within the meaning of Civil Code section 1689.5, then, the notification required by section 1689.7, subdivisions (a) and (c) not having been given, defendants retained a right to cancel."); *see also In re Lloyd*, 369 B.R. 549, 551–52 (Bankr. N.D. Cal. 2007), *aff'd sub nom. Hoffman v. Lloyd*, No. C 06-2416 MHP, 2008 WL 298820 (N.D. Cal. Feb. 1, 2008), *aff'd,* 572 F.3d 999 (9th Cir. 2009) (finding under the Home Equity Sales Contracts Act that "[b]ecause the sale contract failed to provide notice of the right to cancel 'in immediate proximity to the space reserved for the equity seller's signature,'

---

An unfair sales practice unique to home improvement sales 'spiking the job' will be prevented by this provision of the act. In this sales tactic, the salesman who has sold siding, for example, will immediately tear off portions of the old siding replacing it with a few sections of new siding before returning to complete the job. If in the interim the buyer realizes he has been duped, he normally will feel compelled to go along with the transaction since otherwise he would have to find someone else to repair his home. Section 1689.11(c) of the Civil Code, besides providing for no compensation in such a case, requires the seller to restore the property to substantially as good a condition as it was at the time the services were rendered.

*Id.* at 9 (internal quotation marks and citation omitted).

the contract did not substantially comply with the requirements of section 1695.5 and, as a consequence, the time to cancel the sale never expired.").

Tawkify invokes § 1694.4(d) of the DSCA for the proposition that partial refunds are authorized under the statute. *See* Mtn. 27:20-22. But Tawkify's position is contrary to the plain language of the statute, its purpose, legislative history, and common sense. As a practical matter, § 1694.4(d) expressly applies only for installment contracts and circumstances under which "the buyer is relieved from making further payments or entitled to a refund" (*i.e.* death, disability, or relocation). Tawkify's reliance on *Howell v. Grindr, LLC*, No. 15CV1337-GPC(NLS), 2016 WL 1668243, at *3 (S.D. Cal. Apr. 27, 2016) ("*Howell II*") is also unavailing. In *Howell II*, the Court denied a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6) based on a claim that Plaintiff had failed to plead statutory standing under the DSCA. The plaintiff in *Howell II* – unlike Plaintiff Stanfield – "requested that Defendant refund the unused portion of Plaintiff's contract." *Id.* at *2. The court stated in dicta that § 1694.4(d)  required that a prorated portion of the contract be refunded, but neither held this as a matter of law nor offered any explanation. This makes sense because § 1694.4(d) does not apply to "cancellations."

In addition to the cancellation rights under § 1694.2, the DSCA also creates a right to "elect to be relieved of the obligation to make payments for services" where cancellation is caused by death, disability, and relocation. Cal. Civ. C. § 1694.3. As an initial matter, the Legislature's choice of language must be considered intentional. Because the Legislature used the term "cancellation" in § 1694.2 and "elect to be relieved" in § 1694.3, there is a presumption that each term has a distinct meaning. "Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1117 (1999). Consistent with this canon of statutory construction, a buyer's right of "cancellation" differs from being "relieved" in the event of "death or disability," "relocation" that makes the service impracticable (§§ 1694.3(a), (c)) and for installment contracts. Cal. Civ. C. § 1694.4(d).

The unpublished cases cited by Tawkify do not compel a different interpretation. In *Adelman v. Spark Networks Ltd.*, No. B195332, 2008 WL 2108667 (Cal. Ct. App. May 20, 2008), the Court did not address the issue as to whether a dating service can deduct amounts from a refund upon cancellation. The Plaintiff in *Adelman* merely asserted "that the membership contracts were void and unenforceable and that he therefore was entitled to either a full refund or a refund of the price paid minus the reasonable value of the services received." *Id*. at *2. In light of Plaintiff's facts, the plain language of the statute, the DSCA's legislative history, and analogous authority, the DSCA requires full refunds upon cancellation.

The irony of Tawkify's reliance upon the DSCA should not escape the Court's notice. Having ignored its obligations under the law, Tawkify attempts to distort the law's purpose in an effort to turn the DSCA from a consumer shield into a corporate sword. Tawkify's dating service contract with Plaintiff does not comply with the DSCA. Plaintiff cancelled his contract, as was his right. Tawkify failed to refund Plaintiff all his money within 10 days. Tawkify has thus violated the DSCA. There is no other conclusion to draw.

**B.**   **Plaintiff Has Constitutional Standing to Pursue His Claims.**

The evidence supporting the facts set forth above establish Tawkify's liability and Plaintiff's standing. Tawkify concedes that it "is a San Francisco-based company that operates an online matchmaking service." Mtn. at 10:9. Tawkify is an online dating service, and it does not dispute that the DSCA applies to its contracts with Plaintiff. *See* Mtn. at 9:6-8; 23:18-22; 27:20-24. The DSCA explicitly applies to "online dating service[s]," which is defined as, "any person or organization engaged in the business of offering dating, matrimonial, or social referral services online, where the services are offered primarily online, such as by means of an Internet Web site or a mobile application." Cal. Civ. C. § 1694(b). The agreements between Plaintiff and Tawkify are "dating service contracts" because they are contracts with an "organization that offers dating, matrimonial, or social referral services." Cal. Civ. C. § 1694(a). Therefore, the DSCA governs Plaintiff's agreements with Tawkify. *Id*.

It is also undisputed that the agreements between Plaintiff and Tawkify do not contain any of the mandatory disclosures or rights required by the DSCA, including those contained in § 1694.2 or 1694.3. *See* Part II.A, *supra*. As a result, Plaintiff retained the right to cancel at any time and receive a refund of all monies paid within 10 days of cancellation. Cal. Civ. C. §§ 1694.1(e), 1694.2(e). Tawkify did not do so. *See* Part II.B, *supra*.

Tawkify' failure to provide a full <u>and</u> timely refund to Plaintiff upon his cancellation deprived Plaintiff of $1,850 to which he was entitled, as well as the use of that money while Tawkify retained it. The DSCA also provides for treble actual damages, plus reasonable attorney fees. Cal. Civ. C. § 1694.4(c). This identifiable loss of money confers Article III standing.

Tawkify's steadfast refusal to refund all of Plaintiff's money – pursuant to its "Refund Policy[5] – comprises part of Plaintiff's concrete and particularized loss. Additionally, Tawkify's failure to timely process Plaintiff's refund also created a monetary injury sufficient for Article III standing. Tawkify was aware of Plaintiff's intent to cancel by at least July 14, 2020. *See* Stanfield Dec. Ex. F. Tawkify failed to provide the refund within 10 days of that date. Plaintiff's loss of the time value of the wrongfully withheld moneys from July 24, 2020 beyond is a concrete injury that is traceable to Tawkify's failure to provide a timely refund. This provides an additional basis for Article III standing. *See Van v. LLR, Inc.*, 962 F.3d 1160, 1163 (9th Cir. 2020) (holding that the "temporary deprivation of money gives rise to an injury in fact for purposes of Article III standing" because "[e]very day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money"); *see also id.* at 1165 (holding that an injury from loss of use of money "is actual, concrete, and particularized").

---

[5] Even if Tawkify's "pro rata offset" interpretation based on "services . . . actually received," Cal. Civ. C. § 1694.4(d), served as the basis for the calculation, Tawkify's corporate witness testified that Tawkify's misapplication of its Refund Policy resulted in a refund that did not match the amount of money he was owed. As Mr. Schultz testified, Tawkify's July 2020 was in effect at the time Plaintiff's refund was requested. Conn Dec. Ex. B (Schultz Dep. 37:20-21, 179:13-24). Thus, even viewing the DSCA in the light most favorable to Tawkify, the "offset" would have been limited, at most, to the pro rata value of the *two* matches Plaintiff received – which was $1,233.33. Following Tawkify's reasoning, Plaintiff should have been refunded $2,466.67. But Tawkify only refunded him $1,850.00, depriving him of $616.67. ($2,466.67 – $1,850 = $616.67).

Tawkify's efforts to avoid liability by offering a full refund *after* Plaintiff filed a lawsuit is dubious gamesmanship designed to subvert the purpose of a statute it is flouting.[6] Regardless, the size of Plaintiff's loss is not relevant to standing because courts consistently find that "loss of even a small loss of money" is a sufficiently "concrete and particularized" injury. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'") (compiling cases); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766 (9th Cir. 2018) (ruling that a loss of funding satisfies "the 'injury in fact' standing requirement").

Furthermore, Tawkify's post-filing processing of the remainder of the amount paid does not impact standing because standing analysis looks at whether the plaintiff "had Article III standing at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 189 (2000). Plaintiff filed this lawsuit on August 15, 2020. *See* Dkt. 1-1. As of August 15, 2020, Tawkify had not "refunded him all moneys he paid Tawkify." Mtn. at 21:23-24.

### C. <u>Plaintiff Has Statutory Standing to Pursue His Claims.</u>

These same monetary injuries satisfy the statutory standing requirements under the UCL and the CLRA. Section 17204 of the UCL requires a private plaintiff to have "suffered injury in fact and [have] lost money or property as a result of the unfair competition." Consistent with the law enforcement and deterrent purposes of the UCL, the California Supreme Court has set a low threshold for UCL standing. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323-25 (2011)

---

[6] None of the facts Tawkify contends are dispositive of Plaintiff's standing were adduced during discovery, and were thus known to Tawkify when it removed the case last October. Thus, Tawkify's argument about Article III standing is at odds with its claim that Plaintiff has not suffered any constitutionally cognizable injury. Courts have rejected these "dubious" delay tactics. *See Mocek v. Allsaints USA Ltd.*, 220 F. Supp. 3d 910, 914 (N.D. Ill. 2016) ("[D]efendant's professed strategy of removing the case on the basis of federal jurisdiction, only to turn around and seek dismissal with prejudice—a remedy not supported by any of defendant's cases—on the ground that federal jurisdiction was lacking, unnecessarily prolonged the proceedings."); *Ayala v. Sixt Rent a Car, LLC*, No. CV191514FMOMRWX, 2019 WL 2914063, at *2 (C.D. Cal. July 8, 2019); *Collier v. SP Plus Corp.*, 889 F.3d 894, 897 (7th Cir. 2018) ([D]efendant's "dubious strategy has resulted in a significant waste of federal judicial resources, much of which was avoidable.").

1  (establishing that standing is achieved by "economic injury . . . *caused by* the unfair business

2  practice").

3       Plaintiff was deprived of either money or property because of Tawkify's failure to provide

4  an adequate and timely refund, which deprived him of the time value of the money. This alone

5  satisfies UCL standing. *Id*. at 323 ("economic injury from unfair competition may be shown" if

6  the plaintiff has been "deprived of money or property to which he or she has a cognizable

7  claim"). Plaintiff was also forced to file a lawsuit to obtain a full refund, and incurred attorneys'

8  fees as a result, which are recoverable under the DSCA along with three times his actual

9  damages. Cal. Civ. C. § 1694.4(c).

10      Plaintiff's loss of money is directly traceable to Tawkify's violations of §§ 1694.1(e) and

11  1694.2(e), that is, its failure to refund "[a]ll moneys paid" upon cancellation of a noncompliant

12  DSCA contract. Plaintiff has also satisfied the UCL's requirement that there be "causal

13  connection or reliance," 51 Cal. 4th at 326, because he attributes his injury to Tawkify's conduct.

14      Plaintiff has also alleged standing under the CLRA. The CLRA requires that a plaintiff

15  suffer some "damage." Cal. Civ. C. § 1780. Unlike the UCL, that damage need not even be

16  compensable. *Id*. "Because the 'any damage' standard includes even minor pecuniary damage,

17  …any plaintiff who has standing under the UCL's…'lost money or property' requirement will, *a*

18  *fortiori,* have suffered 'any damage' for purposes of establishing CLRA standing." *Hinojos v.*

19  *Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013). Here, because Plaintiff has lost money or

20  property for UCL standing purposes, he has likewise suffered "damage" that satisfies the CRLA's

21  standing requirement.

22      Regardless, Tawkify has not provided Plaintiff with complete relief. "It has not agreed to

23  the injunctive relief [Plaintiff] requests, paid his attorneys' fees, or reimbursed his litigation

24  related costs. [ ] Accordingly, defendant has not afforded plaintiff 'complete relief.'" *Luman v.*

25  *NAC Mktg. Co., LLC*, No. 2:13-CV-00656-KJM-AC, 2017 WL 3394117, at *3 (E.D. Cal. Aug. 8,

26  2017) (quoting *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1146 (9th Cir. 2016)). Nor has Tawkify

27

28

1   compensated Plaintiff to the time value loss of the money that it held or paid the treble damages

2   authorized by the statute. *See* Cal. Civ. C. § 1694.4(c).

### D.   Plaintiff Has Standing To Pursue His Injunctive Relief Claim.

4        Tawkify contends that Plaintiff's claims for injunctive relief must be dismissed with

5   prejudice because he testified that he does not have current plans to use Tawkify's services in the

6   future. Mtn. at 25. But as with Tawkify's broader contention regarding Plaintiff's Article III

7   standing, Tawkify misstates the law and is not entitled to the relief it seeks.

8        In the Ninth Circuit, "a previously deceived consumer may have standing to seek an

9   injunction against false advertising or labeling, even though the consumer now knows or suspects

10  that the advertising was false at the time of the original purchase, because the consumer may

11  suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Davidson*

12  *v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018) (citing *Summers v. Earth Island*

13  *Institute*, 555 U.S. 488, 493 (2009)). Tawkify cites two cases, both decided prior to *Davidson*, for

14  the proposition that Plaintiff must have an "intent to purchase" the products in the future in order

15  to maintain his claims for public injunctive relief under the UCL and the CLRA. Mtn. at 24-25.

16  But this is not the relevant inquiry. *Davidson* holds that a plaintiff who had previously been

17  deceived by false advertising, could nevertheless have Article III standing under California's

18  False Advertising Law, Cal. Bus. & Prof. C. § 17500, *et seq*., if she could show that she was

19  "unable to rely on Kimberly–Clark's representations of its product in deciding whether or not she

20  should purchase the product in the future." *Davidson*, 889 F.3d at 972. Plaintiff's testimony about

21  the likelihood of using Tawkify in the future addresses the pre-*Davidson* concern of the plaintiff's

22  "intent-to-purchase" rather than the reliability of a defendant's representations in the event an

23  injunction is not obtained. Tawkify has failed to make this showing.

24       In *Davidson*, the Ninth Circuit also recognized that the formalistic standing requirements

25  advanced by Tawkify may not be used by defendants as a tool to evade justice:

26       [A]llowing a defendant to undermine California's consumer protection statutes and
         defeat injunctive relief simply by removing a case from state court is an
27       unnecessary affront to federal and state comity [and ] ... an unwarranted federal

28

intrusion into California's interests and laws." 77 F.Supp.3d at 961; *see also Henderson v. Gruma Corp.*, 2011 WL 1362188, at *8 (C.D. Cal. Apr. 11, 2011) ("[T]o prevent [plaintiffs] from bringing suit on behalf of a class in federal court would surely thwart the objective of California's consumer protection laws."). This is because "the primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction," *In re Tobacco II*, 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 34 (2009)—a principle the California Supreme Court recently reaffirmed. *See McGill v. Citibank, N.A.*, 216 Cal.Rptr.3d 627, 393 P.3d 85, 90, 93 (2017) (explaining that "public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public," and that "public injunctive relief remains a remedy to private plaintiffs" under the UCL, FAL, and CLRA (internal quotation marks omitted) ).

*Davidson*, 889 F.3d at 970.

Thus, as with the relief Tawkify seeks with respect to Article III standing, Tawkify seeks an improper remedy for Plaintiff's injunctive relief "claim." As Judge Berzon points out in her concurrence in *Davidson*, the standing requirement for a form of *relief* contained within a claim is "an artifact of the discredited practice of conflating the prerequisites for injunctive relief with the Article III prerequisites for entry into federal court." *Id.* at 972 (Berzon, J., concurring). She further explains that the proper result is splitting the claim and partially remanding the injunctive relief portion of the claim back to state court. *Id.* at 974, n.2 (explaining that "remand is required if the district court lacks jurisdiction over a removed case [under] 28 U.S.C. § 1447(c)") (citing *Polo*, 833 F.3d at 1196).

Thus, if the Court finds that Plaintiff lacks standing to pursue public injunctive relief under the UCL and CLRA, that portion of Plaintiff's UCL and CLRA claims for relief – and only that portion – should be remanded back to the San Francisco Superior Court for adjudication.

**E.   <u>There Is No Equitable Basis for the Court to Refuse to Enforce the DSCA.</u>**

The case law and legislative history of the DSCA require that this Court reject Tawkify's argument that Plaintiff's interpretation of the DSCA would be "unfair" or result in a windfall to the customer. Mtn. at 19, 22. Defendant's "equitable defense" must be rejected as a matter of law and policy. First, such defenses should be discounted in light of Tawkify's willful and patent failure to comply with the principal law governing its industry in California. Tawkify is a

California company that forces even non-residents to apply California law through an adhesive choice of law clause in its Terms of Use. Conn Dec. Ex. I (Terms of Use). The DSCA has been on the books for five decades. In short, the equities clearly weigh *against* Tawkify.

Second, the purpose of the DSCA is to protect consumers – and the remedies it provides were enacted to motivate companies not to ignore the law. As the California Court of Appeal explained when interpreting the analogous remedy provisions of the HSSA:

> If this result appears to deal harshly with merchants who have fully performed under their contracts, it seems clear to this court that the message which the Legislature has attempted to convey by enactment of sections 1689.5 et seq. of the Civil Code is 'Caveat Vendor.' Merchants, put on notice by the statute, can easily and inexpensively protect themselves, however, by including a right to cancel provision and an accompanying notice of cancellation as a matter of course in all contracts signed outside their trade premises.

*Weatherall Aluminum Prod. Co.*, 71 Cal. App. 3d at 249.

Tawkify is no different than the defendant in *Weatherall*. The DSCA's requirements and consequences for noncompliance are clear. Tawkify could "easily and inexpensively protect [itself], however, by including a right to cancel provision . . . as a matter of course in all contracts." *Id*. Despite being on notice of the statute since the company was founded, Tawkify has chosen to violate its provisions.

The *Beley* decision cited by Tawkify (Mtn. 29:2-15) does not provide Tawkify with carte blanche ability to ignore the DSCA. As Tawkify acknowledges, *Beley*, a case involving the HHSA, found that the HHSA (just like the DSCA) "technically extended indefinitely (until the Seller complied with the notice requirement) the Buyer's right to cancel." 100 Cal. App. 3d 5 at 8.

However, Tawkify's attempt to find any similarities between *Beley* and this case is a failure. *Beley* is limited to the unique facts of that case. There, "the parties entered into a contract for extensive remodeling of the buyer's home over a three-month period. The contract was substantially completed before the buyers exercised their right to cancel." *Louis Luskin & Sons, Inc. v. Samovitz*, 166 Cal. App. 3d 533, 538 (discussing *Beley*). Based on these facts, the *Beley* court found that the "large building contract [] was substantially completed over a long period of time before Buyer exercised Buyer's technical right under the statute to cancel" and that "[i]t

would be grossly inequitable to interpret the statute to mean that Seller gets no compensation even though Buyer has the benefit of several thousand dollars' worth of home improvements." *Beley*, 100 Cal. App. 3d at 9-10. As a result, the *Beley* court held that the "[s]eller [wa]s entitled to recovery on quantum meruit for the reasonable value of the improvements Buyer has received." *Id*. at 8.

Six years later, however, the Court of Appeal explained that "*Beley* did not hold that as a general rule the seller can recover on quantum meruit even if he has proceeded in violation of the [HHSA]. To the contrary, the court in *Beley* recognized such a rule would defeat the purposes of the statute, especially § 1689.11. The court merely found section 1689.11 was not intended to apply to the unusual facts of the case before it." *Louis Luskin & Sons, Inc.*, 166 Cal. App. 3d at 537-38 (citations and footnotes omitted).

In addition to being factually inapposite, *Beley*'s holding on *quantum meruit* is contrary to the general principle of law that distinguishes statutory contract requirements from common law contract principles. *See* 14 Cal. Jur. 3d Contracts § 170 (2021) ("A statute prohibiting the making of a particular kind of a contract, except in a certain manner, renders such contract void if made in any other way. . . A contract made otherwise than as so prescribed [by law] is not binding or obligatory as a contract, and the doctrine that there is an implied liability arising from the receipt of benefits has no application.").

More recent case law has applied this principle to reject *quantum meruit* recovery for contracts that violate statutory formation requirements. For example, in *Castillo v. Barrera*, 146 Cal. App. 4th 1317, 1328 (2007), the court refused to allow *quantum meruit* recovery on an oral contract made without the statutorily required license and written contract. The court held, "[a]s in other areas requiring written agreements or licensure, a party may not recover in quantum meruit for that which cannot be recovered on a contract." *Id*. And in 2011, the California Supreme Court quoted the proposition that "no implied liability to pay upon a *quantum meruit* could exist where the prohibition of the statute against contracting in any other manner than as prescribed is disregarded." *Retired Emps. Assn. of Orange Cty., Inc. v. Cty. of Orange*,

52 Cal. 4th 1171, 1187 (2011) (quoting *Reams v. Cooley*, 171 Cal. 150, 153 (1915)); *see also*

Cal. Bus. & Prof. C. § 7031(a) (unlicensed contractors performing work in California cannot

maintain an action for compensation).

 This same principle applies to contracts governed by the DSCA. For example, in *Hadida v. King*, No. 2:11-CV-8648-SVW-VBK, 2012 WL 13012701, *4 (C.D. Cal. Feb. 2, 2012), the Court held that a dating service could not obtain "recovery under a theory of *quantum meruit* where the contract at issue is void under California law." The Legislature has determined that contracts that violate the DSCA are "void and unenforceable" and that buyers may cancel the contract "at any time," and receive a refund of all moneys paid within 10 days. Cal. Civ. C. §§ 1694.1(e), 1694.2(e), 1694.4(a). Allowing *quantum meruit* recovery, despite clear DSCA violations, would thwart the intent of the statute and render its protections meaningless.

### F. Defendant's Evidence is Objectionable and Disputed.

 Tawkify's 14-page "Statement of Material Facts" consists largely of disputed, unsupported, and/or inadmissible *immaterial* facts that ultimately have no bearing the underlying motion.[7] Additionally, Tawkify's bald assertion that "[t]he [August 1, 2020] refund represents a prorated services not yet rendered" is without support and contradicted by admissible evidence. Mtn. 20:15-17. It is undisputed that Plaintiff paid for six dates (Mtn. 11:23-24) but only went on two dates (*see* Mtn. 15:22) by the time that Tawkify processed his cancellation. As Plaintiff had received the benefit of only two out of six matches, and still had at least four remaining, the prorated amount of the services not yet received would be $2,466.67 ($3,700 / 6 x 4).[8] This amount does not include the "credits" that Plaintiff understood he received after the first two

---

[7] For example, Tawkify provides the Court with a transcript from a June 26, 2020 secretly recorded confidential call that was recorded without Plaintiff's consent. This evidence is inadmissible. *See* Cal. Pen. C. § 632(e). Tawkify also misconstrues Plaintiff's deposition testimony. Contrary to Tawkify's assertion that Plaintiff "cannot articulate having suffered any actual damages" (Mtn. 21:22-22:10), when asked at deposition to quantify his damages (a legal question), Plaintiff responded four times, "I leave that up to my attorney to figure out." Conn Dec. Ex. A (Stanfield Dep., 248:3-15, 248:16-249:2, 249:3-11, 250:17-22).

[8] Retaining payment for "any match cycles use, plus one" is consistent with Tawkify's operative refund policy and represents less than a "prorated" refund. Conn Dec. Ex. B (Schultz Dep., 179:11-24).

disastrous dates. Conn Dec. Ex. A (Stanfield Dep. 140:2-142:3, 230:8-15, 236:15-25). If this credit is accounted for, then at the time that the cancellation was processed, Plaintiff still had not received the benefit of five matches, and the prorated amount of the services not yet received would be $3,083.33 ($3,700 / 6 x 4). Either way, Tawkify's "factual" assertion is unsupported and in dispute.

## V.      CONCLUSION

For all the foregoing reasons, Tawkify's Motion should be denied.

Dated:  July 14, 2021                              OLIVIER SCHREIBER & CHAO LLP

CONN LAW, PC


By:     */s/ Elliot Conn*_____
                ELLIOT CONN
                *Attorneys for Plaintiff and the Proposed Class*