UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEREMY STANFIELD,

    Plaintiff,

v.

TAWKIFY, INC.,

    Defendant.

No. C 20–07000 WHA

**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT**

## INTRODUCTION

In this civil action based on California's Dating Services Contracts Act, defendant dating service moves for summary judgment. Plaintiff has already received a full refund. For that reason and others, summary judgment is **GRANTED** for Tawkify and against Stanfield.

## STATEMENT

Plaintiff Jeremy Stanfield paid $3700 to an online dating service to line up six dates. After two dates, neither to his liking, he cancelled the contract and demanded a full refund from defendant Tawkify, Inc., a matchmaking-style dating service. Tawkify had already begun arranging his third date, so it promptly refunded a pro rata amount, namely half of the contract price. Stanfield then demanded all $3700 and threatened to file a lawsuit, which he did (this suit) less than two weeks later. Before service of the complaint, however, Tawkify refunded the balance of the entire $3700. All of this occurred within a forty-day period. This order holds that Stanfield got more than he was entitled to get under California's Dating Services Contract Act, the predicate for this entire lawsuit. The details are as follows.

On June 29, 2020, Stanfield purchased from Tawkify an all-inclusive "6 Match Standard Client Package" for $3700, negotiated down from $5400. When purchasing the package, Stanfield checked a box confirming that he had read and agreed to Tawkify's policies prior to entering the contract (Stanfield Dep. 209:14–25). Stanfield received his receipt via email, which contained links to Tawkify's terms of use, privacy policy, and refund policy. Stanfield testified that he clicked on each link and reviewed the documents (Stanfield Dep. at 48:7–21; Dkt. 89-1 at 24). Tawkify's refund policy stated: "Client packages run in all-inclusive 'match cycles,' with all work performed to find and select each match, plan and coordinate a date to introduce the client to that match, and obtain/provide post-introduction feedback included" (Dkt. 89-1 at 55).

On Saturday July 11 and Tuesday July 14, Stanfield went on his first two dates. If this case went to trial, there would be two sides as to why the dates did not go well. Tawkify would say that Stanfield showed up late for both dates and had misrepresented his preferences to Tawkify (which will not be revealed here, to preserve his privacy). Stanfield also insisted on only in-person dates, despite joining Tawkify in the middle of the COVID-19 pandemic, thus limiting the available dating pool. For his part, Stanfield would say that Tawkify completely neglected his preferences when selecting women for the dates. It is unnecessary to be concerned about these details because he does not ask for a refund based on bad dates and because, more importantly, this case fails on more fundamental grounds.

On Friday July 17, Stanfield text messaged a customer service representative for Tawkify, saying that "I'd like a full refund processed today. I don't wish to discuss this or book time again for someone to be late and/or not communicate with me in a timely fashion" (Dkt. 96-2 at 42–43). A customer service representative emailed Stanfield three times on Sunday July 19, in response to the text message. On Tuesday July 21, Stanfield replied with a list of grievances and said, "I'd like a full refund processed today and if you want me to sign a non-disclosure agreement or gag order to get all my money back, I'll be happy to do so. [¶] I spoke to my attorney this morning and he suggested I offer that to your company" (Dkt. 96-2 at 83).

2

On Wednesday July 22, Stanfield and the customer service representative exchanged a few more emails before Stanfield affirmed, "Yes I want a full refund and it was much more than a disconnect with my matchmaker. Anyways, please refund all $3700 of my money today." The representative confirmed the cancellation of Stanfield's account and informed him "Once your refund is cleared it takes 45–60 days for processing" (Dkt. 96-2 at 56–57). Stanfield sent three follow-up emails expressing displeasure with the wait time for the refund. On Tuesday July 28, a customer service representative informed Stanfield that his refund request had been prioritized.

On Sunday August 1, Stanfield received a refund of $1850. He immediately emailed Tawkify's customer service asking why only half of his money was refunded. When a representative reached out to clarify the issue two days later, on August 3, Stanfield responded, "If I don't get the rest of my money back, be prepared to get sued and I'll make sure it's a class action and anyone else you've taken advantage of like this will also get there [*sic*] money back!" Again, on August 4, Stanfield threatened legal action (Dkt. 96-2 at 50):

> Again I have all this in writing and I'll be contacting my lawyer to start legal action against your company.
>
> I have what I need to proceed legally and I promise you it will cost you a lot less just to give me my money back in full!
>
> You have wasted enough of my time and you need to give me the rest of my money back or prepared to get sued and it's going to cost you A LOT MORE than the $1800 you owe me!

After no response, on Friday August 7, shortly after midnight, Stanfield emailed, "This will be my last message before I file a lawsuit against your company. . . . If I don't hear from someone by the end of the day tomorrow, then I will proceed with legal action." A customer service representative replied around eleven in the morning repeating Tawkify's refund policy and explaining that Stanfield was not entitled to a full refund.

Eight days later, on Sunday August 15, Stanfield filed this lawsuit against Tawkify. The complaint asserted that his contract with Tawkify violated DSCA by failing to include certain required provisions. It further alleged that Tawkify violated the DSCA by having an unlawful

3

refund policy and failing to provide a full refund within ten days after Stanfield cancelled the contract. The complaint also included claims under UCL and CLRA.

On August 26, before plaintiff served the complaint and summons (on September 9), and only forty days after Stanfield's initial grievance, Tawkify refunded the remaining $1850 to Stanfield, for a grand-total refund of all $3700. At no time prior to the total refund did Stanfield serve on Tawkify a demand for a refund within ten days. When he got around to serving the complaint and summons, such a demand was included in the pleading, but that was *after* the full refund. Again, the time between Stanfield's initial request to cancel and the receipt of all his money was forty days.

Eventually, the complaint was amended but still included three claims alleging that Tawkify (1) violated the Dating Services Contracts Act (DSCA), Cal. Civ. Code § 1694, *et seq.*; (2) violated the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*; and (3) violated the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750, *et seq.* (Dkt. 26).

An order previously converted Tawkify's motion to dismiss into a motion for summary judgment and held it in abeyance while the parties conducted discovery. Following three months of discovery, Tawkify now renews its motion for summary judgment as to all of Stanfield's claims.

**ANALYSIS**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are ones that might affect the outcome of the case under the governing, substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Rule 56 does not require the moving party to negate its opponent's claims but only show that the evidence

4

has failed to amount to a genuine issue of material fact. *Ibid*. If the moving party can meet this burden of production, then the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ibid*. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. If the nonmoving party fails to show that there is a genuine issue of material fact, the moving party's motion for summary judgment should be granted. *See Celotex Corp.*, 477 U.S. at 323.

1. **DATING SERVICES CONTRACTS ACT.**

The DSCA requires that a dating service contract contain a three-day right to cancel and get a full refund. The contract must include the name and appropriate mailing address to send a notice of cancellation. Cal. Civ. Code § 1694.2(b)–(c). The contract omitted these terms. Any dating service contract that does not comply with Sections 1694, *et seq.*, is "void and unenforceable." Cal. Civ. Code §§ 1694.2(e), 1694.4(a). If a dating service contract fails to comply with Sections 1694, *et seq.*, the buyer may, at any time, cancel the contract. Cal. Civ. Code § 1694.2(e). "Cancellation occurs when the buyer gives written notice of cancellation by mail, telegram, or delivery to the seller at the address specified in the agreement or offer." Cal. Civ. Code § 1694.1(b)(1). "In the case of a dating service contract with an online dating service, cancellation occurs when the buyer gives written notice of cancellation by email to an email address provided by the seller." Cal. Civ. Code § 1694.1(b)(2).

When enacted in 1989, the DSCA required that if a subscriber cancelled the contract within three business days after entering the contract, the dating service would have to refund all payment except for any services rendered before cancellation. This created a loophole that dating services exploited. Services would promise clients a "cooling-off" period to decide on the contract, but the services would frontload their work in those first three days. So, when consumers tried to cancel the contract at the end of the cooling-off period, the dating services would withhold the bulk of the fees paid, claiming that most of the value of the contract was based on an introductory questionnaire and analysis thereof (Dkt. 96-3 at 359). To close this loophole, the legislature amended the DSCA in 1993, requiring that *all* moneys paid be

5

refunded if the client cancelled a dating service contract within three business days of entering it. Cal. Civ. Code § 1694.1(e).

Here, however, Stanfield cancelled his contract well after the end of the statutory three-day, cooling-off period.

Stanfield invokes a different provision, namely Section 1694.2(e), which allows, as stated, the buyer of a dating service contract to cancel at any time if the contract fails to include certain mandatory provisions. Stanfield correctly points out that Tawkify's contract failed to include three statutorily required clauses: (1) a statement detailing that "the buyer, may cancel this agreement, without any penalty or obligation, at any time prior to midnight of the original contract seller's third business day following the date of this contract"; (2) "the name and address of the dating service operator to which the notice of cancellation is to be mailed . . ."; and (3) language providing that "[i]f by reason of death or disability the buyer is unable to receive all services . . . the buyer and the buyer's estate may elect to be relieved of the obligation to make payments for services other than those received before death or the onset of disability . . . ." Cal. Civ. Code §§ 1694.2(b)–(c), 1694.3(a)(1).

Stanfield argues that the cooling-off provision of Section 1694.1(e) that allows cancellation within the first three days and requires a full refund within ten days should apply to cancellations allowable "at any time" pursuant to Section 1694.2(e).

Tawkify disputes this melding of Sections 1694.1 and 1694.2. Section 1694.1 only concerns the three-day, cooling-off period while Section 1694.2 allows a buyer to cancel "at any time" if the agreement fails to include the mandatory provisions. Section 1694.1 only applies to cancellations occurring within the three-day, cooling-off period. Once the three days pass and dates begin, the refund becomes pro rata. Tawkify also points to Section 1694.4(d) to support its claim that the DSCA only entitles Stanfield to "receive a refund or refund credit of that portion of the cash price as is allocable to the services not actually received . . . ." Thus, since Stanfield went on two dates and, according to Tawkify, the dating service had begun planning Stanfield's third match, Tawkify only owed Stanfield a refund for three matches out of the six.

6

1          This order agrees mostly (but not completely) with Tawkify. Stanfield incorrectly assumes that the full refund of Section 1694.1 applies to the voidable contract of Section 1694.2. Section 1694.1 clearly concerns only cancellations during the three-day, cooling-off period; the first and last parts of the section both specifically identify the three-day period at issue: Section 1694.1(a) introduces the rule that "the buyer has the right to cancel a dating service contract or offer, until midnight of the third business day after the day on which the buyer signs an agreement . . . ."; Section 1694.1(f) provides that "[t]he buyer may notify the dating service of his or her intent to cancel the contract within the three-day period specified in this section and stop the processing of a credit card voucher or check by telephone notification to the dating service." Cal. Civ. Code § 1694.1. Section 1694.1(b) through (d) describe how customers should provide notice of cancellation within those three-days.

By contrast, Section 1694.2 does not concern itself with the three-day, cooling-off period. Instead, Section 1694.2 is a more general and additional right in favor of the consumer. Section 1694.2(a) through (d) focus on the contractual provisions that dating service contracts must or must not include. Section 1694.2(e) provides that "[i]f a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract." So, while Section 1694.1 focuses on cancellations during the three-day, no-fault, cooling-off period, Section 1694.2 separately focuses on cancellations due to noncompliant dating service contracts. Nothing in the text of the statute indicates that both types of cancellations get full refunds and get them within ten days. To allow a customer to go on, say, five or even six dates out of six and then demand a full refund under Section 1694.2 would violate fairness and commonsense.

The evidence of legislative intent provided by both parties confirms this. When revising the DSCA in 1993, the legislature instituted the full refund only for cancellations occurring within the three-day, cooling-off period. Stanfield provides Attorney General Daniel E. Lungren's explanation of the revisions of the DSCA, which contained the following statements (Dkt. 96-3 at 359):

> Cooling[-]off periods are utilized in many types of transactions to counter hard sell and misleading solicitations which tend to take advantage of consumers. . . . Unfortunately, that legislation has created a trap for the unwary, or even the wary, and the statute has been misused by some companies . . . .
>
> Consumers relying on this statute have been led to be less cautious about signing because the contract refers to a cooling[-]off period and they have thus been blindsided . . . .
>
> AB 1323 would provide the protection anticipated by the 1989 statute by deleting the provision for payment of services prior to cancellation as exists in the other cooling[-]off statutes . . . .

Tawkify points to state legislators' descriptions of the DSCA revisions (in Stanfield's exhibits appended to his opposition to this motion) (Dkt. 96-3); correspondence sent by State Assemblywoman Jackie Speier, who introduced the revisions, described the changes as "clarify[ing] existing law regarding the right of a consumer to obtain a full refund of monies paid to a weight loss center or dating service if the consumer cancels the contract within three business days" (Dkt. 96-3 at 388). The Senate Rules Committee's 1993 Digest of Significant Legislation also described the revisions as "[a]llow[ing] buyers that contract for dating and weight loss services to exercise their right to cancel the contract within three business days without penalty or obligations and language to that effect would appear on the contract" (Dkt. 96-3 at 394).

These excerpts reveal that the legislature revised the DSCA to combat dating services' exploitation of the original cooling-off period; the legislature did not mention any issues with the conduct of dating services after the three-day period, and so its revisions to the DSCA did not change the remedies already available of dating service contracts after the three-day, cooling-off period. The remedy of pro rata refunds was already available under Section 1694.2 and was available "at any time." The 1993 amendment added the additional remedy of a full refund within the first three days — no questions asked. But after the first three days, the preexisting set of remedies continued unchanged. To hold otherwise, as stated, would allow a consumer to go on five or six dates and then demand a full refund. This would be unfair and surely not what the legislature intended.

8

Moreover, with the exception of the three-day cooling-off period, the DSCA itself otherwise provides only for prorated refunds. Two provisions provide for prorated refunds. Section 1694.3, concerns cancellations due to death, disability, or relocation. Section 1694.3(a)(2) provides that "[i]f the buyer has prepaid any amount for services, so much of the amount prepaid that is allocable to services that the buyer has not received shall be promptly refunded to the buyer . . . ." Section 1694.3(b) repeats the exact same phrase.

And, the DSCA also applies a prorated refund in Section 1694.4, which provides:

> Notwithstanding the provisions of any contract to the contrary, whenever the contract price is payable in installments and the buyer is relieved from making further payments or entitled to a refund under this chapter, the buyer shall be entitled to receive *a refund or refund credit of that portion of the cash price as is allocable to the services not actually received by the buyer*. The refund of any finance charge shall be computed according to the "sum of the balance method," also known as the "Rule of 78."

(emphasis added). In fact, the DSCA provided only for prorated refunds until the 1993 amendment called for a full refund in the specific scenario of a cancellation within the first three days. The full refund was part and parcel of the cooling-off period in the first three days, completely distinct from the other cancellation-related provisions.

Section 1694.2(e) provides that "[i]f a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract." Section 1694.4(a) reaffirms that "[a]ny contract for dating services which does not comply with this chapter is void and unenforceable." Thus, the prorated refund described in Section 1694.4 more aptly applies to this scenario than the full refund provided by Section 1694.1.

Stanfield points out that Section 1694.4(d) specifically identifies "installment contracts" as eligible for prorated refunds, whereas he paid a single sum of $3700 under his contract with Tawkify. However, Stanfield repeatedly invoked Section 1694.4(d) in his first amended complaint, thereby conceding its application to this lawsuit (Dkt. 26 at ¶¶ 37, 53, 71, 72). And, while Section 1694.4(d)'s installment contract language does not perfectly fit the single payment at issue here, it also refers to contracts "entitled to a refund under this chapter." This is very analogous to our situation. Tawkify refunded Stanfield based on the number of "match

9

cycles" that Stanfield underwent. Tawkify recognized the value of each individual cycle in its refund, thus treating Stanfield's payment likes installments for each cycle.

As for caselaw, *Howell v. Grindr (Howell II)* concerned a dating service contract with the same deficiencies as Tawkify's contracts. 2016 WL 1668243, at *1 (S.D. Cal. Apr. 27, 2016) (Judge Gonzalo P. Curiel). Judge Curiel clearly interpreted the DSCA to provide that "[w]hen a dating service violates the DSCA and a buyer cancels the contract, the dating service shall refund a pro rata portion of the services not received." *Id.* at *4.

In *Adelman v. Spark Networks Ltd.*, a California court of appeals affirmed the trial court's dismissal of the plaintiff's putative class action complaint, where the plaintiff alleged the defendant's dating service contract was void because it did not include the disclosure provisions required by the DSCA; the plaintiff claimed he was entitled to "to either a full refund or a refund of the price minus the reasonable value of the services received." 2008 WL 2108667, at *1–2 (2008). The court found that the plaintiff suffered no injury, in part because he continued to pay for the service and the price paid was "worth the services" he received.

This order holds that the statutory interpretation and caselaw indicate that Tawkify owed Stanfield only a prorated refund for services not yet received when Stanfield cancelled, namely, for four dates.

There is also a question as to *when* a cancelling subscriber must receive his refund. While Stanfield used Tawkify's service, Tawkify had a practice of informing clients that a refund could take up to sixty days to process (Schultz Dep. 175:16–177:19). Stanfield argues this policy was a violation of the DSCA, which, he claims, required refunds to be processed within ten days. However, Stanfield's argument about refund timing once again rests on Section 1694.1, the section concerning cancellations during the cooling-off period. Section 1694.1 requires that a refund must be issued "within 10 days of receipt of the notice of cancellation." As this order has already discussed, Stanfield is mistaken in applying Section 1694.1 requirements to cancellations made pursuant to other sections of the DSCA. None of the other DSCA sections require that refunds be given by a certain time. Section 1694.3, which provides that clients of dating services can be relieved of a contract due to relocation,

death, or disability only mentions that a prorated refund must be "promptly refunded to the buyer" upon relocation. This section does not give a specific time frame, nor would it be applicable to Stanfield's reason for cancellation.

*Howell II* applied the ten-day timeframe to a refund made pursuant to Section 1694.2, but this ruling is not persuasive. Instead, the refund must be made promptly within a reasonable period of time.

This order finds that Tawkify's shortfalls in the contract language under the DSCA entitled Stanfield to the prorated share of the fees paid for services not yet received by Stanfield and no more. Thus, upon Stanfield's cancellation, Tawkify owed Stanfield a prorated share of the $3700 that Stanfield paid for services he had not yet received, four of the six dates, and this should have been paid promptly within a reasonable period of time.

**2.  STANFIELD'S REFUND.**

This order will now assess whether Stanfield received an adequate, prorated refund within a prompt, reasonable period of time. This order holds that he did and, in fact, received more than he deserved under the DSCA.

**A.  *REFUND AMOUNT.***

Tawkify contends that since it began working on finding a match for Stanfield's third date, Tawkify was entitled to retain the value of three dates. Tawkify's refund policy stated that "Client packages run in all-inclusive 'match cycles,' with all work performed to find and select each match, plan and coordinate a date to introduce the client to that match, and obtain/provide post-introduction feedback included" (Dkt. 50-1 at 4). Stanfield testified that he clicked on the links to Tawkify's refund policy when he received his receipt via email after entering the contract (Stanfield Dep. 48:7–21). Stanfield also checked a box confirming that he had read and agreed to the policy prior to entering the contract (Stanfield Dep. at 209:14–25). Thus, Tawkify argues that $1850 was the proper refund amount in light of the contract's terms.

However, the DSCA required that, upon cancellation, the dating service must give a refund of the contract price "allocable to services not actually received by the buyer." Cal.

11

Civ. Code § 1694.4(d). Stanfield never actually received a third match from Tawkify. Tawkify's contract was also voidable under the DSCA for its lack of statutorily required provisions, so Tawkify's refund policies are not binding. Thus, this order finds that Stanfield was owed the value of the four dates or $2467. Thus, Tawkify not only adequately refunded Stanfield but over-refunded him by $1233.

### B.    TIMING OF REFUND.

As to the timing of the refund, both parties agree that Stanfield received the initial refund of $1850 on August 1, 2020. Stanfield sought to cancel the contract on July 17 via text message, demanding that he get "a full refund processed today." He repeated those words in an email on July 21. On July 22, he again requested "a full refund" and "please refund all $3700 of my money today." Stanfield's demands that he receive his refund that very day rated as unreasonable and had no legal force. Nothing in the DSCA provided for an immediate refund. On the other hand, Tawkify's practice of informing customers that their refunds may take 45 to 60 days to be processed also lacked legal force. Under the DSCA, Stanfield was only owed a refund within a prompt, reasonable period of time. While Stanfield filed his lawsuit very quickly (though he did not serve it as quickly), his filing in no way shortened the prompt, reasonable period available to make the refund (and he cites no authority to the contrary).

The DSCA originally required that cancellation be given by mail or telegram. After a 2017 amendment, the DSCA also allowed buyers to cancel via email. The amendment did not provide for cancellation by text message. Thus, the effective date of Stanfield's cancellation was when he emailed Tawkify on July 21. Stanfield received his entire refund 36 days after this date. This order holds that in the circumstances of this case, the refund was done promptly and reasonably so as to satisfy the DSCA. Even if we use forty days (from the date of the text message), that too was prompt and reasonable.

Even supposing the DSCA did require a refund in this scenario to be delivered within ten days, Stanfield never served such a ten-day demand prior to the full refund. In none of his correspondences with Tawkify did Stanfield ever demand a refund within ten days. It was not

until he filed his complaint on August 15, which was not served on Tawkify until well after Stanfield had been fully refunded, that he asked for a refund within ten days.

Assuming arguendo, that Tawkify was obligated to refund within ten days, Stanfield has already been compensated for any lost time value of money, for the over-refund covered more than the lost interest. At California's statutory interest rate of 10% per annum, the lost interest would be dramatically less than the over-refund of $1233. Cal. Civ. Pro. § 685.010(a); *see Northrop Corp. v. Triad Intern. Marketing, S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988); *see also ITN Flix, LLC v. Trejo*, 2020 WL 5820978, at *4 (C.D. Cal. Sep. 30, 2020) (Judge Otis D. Wright). Even if the interest were trebled, this overcompensation would still be true in spades. Stanfield has been grossly overpaid.

Thus, Stanfield's DSCA violation claim is **DISMISSED**.

### 3. STATUTORY STANDING UNDER THE UCL AND CLRA.

Stanfield's UCL and CLRA claims rely on the alleged DSCA violations. Stanfield's standing under these statutes does not need to be addressed because his claims clearly fail on the merits and are therefore **DISMISSED**.

### 4. ARTICLE III STANDING.

There is no reason for this order to address Stanfield's Article III standing as to his claims, as this order dismisses his entire case on the merits.

Likewise as to plaintiff's contention that his request for injunctive relief should be remanded. This case was removed on diversity grounds and diversity still exists to decide the foregoing: what the DSCA means and whether Stanfield has been fully repaid (the predicate of Stanfield's UCL and CLRA claims). There is no point remanding to state court Stanfield's request for injunctive relief because doing so would be a waste of judicial resources. *Polo v. Innoventions Int'l*, LLC, 833 F.3d 1193, 1198 (9th Cir. 2016). Contrary to plaintiff's assertion, *Davidson v. Kimberly-Clark Corp.* is inapplicable because the Court has not found that it lacks jurisdiction over this matter. 889 F.3d 956, 970 (9th Cir. 2018).

**CONCLUSION**

To the extent stated herein, summary judgment is **GRANTED** for Tawkify and against Stanfield. Judgment will be separately entered.

**IT IS SO ORDERED.**

Dated: September 15, 2021

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE